**15-25-00136-CV**

ACCEPTED
15-25-00136-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/14/2025 1:41 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/14/2025 1:41:19 PM
CHRISTOPHER A. PRINE
Clerk

No. _____

_____

# In the Court of Appeals for the Fifteenth Judicial District

_____

*In re: Silver Star Properties REIT, Inc., et al., Relators*

Original Proceeding from the Texas Business Court,
Eighth Division, Fort Worth, Texas, Cause No. 25-BC08B-0016
Hon. Brian Stagner, Judge Presiding

_____

# PETITION FOR WRIT OF MANDAMUS

_____

**This Petition for Writ of Mandamus seeks to have the Eighth Division's lack of jurisdiction declared in time to prevent a Temporary Injunction currently scheduled for Wednesday, August 20, 2025, at 1:30 p.m. By separate motion, Relators will ask this Court to stay that hearing to give this Court additional time to resolve the jurisdictional issue.**

Walter L. Taylor
State Bar No. 19727030
*taylorlawfirmdfw@gmail.com*
**TAYLOR LAW FIRM**
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700
**ATTORNEY FOR RELATORS**

## IDENTITIES OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 52.3(a), the following is a list of all parties and the names and addresses of all counsel:

| Relators | Trial/Appellate Counsel for Relators |
|---|---|
| Silver Star Properties REIT, Inc. | Walter L. Taylor |
| Silver Star CRE, LLC | E-mail: *taylorlawfirmdfw@gmail.com* |
| Silver Star CRE II, LLC | **TAYLOR LAW FIRM** |
| Silver Star Delray, LLC | 6630 Colleyville Blvd, Suite 200 |
| | Colleyville, Texas 76034 |
| | Tel: (817) 770-4343 |
| | Tel: (512) 474-6600 |
| | Fax: (512) 474-6700 |

| Real Parties in Interest | Trial/Appellate Counsel Real Parties in Interest |
|---|---|
| BSPRT CRE Finance, LLC | Jacob Sparks |
| FBRED BDC Finance, LLC | Email: *Jacob.Sparks@NelsonMullins.com* |
| BSPRT CS Loan, LLC | Brent T. Buyse |
| | Email: *Brent.Buyse@NelsonMullins.com* |
| | Xenna K. Davis |
| | Email: *Xenna.Davis@NelsonMullins.com* |
| | **NELSON MULLINS RILEY & SCARBOROUGH, LLP** |
| | 5830 Granite Parkway, Suite 1000 |
| | Plano, Texas 75024 |
| | Tel: (469) 484-4758 |
| | Fax: (469) 828-7217 |

Respondent

Hon. Brian Stagner
Judge Presiding
Texas Business Court
Eighth Division
1515 Commerce Street, Ste. 170
Fort Worth, TX 76102
*BCDivision8B@txcourts.gov*

# TABLE OF CONTENTS

Identities of Parties and Counsel ................................................................ 2

Table of Contents ...................................................................................... 3

Index of Authorities .................................................................................. 5

Statement of the Case ................................................................................ 8

Statement of Jurisdiction .......................................................................... 9

Why the Court Should Hear the Case ........................................................ 9

Issue Presented .......................................................................................... 9

*Issue: The trial court abused its discretion by refusing to rule on its jurisdiction before proceeding to trial on Relators' Application for Temporary Injunction, in applying the law incorrectly as to both the procedure and legal standard for ascertaining jurisdiction, and interpreting the jurisdictional statute incorrectly. This exposes the litigants to the risk of void orders. This Court should provide guidance and issue a writ of mandamus instructing a prompt remand.*

Statement of Facts ................................................................................... 12

Argument ................................................................................................. 19

I. Mandamus Standard ............................................................................. 20

A. Abuse of Discretion ............................................................................ 20

B. No Adequate Remedy by Appeal ......................................................... 21

II. The Texas Business Courts' Jurisdictional Grant Is Extremely Narrow and Limited by Types of Cases and the "Amount in Controversy" ............................. 21

A. Texas Business Courts Have Thus Far Adopted an Unwieldy

    Approach, Not Well-Suited for Emergency Relief Cases ................................. 22

B. Most Texas Courts Have Extremely Broad Jurisdiction, Which

    Includes an Overwhelming and Increasing Flood of Sovereign

    Immunity Arguments ................................................................................. 25

C. Texas Business Courts' Jurisdictional Grant Is Narrower and

More Like That of Federal Courts, Which Lends Itself to a

Much Easier and Swifter Determination of Jurisdiction ................................. 26

D. This Court Should Reject Theoretical or Speculative Guesses

About the "Value of the Injunctive Relief" ....................................... 29

III. Mandamus Must Issue to Ensure Prompt Remand to the Only Court with Subject-Matter Jurisdiction, So Valuable Rights Are Not Compromised ....................................................................................................... 32

Conclusion and Prayer ................................................................ 32

Certification ............................................................................ 34

Certificate of Compliance ........................................................... 34

Certificate of Service ................................................................. 34

Appendix ................................................................................ 36

Verification ............................................................................. 37

# INDEX OF AUTHORITIES

**CASES:**

*Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755 (Tex. 2018) .............. 26

*Ben Bolt-Palito Blanco Consol. ISD v. Texas Political Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320 (Tex. 2006) ....................................................... 25

*Black Mountain SWD, LP v. NGL Water Solutions Permian, LLC*, 2025 Tex. Bus. 24 (Tex. Bus. Ct.—Eighth Div. 2025) ................................................................ 30

*C Ten 31 LLC v. Tarbox*, 2025 Tex. Bus. 1 (Tex. Bus. Ct.—Third Div. 2025) .... 23

*City of Mission v. Cantu*, 89 S.W.3d 795 (Tex. App.—Corpus Christi 2002, no pet.) ........................................................................................................................ 26

*ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867 (Tex. 2010) ................. 32

*Hillman v. Nueces Cty.*, 579 S.W.3d 354 (Tex. 2019) .......................................... 26

*Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848 (Tex.2017) ... 32

*Huie v. DeShazo*, 922 S.W.2d 920 (Tex. 1996) (orig. proceeding) ...................... 21

*In re Am. Homestar of Lancaster, Inc.*, 50 S.W.3d 480 (Tex. 2001) .................... 20

*In re ETC Field Services, LLC*, 707 S.W.3d 924 (Tex. App.—Fifteenth Dist. 2025) (orig. proceeding) ........................................................................................ 11, 20

*In re GlobalSanteFe Corp.*, 275 S.W.3d 477 (Tex. 2008) …............................... 21

*In re Panchakarla*, 602 S.W.3d 536 (Tex. 2020) (orig. proceeding) .................... 11

*In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124 (Tex. 2004) ....................... 11, 21

*In re Shipman*, 540 S.W.3d 562 (Tex. 2018) (orig. proceeding) ........................... 21

*In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017) ......................................... 21

*In re Torres*, 2017 WL 2665986 (Tex. App.—Corpus Christi 2017) (orig. proceeding) ..................................................................................... 21

*M&M Livestock, LLC v. Robinson*, 2025 Tex. Bus. 29 (Tex. Bus. Ct.—Eighth Div. 2025) ………………………………….……………….................................. 30

*Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738 (Tex. 2019) ...................................................................................................... 25

*Royal Canin U.S.A, Inc. v. Wullschleger*, 604 U.S. 22 (2025) ............................................................................................................... 28, 29

*Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648 (Tex. 1994) ...................................................................................................................... 32

*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004) ...................................................................................................... 23

*Waak v. Rodriguez*, 603 S.W.3d 103 (Tex. 2020) ............................................... 31

*Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992) (orig. proceeding)...................... 21

**CONSTITUTIONAL PROVISIONS:**
TEX. CONST. art. I, § 13 ........................................................................... 11
TEX. CONST. art. V, § 8 ............................................................................ 25

**STATUTES:**
21 U.S.C. § 301 *et seq.* ........................................................................... 28
28 U.S.C. § 1331 ........................................................................................ 27
28 U.S.C. § 1332(a) ................................................................................... 27
28 U.S.C. § 1441(a) ................................................................................... 28
TEX. GOV'T CODE § 24.007 ................................................................... 25
TEX. GOV'T CODE § 24.008 ................................................................... 25
TEX. GOV'T CODE § 25A.001(8) ........................................................... 31
TEX. GOV'T CODE § 25A.004(b) ............................................................ 22
TEX. GOV'T CODE § 25A.004(b)(4) ....................................................... 19
TEX. GOV'T CODE § 25A.004(b)(5) ....................................................... 19
TEX. GOV'T CODE § 25A.004(c) ............................................................ 22
TEX. GOV'T CODE § 25A.004(d) ............................................................ 22
TEX. GOV'T CODE § 25A.004(d)(1) .................................................. 18, 22

TEX. GOV'T CODE § 25A.004(d)(3) ........................................................ 18, 22
TEX. GOV'T CODE § 25A.007(a) ............................................................ 11
TEX. GOV'T CODE § 311.034 .................................................................. 26

**RULES:**

TEX. R. APP. P. 9.4(i)(1) ……………………………………………35
TEX. R. APP. P. 52.3(a) ........................................................................... 2
TEX. R. APP. P. 52.3(j) ...........................................................................35
TEX. R. CIV. P. 680 ................................................................................ 24

**STATEMENT OF THE CASE**

*Nature of the Case*: This mandamus action arises out of the Eight Division's refusal to remand for lack of jurisdiction, as well as its refusal to determine whether it actually has jurisdiction over the case before proceeding to hear the Silver Star Relators' Application for Temporary Injunction. *Appendix 1-2*. Relators sued their lenders – the BSP Real Parties in Interest – primarily for injunctive relief to ensure Relators' liquidity during the life of this lawsuit, in which Relators seek declaratory and injunctive relief (provided for in the loan agreements – [*Appendix 4, Ex. 2*]) that BSP's collection conduct is unreasonable, that Relators' defense(s) to BSP's declarations of non-monetary default are valid, injunctive relief for operational expenses less than $10 million, and unspecified damages for various Texas lender liability torts. *Appendix 3-4*.

*Respondent*: The Honorable Brian Stagner, Judge Presiding, Texas Business Court, Eighth Division

*Parties*:

Relators Star Properties REIT, Inc., Silver Star CRE, LLC, Silver Star CRE II, LLC, and Silver Star Delray, LLC are the Plaintiffs below.

Real Parties in Interest BSPRT CRE Finance, LLC, FBRED BDC Finance, LLC, and BSPRT CS Loan, LLC, are the Defendants.

*Course of Proceedings*: In the 48th Judicial District Court of Tarrant County, the Silver Star Relators obtained a Temporary Restraining Order on August 4, 2025, which set Relators' Application for Temporary Injunction for August 12, 2025. *Appendix 5*. Before that hearing could take place, the BSP Real Parties in Interest filed a Notice of Removal to the Texas Business Court, Eighth Division. *Appendix 10*. Relators immediately moved for an expedited remand because the Eighth Division lacks jurisdiction. *Appendix 2*. Without ruling on its jurisdiction first, and speculating on how the jurisdictional statute might incorrectly apply, Respondent scheduled a hearing on the Temporary Injunction, exposing Relators to void orders or rulings. *Appendix 1*. Relators seek a writ of mandamus instructing Respondent he lacks jurisdiction and that he should remand the case promptly to the 48th Judicial District Court of Tarrant County, Texas.

## STATEMENT OF JURISDICTION

This original proceeding arises out of an order entered in the Texas Business Court Eighth Division and is subject to this Court's exclusive jurisdiction under Texas Government Code §25A.007(a), which provides that "the Fifteenth Court of Appeals has exclusive jurisdiction over…an original proceeding related to an action or order of the business court." Tex. Gov't Code §25A.007(a).

## WHY THE COURT SHOULD HEAR THE CASE

As this Court recently noted, "[m]andamus review of significant rulings in exceptional cases would allow this Court 'to give needed and helpful direction to the law that would otherwise prove elusive.'" *In re ETC Field Services, LLC*, 707 S.W.3d 924, 929 (Tex.App. – Fifteenth District 2025) (orig. proceeding). While the Court may not review every claim that a trial court has made a pre-trial mistake, "we cannot afford to ignore them all either." *Id*. Here, the business court's failure to remand or at least follow proper procedures to rule on its subject matter jurisdiction *before* proceeding with injunction proceedings exposes Relator to the risk of void orders. *See, e.g., In re Panchakarla*, 602 S.W.3d 536, 539 (Tex.2020) (orig. proceeding) ("If a trial court issues an order beyond its jurisdiction…such an order is void ab initio").

Given that emergency and expedited relief are the very core of Relator's claims below, receiving void and unenforceable orders is tantamount to losing in its

entirety Relator's right to be heard in a court with subject matter jurisdiction, which violates the open courts provision of the Texas Constitution. TEX. CONST. art. I, § 13. This case therefore presents the type of "exceptional case" where mandamus is "essential to preserve important substantive and procedural rights from impairment or loss." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004).

No. _____

_____

**In the Court of Appeals for the
Fifteenth Judicial District**

_____

*In re: Silver Star Properties REIT, Inc., et al., Relators*

Original Proceeding from the Texas Business Court,
Eighth Division, Fort Worth, Texas, Cause No. 25-BC08B-0016
Hon. Brian Stagner, Judge Presiding

_____

**PETITION FOR WRIT OF MANDAMUS**

_____

**TO THE HONORABLE JUSTICES
OF THE FIFTEENTH COURT OF APPEALS:**

**This Petition for Writ of Mandamus seeks to have the Eighth Division's lack of jurisdiction declared in time to prevent a Temporary Injunction currently scheduled for Wednesday, August 20, 2025, at 1:30 p.m. By separate motion, Relators will ask this Court to stay that hearing to give this Court additional time to resolve the jurisdictional issue.**

The Silver Star Relators file this Petition asking this Court to issue a Writ of Mandamus instructing the Eighth Division below it lacks jurisdiction and instructing it to remand promptly to the 48th Judicial District Court of Tarrant County, Texas.

11

## ISSUE PRESENTED

*Issue: The trial court abused its discretion by refusing to rule on its jurisdiction before proceeding to trial on Relators' Application for Temporary Injunction, in applying the law incorrectly as to both the procedure and legal standard for ascertaining jurisdiction, and interpreting the jurisdictional statute incorrectly. This exposes the litigants to the risk of void orders. This Court should provide guidance and issue a writ of mandamus instructing a prompt remand.*

## STATEMENT OF FACTS

Introduction: BSP became Silver Star's Lender:

Relator Silver Star Properties REIT, Inc., is a self-managed real estate investment trust specializing in the acquisition and management of institutional-grade storage properties. *Appendix 3, Plaintiff's Second Amended POP, ¶5.1*. It also owns and operates office and self-storage assets in Houston, Dallas, McKinney and San Antonio, Texas and Delray Beach, Florida. *Appendix 3, Plaintiff's Second Amended POP, ¶5.2*. In 2024, the Silver Star Relators entered into three financing relationships with the BSP real parties in interest ("BSP"): 1) refinancing the Silver Star office buildings: 2) buying sixteen (16) BSP-foreclosed Walgreens properties directly from BPS (who also loaned the purchase proceeds); and 3) buying a storage facility in Delray Beach, Florida. *Appendix 3, Plaintiff's Second Amended POP, ¶¶5.14-5.22*. The office buildings and Walgreens properties were cross-collateralized. *Appendix 4, Supplemental Application for Temporary Restraining Order, Exhibit 1, ¶7*.

12

The status quo of the loan operations was that the Silver Star Relators collected rents on the commercial properties, which were kept in a Clearing Account, Cash Management Account, or Reserve Accounts – controlled exclusively by BSP. *Appendix 3, Plaintiff's Second Amended POP, ¶5.38; Appendix 5, August 4, 2025, TRO, p.1.* When the Silver Star entities sold properties, proceeds from the sale were also exclusively controlled by BSP – some funds went to pay off principal and interest according to the terms of the loans, while other funds were held in the Reserve accounts – still subject to the exclusive control of BSP. *Appendix 3, Plaintiff's Second Amended POP, ¶5.38.* Silver Star would request operational expenses on a monthly basis, which BSP would approve and release. *Appendix 3, Plaintiff's Second Amended POP, ¶5.38.* Silver Star could not spend its own money without BSP's approval. *Appendix 3, Plaintiff's Second Amended POP, ¶6.6.* As of May 7, 2025, no monetary defaults had occurred. *Appendix 3, Plaintiff's Second Amended POP, ¶5.39-5.41.*

The Litigation:

On May 7, 2025, BSP gave notice of a non-monetary default, claiming Silver Star had provided the wrong kind of financial statements. *Appendix 3, Plaintiff's Second Amended POP, ¶5.39-5.41.* BSP then swept all of Silver Star's reserve accounts (about $8 million, which BSP applied to reduce Silver Star's debt), refused every Silver Star operational expense, and swept all of Silver Star's rents collections

13

without accounting to Silver Star for how it was being applied. *Appendix 4, Exhibit 1, ¶¶44-48; 58.* BSP then went "dark" and stopped communicating with Silver Star's representatives. *Appendix 4, Exhibit 1, ¶¶50.*

Silver Star filed suit in the 48th Judicial District Court of Tarrant County on July 14, 2025, and sought a Temporary Restraining Order compelling BSP to return its roughly $8 million in reserves, among other relief. *Appendix 4, Supplemental Application for TRO, p. 1*. Silver Star also sought declaratory relief on its contractual defense to the alleged non-monetary default and, as expressly authorized by the loan agreements, declaratory relief that BSP's conduct was unreasonable, and injunctive relief to stop it pending the determination of the parties' claims in the litigation (both expressly provided for in the loan agreements – [*Appendix 4, Ex. 2*]). *Appendix 3, Second Amended POP, ¶6.15*. Silver Star also asserted Texas lender liability torts for breach of fiduciary duty (arising out of BSP's exclusive control of Silver Star's operations) and conversion. *Appendix 3, Second Amended POP, ¶¶6.4-6.9.* Though not directly related to its claims for injunctive relief, Silver Star also asserted BSP had committed fraud in a real estate transaction arising out of the Walgreens purchases in which BSP had acted as both seller and lender. *Appendix 3, Second Amended POP, ¶¶6.1-6.3.*

On July 14, 2025, Silver Star's first request for TRO (which included the return of $8 million in reserves) was denied by a visiting judge. *Appendix 4,*

14

*Supplemental Application for TRO, p. 1*. On August 1, 2025 – before the case was removed to business court – Silver Star filed a Supplement Application for Temporary Restraining Order, significantly reducing its "ask." *Appendix 4, Supplemental Application for TRO.* This time, Silver Star sought only its operating expenses between $1-2 million – only the amount necessary to preserve the status quo in which Silver Star collected rents and operated the buildings, so Silver Star could stay in business while the parties litigated their dispute. *Appendix 4, Supplemental Application for TRO, p. 2.*[1]

On August 4, 2025, the Honorable Christopher Taylor entered a Temporary Restraining Order providing as follows:

> To the extent revenues from the Properties (as defined in the Loan Agreements) are currently in the Clearing Account, the Cash Management Account, or the Reserve Accounts (as defined in the Loan Agreements), or collected in such accounts after this Order is signed and before the hearing on Plaintiff's Application for Temporary Injunction set for August 12, 2025, at 10:00, a.m., the BSP Defendants shall release to Silver Star Plaintiffs requested funding, in an amount not to exceed $1.5 million, for (1) the operating expenses of $1,074,039.69 listed in the chart on p. 2 of Plaintiff's Supplemental Application for TRO – with the exception of the tenant refund amount of $55,335.96; and (2) to the extent not duplicative of such amounts,

---

[1] Also on August 1, 2025, Silver Star filed its First Amended Original Petition to drop its negligent misrepresentation cause of action. *Appendix 9.* Despite the filing of its Supplemental Application for reduced injunctive relief [*Appendix 4*], Silver Star's First Amended POP erroneously still contained some of the original language from its first request for injunctive relief (which had already been ruled upon and denied) – claims the Supplemental Application made clear it no longer sought. *Appendix 9.*

the operating expenses listed on pp. 4-5 of Plaintiff's Supplemental Application for TRO

*Appendix 5, p. 1*.

The Temporary Restraining Order set the Temporary Injunction for hearing on Tuesday, August 12, 2025. *Appendix 5, p. 2*.

Removal to Texas Business Courts and Motion for Expedited Remand:

Before that hearing could take place, however, the BSP real parties in interest filed a Notice of Removal to the Eighth Division of the Texas Business Courts. *Appendix 10*. BSP claimed only two bases for removal: 1) Silver Star's claims arose out of a "qualified transaction;"[2] and 2) Silver Star alleged fraud in a real estate transaction against a non-banking entity.[3] *Appendix 10, ¶¶8-9*. As BSP appeared to concede, both grounds require that the "amount in controversy" be in excess of $10 million. Tex. Gov't Code §§25A.004(d)(1) and 25A.004(d)(3). *Appendix 10, ¶¶8-9*. BSP's sole basis for contending the "amount in controversy" was greater than $10 million was a reference to the following vaguely pled paragraph in Silver Star's pleading:

> Texas' Exemplary Damages Act expressly authorizes a plaintiff to recover up to two (2) times its economic damages. Should Silver Star recover economic damages in excess of $100 million, Texas law would authorize an exemplary/punitive damages award up to twice that amount, or in excess of $200 million.

---

[2] Tex. Gov't Code §25A.004(d)(1)
[3] Tex. Gov't Code §25A.004(d)(3)

*Appendix 10, ¶¶9, FN8.* BSP apparently interpreted this paragraph to mean Silver Star was actually seeking such damages, which BSP contended made the case removable to business court. *Appendix 10, ¶¶9, FN8.* BSP cited no other basis for removal. *Appendix 10.*

<u>Silver Star's Motion for Expedited Remand and the Eighth Division's Order Denying It:</u>

Silver Star immediately filed its Second Amended Original Petition. *Appendix 3.* It corrected the erroneous language remaining from its first denied request so the petition conformed to the position to which Silver Star had already retreated in its Supplemental Application – requesting continued injunctive relief it had been granted under the August 4, 2025, TRO (which over the next four months would total between $4-6 million), plus unspecified damages on its causes of action. *Appendix 3, ¶¶9.1-9.6.* It deleted any vague or speculative reference to damages BSP's future actions might cause it in the future, and it continued to seek unspecified damages for its causes of action. *Appendix 3.* It stressed liquidity during the litigation as its priority – all in the form of $4-6 million in injunctive relief, while its damages remained both uncertain and unspecified. *Appendix 3, ¶1.2.* Silver Star also conceded a position BSP had taken in the first TRO hearing on July 14, 2025 – that because the $8+ million in reserves had been applied to Silver Star's debt, it had suffered only nominal or speculative harm, but the absence of the $8+ million made the $4-6 million in operational expenses more critical. *Appendix 3, ¶ 1.3.*

On August 11, 2025, Silver Star filed a Motion for Expedited Remand, emphasizing it sought only injunctive relief of $4-6 million and unspecified damages [*Appendix 2, p. 2*], and notifying the Eighth Division that BSP's sole basis for jurisdiction (which the Eight Division's own precedent said it could not consider for jurisdictional purposes) had been eliminated. *Appendix 2, p. 3*. Silver Star further argued that – even though the transaction out of which the dispute arose was a "qualifying transaction" – the actual "amount in controversy" was less than $10 million because Silver Star sough only $4-6 million in injunctive relief plus unspecified damages, and the Texas Business Courts had no jurisdiction. *Appendix 2, pp. 2-3*. Because its TRO was set to expire the following day, rather than seek to have the TRO extended in a court lacking jurisdiction, Silver Star requested the Eighth Division remand the to the 48th on an expedited basis. *Appendix 2.*

Within roughly two hours, and without making any determination as to whether or not the Eighth Division actually had jurisdiction over the case, the Eighth Division denied the request ("without prejudice to Plaintiff's right to file a renewed motion for remand under standard briefing schedule"). *Appendix 1, p. 2*. Expedited remand, contended the Eighth Division, "is an extraordinary remedy, appropriate – if ever – only where the Court is satisfied there is no colorable basis for jurisdiction. That is not the case here." *Appendix 1, p. 2*. The court then stated "[o]n the contrary, the Court finds it far from clear that jurisdiction is lacking." *Appendix 1, p. 2*. *Sua*

18

*sponte*, the court speculated that jurisdiction "may exist" under BSP's articulated Sections 25A.004(d), and/or Section 25A.004(b)(4) and/or (5), "in view of Plaintiffs' allegations that Defendants exercise control over Plaintiffs' business operations and owe fiduciary duties to Plaintiffs." *Appendix 1, p. 2*. Indicating "these are substantial questions that warrant full briefing and careful consideration," the Eighth Division set Plaintiffs' Second Application for Temporary Injunction for hearing on August 20, 2025, without making any determination as to whether the Eighth Division actually had jurisdiction. *Appendix 1, p. 2*.

Unable to proceed in any other forum, Plaintiffs accepted the opportunity to have their Temporary Restraining Order extended and gave notice of the Temporary Injunction hearing. *Appendix 6; Appendix 8*. Plaintiffs indicated on both the submitted Agreed Order Extending August 4, 2025, TRO and their Notice of Hearing that they were not waiving their jurisdictional arguments – language the court omitted when it entered the Order Extending TRO. *Appendix 6-8*. Plaintiff brings this Petition for Mandamus asking this Court to instruct the Eighth Division it lacks jurisdiction and to remand the case to the 48th District Court.

# ARGUMENT

*Issue: The trial court abused its discretion by refusing to rule on its jurisdiction before proceeding to trial on Relators' Application for Temporary Injunction, in applying the law incorrectly as to both the procedure and legal standard for ascertaining jurisdiction, and interpreting the jurisdictional statute incorrectly. This exposes the litigants to the risk of void orders. This Court should provide guidance and issue a writ of mandamus instructing a prompt remand.*

A) Mandamus Standard:

"A party is entitled to mandamus relief when it demonstrates that the trial court clearly abused its discretion and the party lacks an adequate remedy by appeal." *In re ETC Field Services, LLC*, 707 S.W.3d 924, 926 (Tex.App. – Fifteenth Dist. 2025) (orig. proceeding).

1) Abuse of Discretion:

"A trial court has no discretion to determine what the law is or in applying the law to the facts, and, consequently, the trial court's failure to analyze or apply the law correctly is an abuse of discretion." *In re Am. Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 483 (Tex. 2001). This is true "even when the law is unsettled." *In re Shipman*, 540 S.W.3d 562, 566 (Tex.2018) (orig. proceeding); *In re State Farm Lloyds*, 520 S.W.595, 604 (Tex.2017). A trial court can abuse its discretion in resolving a legal issue even if the issue is a matter of first impression. *Huie v. DeShazo*, 922 S.W.2d 920, 927 (Tex.1996) (orig. proceeding). A trial court clearly abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer*, 827 S.W.2d 833,

20

839 (Tex. 1992) (orig. proceeding). Mandamus relief is available when a trial court litigates the merits of a case and delays ruling on its jurisdiction. *See In re Torres*, 2017 WL 2665986, at \*5 (Tex. App. − Corpus Christi 2017) (orig. proceeding) (collecting cases).

2) No adequate remedy by appeal:

"The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against its detriments." *In re GlobalSanteFe Corp.*, 275 S.W.3d 477, 483 (Tex. 2008). As part of that balancing test, courts consider whether mandamus relief will safeguard "important substantive and procedural rights from impairment or loss." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136. Beyond the impairment of rights, courts should also consider whether mandamus will "allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments." *Id*. Courts should also consider whether mandamus relief will "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings. *Id*. Prudent mandamus relief is also preferable to legislative enlargement of interlocutory appeals. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 137.

B) <u>The Texas Business Courts' jurisdictional grant – unlike other Texas courts – is extremely narrow and limited by types of cases and the "amount in controversy." Beause this more closely resembles the jurisdictional grant of federal courts, this Court should adopt the federal approach for determining jurisdiction and hold that the plaintiff's pleading – even if amended after removal – governs the jurisdictional determination.</u>

This appears to be a case of first impression for this Court to decide what procedural or substantive standards to apply in determining the jurisdiction of Texas Business Courts when that jurisdiction is created solely by the threshold of the "amount in controversy." For example, subsection (b) provides a very limited list of claims for which the threshold amount in controversy[4] is $5 million or more. Tex. Gov't Code §25A.004(b). Subsection (c) removes the monetary threshold where a publicly traded company is a party[5] (facts not present here). Subsection (d) provides a limited list of claims where the "amount in controversy" must be $10 million or more. Tex. Gov't Code §25A.004(d). In this case, both jurisdictional theories asserted by the BSP Defendants in their Notice of Removal required an "amount in controversy" in excess of $10 million. Tex. Gov't Code §§25A.004(d)(1) and (3).

<u>Texas Business Courts have thus far adopted an unwieldy approach, not well-suited for emergency relief cases</u>.

As this Court has not yet had the opportunity to provide guidance, at least one Texas Business Court – the Third Division – has applied Texas' very cumbersome

---

[4] …"excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs." Tex. Gov't Code §25A.004(b).
[5] §25A.004(c).

practice on pleas to the jurisdiction to determine business court jurisdiction. *C Ten 31 LLC v. Tarbox*, 2025 Tex.Bus. 1 (Third Division 2025). In that case, citing and applying *Tex. Dep't of Parks & Wildlife v. Miranda*[6] and other cases involving pleas to the jurisdiction, the Third Division adopted the following time-consuming procedures for amount-in-controversy disputes in Texas Business Courts:

> First, when the plaintiff's petition alleges the amount in controversy, that pleading controls unless (a) a party presents evidence that the amount pleaded is falsely asserted to wrongly obtain or avoid jurisdiction, or (b) a different amount in controversy is readily established, such as by statutorily set fees… Second, when the plaintiff's pleadings are silent as to whether the amount in controversy falls within this Court's jurisdiction, but a removing party's notice of removal properly pleads that the amount is within the Court's jurisdiction, those pleadings will be given the same deference in the remand analysis: they will control absent the circumstances described in (a) or (b) above… Third, in either case, if a party presents evidence demonstrating that the amount in controversy is outside the Court's jurisdiction, the Court will remand the case unless another party presents controverting evidence that, at a minimum, raises a fact issue.

*C Ten 31 LLC v. Tarbox*, 2025 Tex.Bus. 1, ¶¶49-51.

This burden-shifting and heavy briefing approach is ill-advised for Texas Business Courts for at least two reasons. First, it is completely unworkable in the emergency or expedited relief context – as the facts of this case demonstrate. A TRO is good for fourteen (14) days. Tex.R.Civ.P. 680. It can only be renewed once without agreement for an additional fourteen (14) days. *Id*. The TRO must set the

---

[6] 133 S.W.3d 217, 226 (Tex.2004).

temporary injunction for hearing "at the earliest possible date,"[7] which means the temporary injunction hearing quite often must occur within fourteen (14) days, or where (as here) the removal comes on the eve of the temporary injunction hearing, the court's options for briefing may very well be even more limited. For example – what if this removal had occurred (as here) two business days before the temporary injunction hearing, but during the second 14-day TRO period? There is simply not enough time during the emergency relief stage for a court to order briefing, for the parties to attach evidence, make arguments, etc., so the court can determine its jurisdiction under a "normal briefing schedule." Particularly in emergency litigation, but likely in all cases for reasons shown below, this Court should provide a much simpler test so the business courts can determine their jurisdiction (or lack of jurisdiction) quickly, to avoid confusion, the wasting of valuable resources (both the courts' and litigants'), and so that valuable rights such as emergency relief are not compromised by exposing litigants to the risk of void orders while business courts take their time determining jurisdiction.

Second, *Miranda* and Texas plea to the jurisdiction practice developed in far broader contexts than those for which the Texas Business Courts were created. Most Texas courts have extremely broad jurisdiction. For example, district court jurisdiction "consists of exclusive, appellate, and original jurisdiction of all actions,

---

[7] Tex.R.Civ.P. 680

proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court…" TEX.CONST. art. V, §8. District courts also have original jurisdiction over "a civil matter in which the amount in controversy is more than $500, exclusive of interest." Tex. Gov't Code §24.007. District courts can also "hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity." Tex. Gov't Code §24.008. Thus, challenges to district court jurisdiction seldom stem from the types of causes of action pled or the "amount in controversy."

Most Texas courts have extremely broad jurisdiction, which includes an overwhelming and increasing flood of sovereign immunity arguments.

The vast majority of case law developing Texas practice on pleas to the jurisdiction arises out of sovereign and governmental immunity – common-law doctrines that protect a sovereign (i.e., the State and its political subdivisions) from being sued for damages in its own courts without its consent. *Ben Bolt-Palito Blanco Consol. ISD v. Texas Political Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 3209, 323-24 (Tex.2006). Immunity in Texas involves two issues (1) the government's consent to suit and (2) the government's consent to liability. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 746 (Tex.2019). For the Legislature to waiver a governmental unit's immunity from suit, a statute must contain a clear and unambiguous expression of that waiver. Tex. Gov't

Code §311.034; *Hillman v. Nueces Cty.*, 579 S.W.3d 354, 360 (Tex.2019). And the plaintiff must then plead the specific facts necessary to invoke the waiver, and must be careful not to invoke any exceptions that reinstate immunity. *See, e.g., City of Mission v. Cantu*, 89 S.W.3d 795, 813 (Tex.App. – Corpus Christi 2002, no pet.).

The *Miranda* case itself and cases like *Alamo Heights Indep. Sch. Dist. v. Clark,* 544 S.W.3d 755 (Tex. 2018) illustrate the "one size fits all" test the Texas Supreme Court has developed to determine jurisdiction – that is, whether sovereign immunity has been waived in the extremely broad categories of cases district and other courts might hear, and whether the plaintiff has sufficient pled or raised a fact issue on waiver of sovereign immunity:

> A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. When [it] challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction. ***If [it] challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim.***
> [In the latter situation], the standard of review mirrors that of a traditional summary judgment: '[I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal ***plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction.***"

*Alamo Heights*, 544 S.W.3d at 770–71 (quoting *Miranda*, 133 S.W.3d at 221) (other citations omitted).

Texas Business Courts' jurisdictional grant is narrower and more like that of federal courts, which lends itself to a much easier and swifter determination of jurisdiction – what does the plaintiff seek?

Texas Business Courts, in contrast, are more like federal courts – they have much narrower and more limited jurisdiction, measured by the specific type of claim and "amount in controversy." *See, e.g.,* Tex. Gov't Code §§25.004(d)(1) and 25.004(d)(3). In the same way, 28 U.S.C. §1332(a) grants federal district courts power to decide diversity cases between citizens of different states where the amount in controversy is greater than $75,000, and 28 U.S.C. §1331 confers federal question jurisdiction – that is, cases arising under federal law. 28 U.S.C. §1332(a); 28 U.S.C. §1331. For these reasons, the test this Court adopts for determining jurisdiction should mirror the federal test, which provides that – when a plaintiff amends to eliminate claims that would otherwise confer jurisdiction, even after removal and even after a court of appeals decision and remand – jurisdiction no longer exists and remand is required. *Royal Canin U.S.A, Inc. v. Wullschleger*, 604 U.S. 22, 30 (2025).

In *Royal Canin*, the plaintiff sued in Missouri state court over false advertising in the sale of dog food. *Royal Canin*, 604 U.S. at 28. She alleged Royal Canin sold its dog food solely by prescription – not because its ingredients contained any medication making that necessary, but to fool consumers into thinking it did and paying a higher price. *Id*. She originally sued under a Missouri statute, but when she

added claims for violations of the Federal Food, Drug, and Cosmetic Act (FDCA),[8] the Defendant removed the case to federal court pursuant to 28 U.S.C. §1441(a). *Id*. "But that is not where Wullschleger wanted the case to be resolved. So she countered Royal Canin's move: She amended her complaint to delete its every mention of the FDCA, leaving her state claims to stand on their own." *Royal Canin*, 604 U.S. at 29. She then requested remand, which the federal district court denied. *Id*.

The Eighth Circuit reversed, and the Supreme Court affirmed the reversal,[9] writing:

> When a plaintiff amends her complaint following her suit's removal, a federal court's jurisdiction depends on what the new complaint says. If (as here) the plaintiff eliminates the federal-law claims that enabled removal, leaving only state-law claims behind, *the court's power to decide the dispute dissolves*. With the loss of federal-question jurisdiction, the court loses as well its supplemental jurisdiction over the state claims.

*Royal Canin*, 604 U.S. at 30. "'Begin from the beginning: The plaintiff is the master of the complaint,' and therefore controls much about her suit." *Royal Canin*, 604 U.S. at 35. "She gets to determine which substantive claims to bring against which defendants. And in so doing, she can establish – or not – the basis for a federal court's subject-matter jurisdiction." *Id*.

---

[8] 21 U.S.C. §301 *et seq*.

[9] *Royal Canin*, 604 U.S. at 29-30.

Moreover, the Supreme Court made clear that "in cases like this one, [the plaintiff] may decide to plead federal-law claims, or instead to allege state-law claims alone and thus ensure a state forum." *Royal Canin*, 604 U.S. at 35. The Court then went on to write:

> "The District Court here should have remanded Wullschleger's case to state court…[W]hen Wullschleger amended her complaint, the jurisdictional analysis also changed. Her deletion of all federal claims deprived the District Corut of federal-question jurisdiction."

*Royal Canin*, 604 U.S. at 43-44.

This Court should adopt the same approach in analyzing Texas Business Court jurisdiction when it narrowly arises out of the type(s) of claims or the "amount in controversy." Where, as here, the Plaintiffs' live pleading affirmatively *negates* jurisdiction, the only choice for Texas Business Courts should be to remand – just as all federal courts across the nation are now required to do under *Royal Canin, supra*.

This Court should reject theoretical or speculative guesses about the "value of the injunctive relief;" moreover, the Eighth Division's *sua sponte* and offhand reference to the "controlling person" language of §25A.004(b)[10] is misplaced.

The sole grounds for Texas Business Court jurisdiction alleged by BSP below were §25A.004(d)(1) and §25A.004(d)(3)[11] – both of which required that the "amount in controversy" exceed $10 million in damages. It is not enough under

---

[10] Appendix 1, p. 2.
[11] Notice of Removal, Appendix Tab 10, ¶¶8-9.

29

§25A.004(d)(1) that the transaction out of which the claim arises be a "qualified transaction" – which Relators concede it is – the "amount in controversy" must *also* be $10 million or more. §25A.004(d)(1). The Eighth Division's own precedent held that when the plaintiff is the only party seeking relief, "the proper inquiry is to ask what the parties seek to recover, not what they will recover or are likely to recover…" *Black Mountain SWD, LP v. NGL Water Solutions Permian, LLC*, 2025 Tex.Bus. 24, *3, ¶12 (Eighth Division 2025). Here, as shown above, Relators' claims were limited to injunctive relief valued at $4-6 million and unspecified damages; under the Eighth Division's own precedent, whether they might ultimately receive more was irrelevant to jurisdiction. *Id*. BSP's sole argument that plaintiff – the only party seeking damages – sought more than $10 million was the speculative reference in Relators' pleading, which had been deleted.

Even if it had not been deleted, however, nowhere in its pleadings had Relators alleged factually that any BSP actions had already occurred which caused Relators such harm, or that Relators had already suffered such damages. *Appendix 2, p. 3*. Nor did Relators ever actually plead for such damages. *Appendix 2, p. 3*. Further, this offhand and casual reference (on which BSP relied as its sole means of arguing Relators sought more than $10 million) was not tied to any particular theory of recovery, nor was it pled with the degree of factual sufficiency to support a jurisdictional argument. *Appendix 2, p. 3*. Under the Eighth Division's own precedent, "the Court could not consider those

theories or amounts because Plaintiffs did not adequately plead them in their petition."

*M&M Livestock, LLC v. Robinson*, 2025 Tex.Bus. 29, *3, ¶14 (Eighth Division 2025).

Thus, even at the time the case was removed, the Eighth Division had no jurisdiction

and should have immediately remanded to the 48th.

Moreover, the Eighth Division's *sua sponte* and offhand reference to of

§25A.004(b)'s "controlling person" language[12] is misplaced. It is a fundamental rule

of statutory construction that when a statute contains a list, undefined or otherwise

broadening words must be interpreted narrowly to keep the terms within the list. See,

e.g., *Waak v. Rodriguez*, 603 S.W.3d 103, 109 (Tex.2020) (limiting the interpretation

of otherwise expansive words to the specific list of Farm Animal Act activities,

because otherwise the list itself has no statutory meaning). Section 25A.004(b) lists

"controlling person" between "owner" and "managerial official" – which is defined

in the jurisdictional statute as "a governing person or officer." §25A.001(8). Both

"owner" and "managerial official" mean persons within the organization alleged to

be controlled – not outside it – and thus "controlling person" cannot be read to

expand the statute's language to include categories of persons or entities outside the

organization who are not like "owners" or "managerial officials," as the Eighth

Division sought to do.[13] For all of these reasons, the Eighth Division lacked

---

[12] Appendix 1, p. 2.
[13] While neither the court below nor the parties raised it, even if jurisdiction were to turn on the purported value of Relators' right to continue operating, Relators' assets are heavily encumbered

jurisdiction, should have readily ascertained its lack of jurisdiction, and should have remanded the case to the 48th Judicial District Court before hearing Relators' Temporary Injunction.

C) Mandamus must issue to insure prompt remand to the only court with subject-matter jurisdiction, so valuable rights are not compromised and

The Eighth Division abused its discretion by refusing to rule on its jurisdiction before proceeding with the trial on the merits of the temporary injunction, and by applying the wrong law. The Texas Business Courts lack subject matter jurisdiction because the "amount in controversy" is less than $10 million. The Texas Business Courts lack subject matter jurisdiction because the value of the injunctive relief has not been established by competent evidence to be more than $10 million. The Eight Division's insistence on proceeding without first determining its jurisdiction exposes Silver Star to void orders on its injunctive relief – the core of its case. Silver Star has no remedy on appeal, because by the time this matter is litigated to a final judgment, Silver Star will have long lost the opportunity to have its injunctive relief claims heard in a court with subject-matter jurisdiction.

---

and the value of that right is highly speculative. Future profits must be established by competent evidence – not conclusory assumptions –they are not subject to speculation. *See, e.g., Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 859-60 (Tex.2017) *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex.2010); *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994). This further underscores the need for a quick, easy method for determining jurisdiction – leaning even more in favor of the federal approach discussed above.

## CONCLUSION AND PRAYER

**This Petition for Writ of Mandamus seeks to have the Eighth Division's lack of jurisdiction declared in time to prevent a Temporary Injunction currently scheduled for Wednesday, August 20, 2025, at 1:30 p.m. By separate motion, Relators will ask this Court to stay of that hearing to give this Court additional time to resolve the jurisdictional issue.**

For these reasons, Relator prays this Court issue a stay of the proceedings below until this Court has resolved the procedural and substantive issues regarding Texas Business Court jurisdiction, that this Court resolve such issues promptly and reach the only decision the Eighth Division could have properly reached (remand due to lack of subject matter jurisdiction), and issue a writ of mandamus instructing the Eighth Division to remand this case to the 48th Judicial District Court.

Solely in the alternative, and with all of the reservations expressed above that there is simply insufficient time for the Eighth Court to determine its jurisdiction and for this Court to review that decision to ensure Relator's claims for injunctive relief are heard in a court with subject matter jurisdiction, Relator prays alternatively that this Court issue writ of mandamus instructing the Eighth Division to rule promptly and properly on its subject matter jurisdiction, with guidance on the proper legal standard to apply. By separate motion, Relator seeks a temporary stay of the Eighth Division proceedings until this Court has ruled on the writ of mandamus.

33

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
*taylorlawfirmdfw@gmail.com*
**TAYLOR LAW FIRM**
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700
**ATTORNEY FOR RELATORS**

## TRAP 52.3(j) CERTIFICATION

By my signature above, I certify that I have reviewed the Petition and have concluded that every factual statement made in the Petition is supported by competent evidence included in the Appendix or in the record.

## CERTIFICATE OF COMPLIANCE

By my signature above, I certify that this document was produced on a computer using Microsoft Word and contains 5,827 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

## CERTIFICATE OF SERVICE

I hereby certify by my signature above that a true and correct copy of the foregoing document has this day been served via certified mail, return receipt requested, electronic service, facsimile or hand delivery in open court, upon the Real Parties in Interest and Respondent on this 14th day of August, 2025:

**Jacob Sparks**
Email: *Jacob.Sparks@NelsonMullins.com*
**Brent T. Buyse**
Email: *Brent.Buyse@NelsonMullins.com*
**Xenna Davis**
Email: *Xenna.Davis@NelsonMullins.com*
**NELSON MULLINS RILEY &SCARBOROUGH, LLP**

Hon. Brian Stagner
Judge Presiding
Texas Business Court
Eighth Division
1515 Commerce Street, Ste. 170
Fort Worth, TX 76102
***BCDivision8B@txcourts.gov***

No. _____

_____

### In the Court of Appeals for the
### Fifteenth Judicial District

_____

*In re: Silver Star Properties REIT, Inc., et al., Relators*

Original Proceeding from the Texas Business Court,
Eighth Division, Fort Worth, Texas, Cause No. 25-BC08B-0016
Hon. Brian Stagner, Judge Presiding

## INDEX TO APPENDIX

**Tab #  Document**

1. 2025.08.11 Order Denying Without Prejudice Plaintiffs' Motion for Expedited Remand (in the Texas Business Court, Eighth Division)

2. 2025.08.11 Plaintiffs' Motion for Expedited Remand (in the Eighth Division)

3. 2025.08.11 Plaintiffs' Second Amended Original Petition, Application for Temporary Restraining Order, Temporary and Permanent Injunction (in the Eighth Division)

4. 2025.08.01 Plaintiffs' Supplemental Application for Temporary Restraining Order (in the 48th Judicial District Court of Tarrant County)

5. 2025.08.04 Order Granting in Part and Denying in Part Silver Star Plaintiffs' Supplemental Application for Temporary Restraining Order (in the 48th)

6. 2025.08.12 Order Extending August 4, 2025, Temporary Restraining Order (in the Eighth Division)

7. 2025.08.12 Proposed Agreed Order Extending August 4, 2025, Temporary Restraining Order (in the Eighth Division)

36

8. 2025.08.12 Plaintiffs' Notice of Hearing on Plaintiffs' Second Amended Application for Temporary Restraining Order (in the Eighth Division)

9. 2025.08.01 Plaintiffs' First Amended Original Petition and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction

10. 2025.08.08 Defendants' Notice of Removal (without exhibits) (in the 48th)

11. 2025.08.07 Defendants' Response to Plaintiffs' Amended Application for Temporary Injunction (in both the Eighth Division and the 48th)

## **<u>VERIFICATION</u>**

My name is Walter L. Taylor, my date of birth is June 9, 1964. I am over the age of 18 years and am fully competent to make this declaration. My law firm's address is 6630 Colleyville Blvd., Ste. 200, Colleyville, Texas 76034, USA. I am an attorney at Taylor Law Firm. I serve as counsel for Relators Silver Star Properties REIT, Inc., Silver Star CRE, LLC, Silver Star CRE II, LLC, and Silver Star Delray, LLC, in the above-captioned case.

I am admitted to practice law in the State of Texas, and I prepared the record and appendix in this case. Based on my personal knowledge, the following facts are true and correct: The documents in this Appendix at Tabs 1-11 are true and correct copies of pleadings, motions, orders and other instruments filed and served in this case. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Wise County, State of Texas, on August 14, 2025.

*/s/ Walter L. Taylor*

Walter L. Taylor

37



# The Business Court of Texas, Eighth Division

| | | |
|---|---|---|
| Silver Star Properties REIT, Inc., Silver Star CRE, LLC, Silver Star Delray, LLC | § § § | |
| *Plaintiffs* | § § § | |
| v. | § § | Cause No. 25-BC08B-0016 |
| BSPRT CRE Finance, LLC, FBRED BCD Finance, LLC, and BSPRT CS Loan, LLC | § § § § | |
| *Defendants* | | |

## ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR EXPEDITED REMAND

Before the Court is Plaintiffs' Motion for Expedited Remand, filed on August 11, 2025 (the "Motion"). Plaintiffs seek immediate remand of this action to the 48th Judicial District Court of Tarrant County, contending this Court lacks subject matter jurisdiction. Plaintiffs request expedited consideration in light of uncertainty surrounding their pending application for a temporary injunction and the potential expiration of a previously issued temporary restraining order.

Having considered the Motion, the pleadings, and other materials of record, the Court **denies** the Motion **without prejudice** to Plaintiffs' right to file a renewed motion for remand under a standard briefing schedule. Expedited remand is an extraordinary remedy, appropriate—if ever—only where the Court is satisfied there is no colorable basis for jurisdiction. That is not the case here.

On the contrary, the Court finds it far from clear that jurisdiction is lacking. Jurisdiction may exist under both Section 25A.004(d), as addressed by the parties, and Section 25A.004(b)(4) and/or (5), in view of Plaintiffs' allegations that Defendants exercise exclusive control over Plaintiffs' business operations and owe fiduciary duties to Plaintiffs. These are substantial questions that warrant full briefing and careful consideration.

Accordingly, Plaintiffs' Motion is DENIED without prejudice.

SO ORDERED.

Signed this the 11th day of August, 2025.

_____
Brian Stagner, Judge
Texas Business Court, Eighth Division

E-filed in the Office of the Clerk
for the Business Court of Texas
8/11/2025 7:40 AM
Accepted by: Alexis Jennings
Case Number: 25-BC08B-0016

**NO. 25-BC08B-0016**

| | | |
|---|---|---|
| **SILVER STAR PROPERTIES REIT,** | § | **IN THE** |
| **INC., SILVER STAR CRE, LLC, SILVER** | § | |
| **STAR CRE II, LLC, SILVER STAR** | § | |
| **DELRAY, LLC, Plaintiffs,** | § | |
| | § | **TEXAS BUSINESS COURT** |
| **V.** | § | |
| | § | |
| **BSPRT CRE FINANCE, LLC, FBRED** | § | |
| **BDC FINANCE, LLC, and BSPRT CS** | § | **EIGHTH DIVISION** |
| **LOAN, LLC, Defendants** | § | **FORT WORTH, TEXAS** |

## PLAINTIFFS' MOTION FOR EXPEDITED REMAND

The Silver Star Plaintiffs request immediate remand to the 48th Judicial District Court of Tarrant County for three reasons: 1) under clear Texas Business Court precedent, this Court lacks subject-matter jurisdiction over Plaintiffs' requested expedited and injunctive relief, because it lacks jurisdiction over the case as a whole; 2) any Temporary Restraining Order or Temporary Injunction this Court issues or extends is ultimately likely to be determined void and unenforceable once it is finally determined this Court lacks jurisdiction, which places Plaintiffs at substantial risk that any relief they obtain from this Court is void and unenforceable; and 3) the 48th Judicial District Court's jurisdiction is undisputed, so any emergency and injunctive relief granted there cannot be declared void on a jurisdictional basis.

### GROUNDS FOR REMAND

**A) The Court must remand if it does not have jurisdiction, which is determined from the relief sought.**

Section 25A.006(d) of the Government Code and Rule 355 of the Texas Rules of Civil Procedure dictate that if this Court lacks jurisdiction over a removed action, the Court must remand the action to the court from which it was removed. *C Ten 31 LLC v. Tarbox*, 708 S.W.3d 223, 229, ¶7 (3rd Div.). Whether a court has subject-matter jurisdiction is generally a question of law for the court to decide. *C Ten*, 708 S.W.3d at 230, ¶9; *Black Mountain SWD, LP, v. NGL Water Solutions Permian,*

*LLC*, 25 Tex.Bus. 24, *3, ¶10 (8th Div.). As the parties seeking removal, the BSP Defendants bear the burden of establishing this Court's jurisdiction over the action. Black Mountain, 25 Tex.Bus. 24, *3, ¶10.

The BSP Defendants cannot meet this burden, because when the plaintiff's petition alleges the amount in controversy, *that pleading controls* unless (a) a party presents *evidence* that the amount pleaded is falsely asserted to wrongly obtain or avoid jurisdiction, or (b) a different amount in controversy is readily established, such as by statutorily set fees (not present here). *C Ten*, 708 S.W.3d at 243, ¶49. The proper inquiry is what the parties seek to recover. *Black Mountain*, 25 Tex.Bus. at *3, ¶12. Moreover, this Court has previously recognized that when a party has merely pled other plausible theories of recovery or has mentioned monetary amounts of a speculative nature, such assertions are *not* to be considered when they are not pled sufficiently to establish jurisdiction affirmatively. *See, e.g., M&M Livestock, LLC v. Robinson*, 2025 Tex.Bus. 29, *3, ¶14.

**B) Silver Star is the only party seeking relief, and it seeks injunctive relief significantly less than $10 million.**

Under the Texas Rules of Civil Procedure, in the absence of a scheduling order, the Plaintiff generally has the right to amend its pleading without leave of Court during the litigation. TRCP 63. After the BSP Defendants filed their Notice of Removal, the Silver Star Plaintiffs amended their pleadings, and the live pleading before the Court is Plaintiff's Second Amended Original Petition,[1] Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction. In it, Plaintiff seeks primarily injunctive relief in the amount of $4 million to $6 million, plus unspecified damages in amounts not yet quantifiable. These assertions are too vague to support jurisdiction, as this Court has previously acknowledged. *See, e.g., M&M Livestock, LLC*, 2025 Tex.Bus. 29, *3, ¶14. For these reasons, this Court lacks subject-matter jurisdiction over the entire case and should remand the

---

[1] Attached as Exhibit A.

whole case to the 48th Judicial District Court of Tarrant County, from which it was improperly removed. *C Ten*, 708 S.W.3d at 243, ¶51.

Defendants' only purported bases for alleging Texas Business Court jurisdiction are Sections 25A.004(d)(1) and 25A.004(d)(3) of the Texas Government Code – both of which require an amount in controversy greater than $10 million. Tex. Gov't Code §§25A.004(d)(1); 25A.004(d)(3). Defendants' sole argument for alleging an "amount in controversy" greater than $10 million is its self-serving interpretation of the following statement ¶6.19 in Plaintiffs' prior pleading:

> Texas' Exemplary Damages Act expressly authorizes a plaintiff to recover up to two (2) times its economic damages. Should Silver Star recover economic damages in excess of $100 million, Texas law would authorize an exemplary/punitive damages award up to twice that amount, or in excess of $200 million.[2]

This statement was initially asserted by the Silver Star Plaintiffs solely as a warning to the BSP Defendants to be careful about future actions and the damages they might cause.

Nowhere in this or any other prior pleadings did Plaintiffs allege factually that any such BSP actions had already occurred, or that Plaintiffs had already suffered such damages. Nor did Plaintiffs ever actually plead for such damages. Further, this offhand and casual reference (on which Defendants rely as their sole means of arguing Plaintiffs seek more than $10 million) was not tied to any particular theory of recovery, nor was it pled with the degree of factual sufficiency to support a jurisdictional argument. This Court has already indicated it cannot consider theories or amounts that are not adequately pled. *M&M Livestock, LLC*, 2025 Tex.Bus. 29, *3, ¶14. Thus, even prior to Plaintiffs' having filed their Second Amended Petition, Defendants' reliance on this paragraph was improper at the time Defendants sought removal.

Either way, however, Defendants' sole argument is now negated, because Plaintiffs have

---

[2] Plaintiff's First Amended Original Petition, ¶6.19.

deleted the extraneous verbage from their current pleading. While Plaintiffs continue to hope the BSP Defendants will heed the warning, Plaintiffs have not yet suffered, nor do they currently seek, such damages which may possibly result from Defendants' future actions.

Rather, Plaintiff's Second Amended Original Petition seeks Temporary Restraining Order and Temporary Injunction relief – capped at $1.25 million per month for the months of August, September, October and November – followed by a November 2025 trial on the merits. Even if Defendants argued a November trial might not occur, Defendants can engage in nothing more than rank speculation as to how much the amount in controversy under injunctive relief might ultimately be – which, again, is insufficient to support jurisdiction. *M&M Livestock, LLC*, 2025 Tex.Bus. 29, *3, ¶14. Significantly, this Court should be aware that the $1.5 million cap in the current TRO was an arbitrary number supplied by the Court – Plaintiff's pleadings demonstrate the actual relief Plaintiffs sought in their Supplemental Application for TRO was less, and even under the TRO as written, the amount of relief Plaintiffs are likely to receive under it is much closer to only $1 million per month. Thus, the total amount of injunctive relief Plaintiffs are likely to receive is approximately $4-6 million. Anything beyond that is pure speculation, as are Plaintiffs' damages allegations currently of a nominal, vague or undetermined value – none of which can support jurisdiction. *M&M Livestock, LLC*, 2025 Tex.Bus. 29, *3, ¶14.

**C) The Court must expedite the remand rather than risk jurisdictional issues affecting the validity of any expedited or emergency injunctive relief.**

Plaintiffs recognize this Court's historical practice has been to order the parties to brief jurisdictional issues, rather than grant an expedited remand. *See, e.g., M&M Livestock, LLC*, 2025 Tex.Bus. 29, *2, ¶10. Here, however, the 48th District Court has already issued a Temporary Restraining Order, which expires at 4:35 p.m. on August 18, 2025. Due to Defendants' improper removal, Plaintiffs have already lost the opportunity to be heard on their Application for Temporary Injunction at an August 12, 2025, 10 a.m. hearing, which was cancelled due to the improper removal.

In the time it might otherwise take this Court to determine whether it ultimately has or lacks jurisdiction, the 48th District Court's TRO will expire. Although this Court's staff has efficiently offered dates for a Temporary Injunction hearing and has even communicated the possibility of extending the TRO, if Plaintiffs ultimately prevail on the jurisdictional question, any orders this Court has issued in the interim will be void, causing Plaintiffs to lose valuable rights.

Since the 48th District Court's jurisdiction is undisputed, in the interests of justice this Court should grant an expedited remand to the 48th District Court, so those matters can be heard with their jurisdictional validity beyond question. Plaintiffs' rights should not be placed in peril, nor should Plaintiffs be forced to accept wrongful removal in order to have their emergency injunctive relief heard; nor should Plaintiffs have to risk obtaining expedited and injunctive relief in an order later voided by want of subject-matter jurisdiction.[3] Finally, Plaintiffs should not have to sacrifice the opportunity to be heard timely in a Court whose jurisdiction is undisputed. For all of these reasons, Plaintiffs request, and the Court should grant, an expedited remand to the 48th Judicial District Court of Tarrant County.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
*taylorlawfirmdfw@gmail.com*
**TAYLOR LAW FIRM**
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700
**ATTORNEY FOR PLAINTIFFS**

---

[3] Any protestations or commitments the BSP Defendants might offer that – having sought removal – they would not challenge adverse rulings by this Court on subject-matter jurisdictional grounds are unavailing. Subject-matter jurisdiction cannot be given or taken away by consent, and it cannot be waived. *Carroll v. Carroll*, 304 S.W.3d 366,367 (Tex.2010); *Parham F.L.P. v. Morgan*, 434 S.W.3d 774, 783 (Tex.App. – Houston [14th Dist.] 2014, no pet.); see *In re Guardianship of Fairley*, 650 S.W.3d 372, 379 (Tex.2022); *University of Houston v. Barth*, 313 S.W.3d 817, 818 (Tex.2010).

## <u>CERTIFICATE OF SERVICE</u>

I certify by my signature above that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on August 11, 2025, including:

**Jacob Sparks**
Email: *Jacob.Sparks@NelsonMullins.com*

**Brent T. Buyse**
Email: *Brent.Buyse@NelsonMullins.com*

**Xenna Davis**
Email: *Xenna.Davis@NelsonMullins.com*

**NELSON MULLINS RILEY &SCARBOROUGH, LLP**

E-filed in the Office of the Clerk
for the Business Court of Texas
8/11/2025 7:40 AM
Accepted by: Alexis Jennings
Case Number: 25-BC08B-0016

NO. 25-BC08B-0016

| | | |
|---|---|---|
| **SILVER STAR PROPERTIES REIT, INC., SILVER STAR CRE, LLC, SILVER STAR CRE II, LLC, SILVER STAR DELRAY, LLC, Plaintiffs,** | § § § § § | **IN THE** |
| | § | **TEXAS BUSINESS COURT** |
| **V.** | § § | |
| | § | |
| **BSPRT CRE FINANCE, LLC, FBRED BDC FINANCE, LLC, and BSPRT CS LOAN, LLC, Defendants** | § § § | **EIGHTH DIVISION FORT WORTH, TEXAS** |

**PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY AND PERMANENT INJUNCTION**

The Silver Star Plaintiffs (hereinafter "Plaintiff" or "Silver Star") file this Second Amended Original Petition, Application for Temporary Restraining Order, Temporary and Permanent Injunction.

### I. OVERVIEW OF CLAIMS AND EMERGENCY RELIEF

1.1 Silver Star is self-managed real estate investment trust engaged in commercial office building ownership and leasing, whose two principal offices are in Texas – one in Fort Worth. A New York lender – Benefit Street Partners ("BSP") – and Silver Star entered into a debt refinancing relationship, in which they expressly contemplated BSP's future financing of Silver Star's planned pivot into self-storage facilities.

1.2 Emergency injunctive relief is necessary because, without warning, and despite the fact that no monetary default had occurred, BSP abused its exclusive control and possession of Silver Star's cash reserves to self-deal, while refusing to advance critical operating funds – all of which threatens Silver Star's ability to operate during the litigation unless this Court grants a TRO.

1.3 While it is also true Silver Star alleges BSP converted more than $8+ million of Silver Star's cash reserves, the reality is that Silver Star's debt was offset by a corresponding amount, rendering any monetary damages resulting from this act either nominal or speculative as of this date (as BSP itself

argued in the July 14, 2025 TRO hearing).The significance of the conversion (even with nominal or speculative damages) is that 1) loss of cash reserves makes the application of Silver Star's rent collections to Silver Star's ability to continue operating during this litigation – the $4M to $6M in injunctive relief Silver Star seeks; and 2) it provides an additional cause of action to support Silver Star's request for injunctive relief – that is, maintaining during this litigation the *status quo* in which Silver Star collects rents on commercial properties and uses those funds to pay operational expenses – as the loans had functioned for more than a year before BSP's first wrongful act in May 2025.

## II. DISCOVERY CONTROL PLAN AND CLAIM FOR RELIEF

2.1    Pursuant to Tex. R. Civ. P. 190.4, Plaintiff intends to conduct discovery under a Level 3 Order of the Court, in addition to expedited discovery as authorized by the Court in a Temporary Restraining Order. Plaintiff hereby requests expedited discovery in pursuit of a Temporary Injunction, and that the Court enter a discovery control order under Rule 190.4 at the appropriate time.

2.2    Purely for case administrative purposes, Texas Rule of Civil Procedure 47 requires an original petition to select among specified ranges of potential relief. This original petition selects the range in Texas Rule of Civil Procedure 47(c)(4). This range may change over time. Plaintiff is free to suggest, and the jury and judge are free to find, more or less at trial based on the evidence.

2.3    This case is a fight for the Silver Star Plaintiffs' liquidity – all of which can be accomplished with equitable relief forming an amount in controversy of roughly $4M to $6M, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs. Regardless of any specific facts or events pled or discussed herein, Plaintiff seeks only injunctive relief of roughly $4M to $6M – an amount in controversy substantially less than $10 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

2.4    While Plaintiff also pleads for monetary damages, if any, such damages are not easily quantifiable, and not all such damages are certain to occur.

## III. PARTIES

3.1    Plaintiff **SILVER STAR PROPERTIES REIT, INC.**, is a Maryland corporation with its principal place of business in Texas. Plaintiffs **SILVER STAR CRE, LLC**, **SILVER STAR CRE II, LLC**, and **SILVER STAR DELRAY, LLC,** are Delaware limited liability companies with their principal places of business in Texas.

3.2    Defendants **BSPRT CRE FINANCE, LLC**, **FBRED BDC FINANCE, LLC,** and **BSPRT CS LOAN, LLC** are Delaware limited liability companies, which have appeared. No service is requested at this time.

## IV. JURISDICTION AND VENUE

4.1    Jurisdiction and venue of this action are proper in the 48th Judicial Court of Tarrant County, in that Plaintiff's requested injunctive relief exceeds the minimum jurisdictional limits of that Court, its causes of action accrued in Tarrant County, Texas, as well as tortious acts by Defendant in Tarrant County that caused harm in Tarrant County.

4.2    Jurisdiction further rests with the 48th Judicial District Court of Tarrant County, because Plaintiff seeks only monetary damages and equitable relief in the form of a temporary restraining order and temporary injunctive relief of roughly $4M to $6M, and a permanent injunction.

4.3    For these reasons, the Texas Business Courts lack jurisdiction over this matter. Since Plaintiff holds a Temporary Restraining Order expiring on August 18, 2025, and since this Court lacks jurisdiction to extend the TRO or grant Plaintiff's Temporary Injunction, Plaintiff separately files a Motion for Expedited Remand to the 48th Judicial District Court of Tarrant County, so Plaintiffs' expedited relief claims can continue to be heard timely in a Court with undisputed jurisdiction.

## V. FACTUAL ALLEGATIONS

**Introduction**

5.1     Silver Star Properties REIT, Inc. is a self-managed real estate investment trust specializing in the acquisition and management of institutional-grade self-storage properties and other storage properties in secondary markets. In addition, Silver Star manages five legacy commercial office assets, which it is evaluating for a sale or hold strategy.

5.2     Silver Star currently owns and operates office and self-storage assets in Houston, Dallas, McKinney and San Antonio, Texas and Delray Beach, Florida and is continuously evaluating future investments. Silver Star is currently focused on acquiring well-located self-storage facilities in markets with significant demand for storage space.

5.3     This plan to expand the Company's asset classes allows the Company to maintain a resilient investment approach and create a more inflation-resistant portfolio. Silver Star's business plan for the last 18 to 24 months has been to pivot away from its office REIT title to include a broader selection of asset classes. Silver Star expects this pivot to better position the Company to provide enhanced liquidity to its shareholders, by scaling its operations quickly with anticipated capital and through a listing of its securities on a national exchange.

5.4     Plaintiff's First Amended Original Petition and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction, and/or any Supplemental Application for Temporary Restraining Order, have been made necessary because Silver Star's lender(s) – Benefit Street Partners and its affiliated lending entities ("BSP") – have overreached their lender rights under one or more in a series of cross-collateralized loan agreements with Silver Star and its affiliated entities. As explained more fully below, BSP's overreaching and egregious, aggressive collection measures have included abusing its exclusive control over Silver Star's entire cash

reserves (in excess of $8 million), seizing all of Silver Star's available cash (in excess of $8 million) for its own benefit and increasing Silver Star's peril, charging excessive "default interest," insurance charges ($120,000), and BSP's legal fees ($50,000). Most critical to Silver Star's survival is BSP's refusal to maintain the status quo – using the buildings' rental income to fund basic monthly property operating expenses such as electricity, HVAC, janitorial, security, tenant refunds, trash, water, and other normal operational expenses – all of which has harmed and imminently threatens continuing irreparable harm to Silver Star Properties REIT, Inc. and its subsidiaries.

5.5     As of May 7, 2025, all Silver Star / BSP loans were fully performing, and no monetary default had occurred on any loan between the parties. Moreover, at all times material to these loans, BSP's interests were at all times fully and adequately secured by the collateral contractually chosen and agreed upon by the parties. Despite these facts, BSP declared a default on a non-monetary covenant (and in Silver Star's view, a non-material covenant impossible to perform as written) – the provision of financial statements "prepared and reviewed by an 'independent' certified public accountant."

5.6     Silver Star has been transparent with BSP about the futility and impossibility of performing this non-monetary covenant and has offered alternative solutions in response to BSP's declaration of its breach. Silver Star has requested that BSP maintain the status quo – that is, that BSP continue to perform its lender obligations under the loans – approving and releasing basic operating expenses from Silver Star's cash reserves – but BSP has refused. BSP has instead seized Silver Star's operating funds and all cash reserves, and BSP has refused to extend operating expense funds necessary to operate the collateral properties and make Silver Star's payroll.

5.7    As irreparable harms continue to occur and additional irreparable harms remain imminent, Silver Star is requesting again that this Court grant immediate injunctive relief in the form of a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction ordering BSP to refrain from further conversion of Silver Star's operating funds, and compelling BSP to disburse to Silver Star's necessary operating expense funds from available unconverted funds. This emergency relief is necessary to restore the status quo – where Silver Star as landlord collects rents on the properties, and uses those funds to pay expenses necessary to operate the commercial properties, as described more fully below.

**Improper and Unauthorized Actions by Prior Executive Chairman; Bankruptcy Filing; BSP Exit Loans**

5.8    In the field of finance, "senior debt" is a type of debt that has priority over other forms of debt and equity in the event of a company's liquidation. Silver Star's senior debt – commonly referred to as the SASB loan ("SASB") – was originated in October 2018.  The SASB had a two-year term and three one-year extensions.  The final one-year extension was effective in October 2022.  The maturity date of the SASB was October 9, 2023.

5.9    During the term of the SASB final extension, Silver Star undertook to sell certain real estate assets with applications of net sales proceeds to the SASB loan balance, in order to reduce the loan amount to be refinanced.

5.10    In November 2022, Silver Star met with representatives of Raymond James Financial, Inc. – an investment banking and financial services company – to discuss an engagement to identify prospective lenders and manage the process of a refinance of Silver Star's SASB.  In January 2023, Silver Star engaged Raymond James, who then commenced preparation of an offering memorandum and began marketing efforts. In March 2023 Raymond James completed the offering

memorandum and identified three prospective lenders. In order to enter into negotiations with Silver Star, BSP signed a non-disclosure agreement ("NDA").

5.11    In May 2023 BSP delivered an initial term sheet to Silver Star to provide up to $200 million for the refinance. In June 2023, representatives of Silver Star met with BSP in New York, and shortly thereafter Silver Star executed the term sheet/loan application. From June 2023 to August 2023 preliminary loan documents were drafted and reviewed.

5.12    During these negotiations, it became necessary for Silver Star to address a pending internal issue affecting its ability to refinance the SASB. Unfortunately, Silver Star's former Executive Chair Allen Hartman had previously engaged in improper, illegal, and unauthorized actions in order to challenge, frustrate and cloud title issues related to assets sales necessary to reduce Silver Star's SASB loan balance. As a means of swiftly addressing, and for the sole purpose of resolving, Hartman's spurious claims and actions against an affiliated entity bearing his name, Silver Star approved the filing of a Chapter 11 bankruptcy petition for Hartman SPE LLC (the named borrower and collateral owner under the SASB) on September 13, 2023.

5.13    Together with counsel for Hartman SPE LLC (now the Debtor), Silver Star developed a plan of reorganization. On November 28, 2023, BSP provided an updated term sheet (unsigned) for exit financing for the exit plan.

**The Silver Star Senior and Junior Exit Loans**

5.14    On March 27, 2024, the reorganized Debtor entered into the BSP Senior Loan and the RMWC Junior Loan which provided $120 million and $15 million, respectively, of exit financing under the exit plan approved by the bankruptcy court, the lenders and the unsecured creditors.

5.15    Pursuant to the plan to which all parties had agreed, property sales were executed for the purpose of reducing the SASB loan – including many properties sold at a gain. In order to defer

tax liability associated with gains, the property sales were closed using a qualified intermediary to facilitate 1031 exchanges. The net sales proceeds (cash) from the property sales were applied to reduce Silver Star's secured debt. In order to complete the 1031 exchange requirements and defer tax consequences, however, Silver Star had to identify replacement property and then acquire it within a certain time frame.

5.16    In order to complete the re-investment leg of the 1031 exchange, in June 2024 an arrangement was made with RMWC to provide an upsize to its Junior Loan in order to provide borrowed equity to close open 1031 exchanges. In June 2024, Silver Star acquired the McKinney storage property from an unrelated third party using upsize Junior loan proceeds for equity capital and seller financing. In July 2024, Silver Star acquired the Walgreens portfolio of 16 net lease assets from BSP using upsize Junior loan proceeds for equity capital and seller financing provided by BSP.

5.17    In summary, on March 27, 2024, Silver Star entered into the BSP Senior and Junior exit loans provided in connection with the conclusion of the Chapter 11 bankruptcy proceedings of Hartman SPE LLC. The Senior loan was a $120 million loan with a maturity date of April 2026. The Junior loan was initially a $15 million loan which was later upsized by the Junior lender to approximately $35 million. The primary document for these loans is the March 27, 2024, Loan Agreement between SILVER STAR CRE, LLC and SILVER STAR CRE II, LLC, as Debtors, and BSPRT CRE FINANCE LLC, as Lenders, which is attached as Exhibit 1-A to Plaintiff's Original Petition on file with the Court.

5.18    As of December 31, 2024, the Senior loan was paid in full, including Silver Star's payment of $14.4 million in minimum interest. The balance of the Junior loan as of April 30, 2025, was

approximately $4.7 million. During the first quarter of 2025, BSP purchased the Junior loan, which to that point in time had experienced no monetary defaults and was performing well.

**The Walgreens Portfolio Loans – "BSP the Lender" Becomes "BSP the Seller"**

5.19    BSP, the senior lender for Hartman SPE LLC – the significant subsidiary of Silver Star – in connection with Hartman SPE LLC's exit from Chapter 11 bankruptcy – requested Silver Star purchase sixteen (16) Walgreen's properties BSP had foreclosed, rather than BSP's having to sell them at auction. BSP agreed to finance the purchase, if Silver Star would buy the foreclosed properties. On July 1, 2024, acting through its affiliate lending entities BSPRT Walgreens Portfolio (Nos. 1, 2, 3, 4, 6, 7, 13, 14, 15, 16, 17, 19, 20, 21, 23 and 24) LLC ("BSPRT Walgreens"), BSP sold sixteen (16) single tenant Walgreens retail locations to Silver Star for a sales price of $60,925,000.  Acting through its affiliate BSPRT CRE FINANCE, LLC, BSP provided seller financing for the sale transaction(s) in the original loan amount of $57,750,000.  The Walgreens loan is subject to a cash management agreement during the term of the loan.  The maturity date of the Walgreens loan is August 9, 2025. The Walgreens Purchase and Sale Agreement is attached as Exhibit 1-B to Plaintiff's Original Petition on file with the Court.

5.20    Silver Star's acquiescence to BSP's request that it purchase the Walgreens portfolio was an accommodation to BSP – as both seller and financing source – based on informal discussions that included BSP's representation, and therefore Silver Star's very reasonable expectation, of future financing commitment by BSP after the repayment of the exit loans provided at the conclusion of the Chapter 11 bankruptcy proceedings of Hartman SPE LLC.

5.21    In addition to BSP's representations and commitment regarding future financing, in marketing the Walgreens properties for sale, BSP provided due diligence materials that included leases, historical analyses and other documents related to the performance and value of the properties. Silver Star will show that the materials provided by BSP indicated that the values of

the Walgreens properties was greater than their values actually were. BSP made the misrepresentations for the purpose of inducing Silver Star to buy the Walgreens properties. In reliance on BSP's misrepresentations, Silver Star purchased the Walgreens properties. Silver Star suffered harm from BSP's misrepresentations, in that it purchased Walgreens properties it would not otherwise have purchased but for BSP's misrepresentations, and it now owns properties worth significantly less than the values it believed it was getting.

**The Delray Loan**

5.22    On July 19, 2024, BSP and Silver Star entered into a third loan agreement for the financing of one stand-alone self-storage facility. The Delray Loan Agreement between SILVER STAR DELRAY, LLC, as Borrower, and FBRED BDC FINANCE, LLC, as Lender, which is attached as Exhibit 1-C to Plaintiff's Original Petition on file with the Court.  The Delray storage property was identified as a replacement property for 1031 exchange purposes in order to defer gain attributable to a property sold.  The net proceeds of the property sold were utilized to pay down secured debt.  The Delray acquisition was financed with proceeds of the upsized RMWC Junior Loan as equity capital and mortgage debt provided by BSP.

**BSP's Exclusive Control of Silver Star's Business Operations, and Unreasonable Self-Help Remedies**

5.23    At BSP's insistence from day one, all cash collections for the legacy office properties, the Delray self-storage and the Walgreens portfolio are subject to the exclusive control of BSP and its agents, as are Silver Star's cash reserves. Since not one dollar can be spent without BSP's approval, BSP is essentially operating Silver Star's business – it determines every bill to pay or not pay, including every capital improvement, vendor or maintenance expense.

5.24    The situation Silver Star has endured since April as a result of BSP's actions is untenable to the point of impossibility. Specifically, Silver Star is unable to pay collateral property operating expenses, which will quickly result in irreparable harm to vendor and tenant relationships.

5.25    These relationships are not fungible nor easily recovered or replaced – they are built on trust and reputation, and word travels. If utilities are not paid, utilities are subject to service interruption (i.e., the power goes off).  Unpaid contractual services such as security, janitorial, elevator maintenance, HVAC maintenance will result in service suspensions that will in turn disrupt property management operations and irreparably harm tenant relationships and renewal prospects.

5.26    The loan principle secured by Silver Star's legacy office properties is now ZERO.  The funds needed for property operating expenses for these legacy properties are instead being converted to loan principal and fees of cross-collateral property (Walgreens). Since BSP is also fully secured on the Walgreens loan, BSP's exercise of power to divert Silver Star's funds is unnecessary for its own protection and instead serves principally to irreparably harm Silver Star and its affiliates, tenants and vendors.

**The impossibility of the "prepared and reviewed by an independent CPA" covenant**

5.27    As previously stated, all three (3) loans in the Silver Star / BSP series are cross-collateralized. Both the Senior and Junior Exit Loans (March 2024) and the Delray Loan (July 2024) contained the following identical provision:

> **Section 4.12 Books and Records.**
> …
> (b) ***Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements <u>prepared and reviewed by an independent certified public accountant</u> acceptable to Lender (provided, however, that at any time an Event***

***of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower or the Property, <u>the same shall, upon Lender's written request, be audited by such independent certified public accountant</u>)*** in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, and operating expenses.

5.28    As established by the Affidavit of Lou T. Fox, III and his education and training in the financial world, including public accounting, the words "certified public accountant (CPA)," "review" and "independent," as they pertain to financial statements, are terms of art in the field of public accounting. A certified public accountant (CPA) is a licensed accounting professional who has met specific education, examination, and experience requirements, allowing them to provide a range of accounting services to the public. CPAs prepare and analyze financial records, prepare tax returns, conduct audits, reviews and compilations of financial statements, and provide other consulting and financial services. A "review" of financial statements by a certified public accountant generally refers to an attest or assurance engagement for the purpose of issuing a review report resulting from the conduct of work conducted in connection with the scope of work outlined in an engagement letter. "Independent" as that term is applied to certified public accountants means that the certified public accountant is independent in the performance of its professional services, which includes the representation that the reviewer did not participate in the preparation of the financial statements he/she is reviewing. Participation in the preparation of the financial statements under review spoil independence.

5.29    Financial statements can be prepared by a certified public accountant. Such accountant could be a third party, unrelated and unaffiliated. An independent certified public accountant could review or (not required here) audit financial statements. A certified public accountant who

prepares and reviews financial statements is not independent. In Fox's opinion as Chief Financial Officer and in Silver Star's opinion, the financial statements furnished are no different than financial statements which would have been prepared by any other competent accountant with knowledge of the individual properties, their respective leases, the administration of funds and the Loan Agreement. The determination to provide annual financial statements prepared by the Borrower was done in good faith and in the sincere belief that the literal loan agreement requirement is an impossibility. The Borrower's hands are clean. Notwithstanding the impossibility described above, the Borrower mitigated the issue by preparing and providing its annual financial statements.

5.30    With respect to the Walgreens properties, the periodic financial statements for the individual properties are simple. Income consists of rent. Expense consists of interest expense and bank charges. The difference between income and expense is net operating income. The accounting source information necessary for the preparation of the financial statements is under the control and administration of the Lender. The Lender, as the former owner and previous lender for the individual properties, is fully versed in the leases and the rents. Pursuant to the cash management account required and administered by the Lender, the Lender has full insight and access to the rent payment. The Lender has full insight and access to its servicer regarding the payment of debt service and bank charges.

**Silver Star exercises substantial effort to perform its non-monetary covenants capable of performance.**

5.31    Silver Star takes the performance of its non-monetary covenants seriously. For example, Silver Star REIT's Guarantee requires it to furnish audited financial statements. At the time the loans were made, however, Silver Star's prospects for engaging an auditor had been, and continued to be, hamstrung by an inquiry subsequently an investigation by the SEC and the continuous

assault on the Company by a rogue director and dissident shareholder – of which BSP was also aware prior to the inception of all three loans.

5.32    Specifically, on or about November 29, 2023, Silver Star's previous CPA firm – Weaver and Tidwell, L.L.P. ("Weaver") – notified the Company and the Audit Committee of its Board of Directors of Weaver's decision not to stand for reelection as the Company's registered public accounting firm for the Annual Report for the 2023 fiscal year. Immediately thereafter, Silver Star – at the direction of the Audit and Executive Committees – undertook to engage a successor certified accounting firm.

5.33    Silver Star and its Audit Committee engaged in countless calls, meetings and discussions with seven (7) prospective CPA firms, including a former auditor for the Company. On or about January 8, 2024, the Audit Committee signed an engagement letter with a prospective successor audit CPA firm. On or about January 15, 2024, however, this same prospective successor audit CPA firm advised the Company that, after completion of the CPA firm's client acceptance procedures, the CPA firm's client acceptance committee determined it would not approve the engagement. All of these facts predated the March 2024 Exit Loans and were fully known to BSP prior to executing the transactions.

5.34    From January 2024 through November 2024, Silver Star had periodic and significant contact with the prospective firms referred to above – including substantial solicitations relating to acceptance of the full audit engagement – before Silver Star's negotiations with CBIZ CPAs (formerly Marcum LLP) finally entered a more serious phase as the Company was sent CBIZ's engagement letter for review.

5.35    Throughout this period of time, several concerns were expressed by the various prospective CPA firms regarding potential engagement, including but not limited to the following:

(a) the ability of Hartman SPE to exit satisfactorily out of the bankruptcy proceedings;

(b) the SEC initiated inquiry/investigation; and

(c) the ongoing litigation with Hartman, in both Baltimore Maryland and Harris County, Texas, which involved complex analysis regarding the cessation of distributions, damages directly caused by Hartman's mismanagement, and general potential reputational harm to the Company.

5.36    Of these concerns, the most challenging and a common hurdle negating client acceptance by the CPA firms was the SEC investigation. Fortunately, on December 24, 2024, Silver Star engaged CBIZ CPAs as its new independent registered public accounting firm. As of the date of this Affidavit, the CBIZ engagement team is and has continued to be fully engaged in the audit of the 2023 consolidated financial statements including communications with and documentation for the firms practice directors. Silver Star now expects it to be completed in either the late 3rd Quarter or early 4th Quarter of 2025.

5.37    On or about April 16, 2025, Silver Star's CFO – Lou T. Fox, III – provided BSP by letter and E-mail the only set of financial statements Silver Star had been able to obtain up to that point in time, which Silver Star had prepared on its own behalf at Fox's direction. Fox also advised BSP that having annual financial statements "prepared and reviewed by an independent CPA" was a futility. With respect to Silver Star REIT – the Guarantor – Fox also advised BSP that CBIZ CPAs had signed on as successor independent registered public accountants on December 24, 2024, to conduct audits of the Company's consolidated financial statements for the years ended December 31, 2023, and December 31, 2024, and that those audits were underway. Fox also advised BSP that, under the direction of its Audit Committee, Silver Star had put forth substantial effort to obtain audited financial statements after the resignation of its previous auditing CPAs, but those efforts had been futile until CBIZ CPA's accepted the position. Fox also advised BSP that,

although CBIZ CPAs' efforts were underway, the estimated completion date for both audits was currently undetermined at that time.

**As a result of BSP's self-dealing, irreparable harm has occurred and will continue unless the status quo operation of the properties is restored and preserved**

5.38    Generally, the way these loans were supposed to operate was that Silver Star would market a collateralized property for sale, sell it, and a specified portion would be applied toward principal and interest related to that property. The remainder would be held in trust by BSP under a Cash Management Agreement – a side agreement in the loan packages the parties had executed. Prior to April of 2025, Silver Star made reasonable requests from its revenue collections for funding of ordinary and necessary property operating expenses (electricity, HVAC, internet, janitorial, landscape, parking lot rental, permits, pest control, security, security access control, trash, tenant refunds on sold properties, and water, among other critical monthly expenses). Prior to April of 2025, these requests were usually between $700,000 and $900,000, and BSP ultimately funded such requests, although not without other issues causing harm to Silver Star (see below). However, the last such request to fund under the loans was $886,916 on April 9, 2025.

5.39    On May 7, 2025, instead of working with the Silver Star entities, BSP notified Silver Star that on April 25, 2025, it had acquired and was now the owner and holder of the Junior Loan Agreement and the Loan Documents as defined therein. At inception the Senior Loan lender is BSP. SitusAMC is/was the service for the Senior Loan and held the various loan reserves provided for under the loan agreement. The Junior Loan Lender is/was RMWC. Bellwether was the servicer for the Junior Loan. After the payoff of the Senior Loan is December 2024, SitusAMC transferred the loan reserves to Bellwether to hold and maintain. Following the BSP acquisition of the Junior Loan, loan servicing was transferred back to SitusAMC. SitusAMC is the servicer for the Delray Loan and the Walgreens Loan.

5.40 BSP also immediately invoked Section 4.12(b) of the Junior Loan Agreement (discussed above as an impossibility) and declared Silver Star to be in covenant default. BSP then seized $8,562,846.74 of Silver Star's reserve funds, paid off the Junior Loan Agreement's principal ($4,733,151.80), as well as $3,511,932.80 toward the Walgreens Loan Agreement's principal. In the process, BSP also paid itself accrued regular interest on the Junior Loan Agreement ($112,928.76), then charged Silver Star an extra $5,916.44 in "default interest" on the Junior Loan Agreement, and $104,053.90 in "default interest" on the Walgreens Loan. In short, by letter dated May 7, 2025, counsel for BSP advised the taking and application of $8.6 million of Silver Star Collateral Reserves to (1) payoff $4.9 million of the Junior Exit loan balance acquired by BSP and costs, and (2) the application of $3.7 million to the principle and interest costs of the Walgreens Loan. A copy of BSP's May 7, 2025, letter is attached as Exhibit 1-D to Plaintiff's Original Petition on file with the Court.

5.41 On May 9, 2025, Silver Star requested disbursement of $746,207 from its revenue collections for the month of May 2025. Silver Star was initially told the servicer for BSP was processing the request, but the request was not funded. Silver Star's Collateral funding requirement for operating expense funds was $732,694 for June 2025 and $720,225 for July 2025. However, since April 11, 2025, Silver Star has ordered ten (10) withdrawals from the cash management account for a total of $4,222,982. Without any response or explanation to these requests, not one of these requests has been funded, nor has BSP responded to requests for accounting as to where and how it applied the funds.

5.42 On May 29, 2025, BSP declared Silver Star in default on the Delray loan, citing the same provision, and asserted that BSP would now charge the Delray loan's interest at the "default rate."

BSP seized $549,854.35 of Silver Star's operating funds and purported to apply $387,854.35 to principal, $112,000 to an unspecified "insurance," and $50,000 to an unspecified "legal retainer." Both actions were taken despite the fact there had been no monetary default prior to BSP's aggressive collection actions. A copy of BSP's May 29, 2025, letter is attached as Exhibit 1-E to Plaintiff's Original Petition on file with the Court.

5.43   By the very design of the loan packages and the agreements between the parties, Silver Star is wholly dependent on revenue from the Silver Star Collateral properties to pay the operating expenses of those properties. BSP's good faith and wise discretion and consideration of the business interests of Silver Star is therefore critical to Silver Star's survival. As of July 7, 2025, the following property operating expenses (shown as "OPEX") are either past due or currently due and payable:

| OPEX Type | Current Due |
|---|---|
| Electricity | 340,924.54 |
| Elevator | 15,006.40 |
| HVAC | 145,073.27 |
| Internet | 1,012.74 |
| Janitorial | 259,502.67 |
| Landscape | 13,566.42 |
| Parking lot rental | 2,500.00 |
| Permits | 4,077.15 |
| Pest control | 7,593.56 |
| Security | 156,361.60 |
| Security access control | 6,243.18 |
| Tenant refund | 54,335.96 |
| Trash | 7,697.20 |
| Uniforms | 1,001.19 |
| Water | 59,143.81 |
| **Grand Total** | **1,074,039.69** |

5.44   In addition to the foregoing list of property operating expenses, property operating labor expenses have not been disbursed.  Property operating labor expenses are $157,294 for May 2025,

$157,294 for June 2025 and $148,527 for July 2025. Property management and operations personnel have been paid as of August 1, 2025, for salaries and wages earned as of July 26, 2025. There can be no assurance that Silver Star will be able to fund next payroll which is due August 15, 2025.

5.45    The Silver Star Collateral Reserves included a tax reserve and insurance reserve. All 2024 tax payments were not timely or ever paid from the tax reserve and the time of conversion and application. The annual property and related insurance coverages renewal for 2025-2026 had been bound in April 2025. The insurance reserve was converted and applied elsewhere.

**Loss of CubeSmart management relationship, which BSP used to accusing Silver Star of diverting funds**

5.46    Silver Star had engaged CubeSmart to initially manage the Delray self-storage facility. From the inception of the Delray Loan, Silver Star experienced recurring monthly issue with BSP regarding the disbursement of operating expenses from operating revenues. The recurring delays in operating expense funding damaged Silver Star's relationship with CubeSmart to the point of default under the CubeSmart management agreement and ultimately the termination of the CubeSmart relationship. As a result of this change in management, rents were delayed because CubeSmart failed to deliver information to Silver Star, including credit card authorizations necessary to process payments for some of the tenants' rent payments. As a result, the related rent payments were not made. Silver Star informed BSP of the loss of this relationship on June 5, 2025, and the numerous likely delays and errors likely to result are obvious. Rather than recognizing and understanding the results of its own predatory collections practices, BSP hired its lawyers to write an incendiary letter pointing out the discrepancy in rents collected and accusing Silver Star of misappropriating funds.

5.47 Irreparable harm and damage to tenant obligations and relationships will imminently result from a combination of one or more unpaid operating expenses. In the event of utility disconnects, the Silver Star Collateral properties affected will be closed and secured. Tenants will not have access to the properties. The order of the cascade failure is not readily determinable. As of the signing of this Affidavit, other than BSP's recent and unfounded accusations of wrongdoing by Silver Star, BSP has otherwise gone "dark" – no accounting, no response to reasonable requests for operating expense funds under the agreement, and no response to any proposals by Silver Star for a workout agreement that allows Silver Star to continue to operate. Despite the fact that the loans were never in monetary default and BSP was at all times fully secured, BSP has engaged in these aggressive collection tactics and charged extra, excessive and unnecessary fees for its own financial gain, to the detriment of Silver Star, its ongoing business interests, its relationships, and the value of the interests of Silver Star's roughly 4,500 shareholders (who hold approximately 185 million shares – all of whom will suffer irreparable harm in the loss of their investment(s) should Silver Star go under – which BSP's actions will very likely cause.

**BSP's Egregious Actions Have Now Caused the Evacuation of a Major Silver Star Tenant**

5.48 The GSA – Veterans Administration ("VA") is a tenant of the Silver Star office property referred to as One Technology Center ("OTC") located at 7411 John Smith Drive, San Antonio, Texas. The VA occupies approximately 48,708 square feet, which is roughly 24.8% of the rental square footage of OTC. On July 11, 2025, the VA notified Silver Star that it is temporarily vacating all tenant space at OTC as a result of its safety concern with respect to the inability of Silver Star to install a necessary fire panel replacement for the property.

5.49 This fire panel issue was identified by Silver Star in 2024 and communicated to BSP's representatives. As a result of the fire panel function or malfunction, a fire watch status was

instituted resulting in the deployment by Silver Star of full-time additional security until such as time as the fire panel replacement could be completed.

5.50    On February 28, 2025, Silver Star made a formal request for disbursement of approximately $95,000 for the replacement of the fire panel.  The request was delivered to RMWC as lender and Bellwether as servicer for the then remaining Junior loan.  As of March 12, 2025, Silver Star's correspondence with Bellwether reflects that the service was ready to process the payment request subject to receipt of the fire panel invoice and payment instructions.

5.51    On April 7, 2025, however, Silver Star received an email and letter from Bellwether regarding a certain financial statement covenant which was outstanding, but Bellwether communicated nothing further regarding the fire panel funding request. On or about May 7, 2025, Silver Star learned that BSP had acquired the balance of the RMWC Junior loan and that Silver Star's applicable reserves had been transferred to the service for BSP.  In a telephone conversation on May 23, 2025, in which Fox participated with Silver Star's counsel, BSP and its counsel stated that it had no knowledge of any reserve requests.

5.52    Failure on the part of RMWC/Bellwether – and now BSP – to release operating expense funds necessary to replace this fire panel has resulted in the displacement of a substantial tenant of Silver Star's. If this Court does not grant a Temporary Restraining Order resulting in the release of operating expenses funds sufficient to replace the fire panel, the permanent departure of this substantial tenant will result in irreparable harm to Silver Star. Further, if the Court does not grant a Temporary Restraining Order resulting in the release of operating expenses corresponding to Silver Star's May 2025, June 2025, and July 2025, requests, and restrain future denials, Silver Star will suffer additional and ongoing, irreparable harm, by defaulting on its other landlord obligations

and responsibilities, losing countless other valuable tenants and business relationships with managers and vendors – all critical to its very survival as a company.

**New imminent and irreparable harms continue**

5.53    On or about July 14, 2025, the Honorable Melody Wilkinson denied Silver Star's initial request for a TRO to order BSP to return Silver Star's applicable reserves, among other relief. Since that time, new irreparable harms continue to occur. For example, the following is a revised total of funds swept by BSP since May 1, 2025, without accounting by BSP or explanation, all of which is resulting irreparable harm to Silver Star:

| DATE | AMOUNT | (BSP)ACCOUNTING |
|------|--------|-----------------|
| 07/16/25 | $136,658.64 | NONE |
| 07/14/25 | $457,700.55 | NONE |
| 07/07/25 | $447,706.71 | NONE |
| 06/30/25 | $114,444.82 | NONE |
| 06/20/25 | $490,910.79 | NONE |
| 06/18/25 | $23,606.91 | NONE |
| 06/06/25 | $1,000,290.93 | NONE |
| 05/19/25 | $1,394,028.68 | NONE |
| 05/16/25 | $5,000.00 | NONE |
| | $4,070,348.03 | |

5.54    Silver Star continues to experience serious problems across the legacy portfolio that both impact and threaten its ability to provide the required, appropriate, and safe property-level service to its tenants and customers as outlined by its lease agreements with them.  These include but are

not limited to fire safety, HVAC repair & maintenance, elevator repair and maintenance, housekeeping and janitorial, and funding of tenant improvements, including but not limited to:

*Three Forest Plaza* – One of the two chillers is not operational and requires a leak repair. The other chiller has a bad bearing which needs to be replaced. With one down and the other operating under need of repair, Silver Star is at significant risk of losing the ability to provide conditioned air to tenants at the peak of summer, which if failure of the operating chiller happened would force them to close their offices and work elsewhere. There is an outstanding balance of $11,287 plus tax due to the HVAC vendor at Three Forest. A non-operational garage elevator needs repair, which creates both convenience and safety issues for Silver Star's frustrated tenants. One of the high-rise elevators is non-operational, requiring assessment costing $10,242 plus tax that Silver Star cannot fund to determine the necessary work to bring it operational.

*The Preserve* – One of the two chillers is not operating and needs a new compressor costing $94,795 plus tax. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for its tenants.

*One Technology* – as discussed above the fire panel needs replacement at a cost of $87,987 plus tax and one of Silver Star's significant tenants has sent employees away until this safety issue is resolved. Silver Star has $82,995 in unpaid bills with an HVAC vendor preventing Silver Star from obtaining the proper repair and maintenance work necessary to keep these systems operational. UT Health San Antonio has abandoned the building due to ongoing problems with HVAC.

*Westheimer Central* – One of the two chillers is not operational. With a substantial past due balance, the vendor is unwilling to repair the other chiller. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for Silver Star's tenants. The pending HVAC work at this property would cost $96,277 plus tax. Silver Star has outstanding repairs necessary to the elevators, estimated at $150,000 by its Director of Asset Management, which cannot move forward without proper funding.

*601 Sawyer* – Silver Star's HVAC vendor is unwilling to provide service due to unpaid balance of $5,995 plus tax.

*Across the Legacy Portfolio*

- Chemicals for chilled water – Silver Star's vendors are unpaid and therefore not providing chemicals for treatment of the chilled water across the legacy portfolio. This puts these systems at imminent risk for further damage.

- Landscaping maintenance – Payments to landscaping service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Tejas landscaping, one of the landscape vendors, has stopped providing service with $5,485 of outstanding balance.

- Janitorial services – Payments to janitorial service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Starlight the vendor at Three Forest Plaza says they will stop service with a $63,201 balance due.

- Security – Silver Star's portfolio-wide security vendor had been threatening to remove service due to a $162,430 past due balance. On July 30, 2025, Avail Security terminated service for all office properties (Preserve, Westheimer, Sawyer, One Technology Center, and Three Forest Plaza. Silver Star was forced to reject Avail's demand for current weekly payments, because with BSP's withholding of operation expense funding, Silver Star has no means to make such payments. This removal of security puts Silver Star's tenants at substantial personal, possibly life threatening, risk, and it will likely induce them to abandon Silver Star's buildings.

5.55    Due to these issues, tenants are and have been unable to operate at the properties. They are also reluctant to engage in renewal discussions. When they do engage in renewal discussions, they and their broker representatives have required non-market concessions, such as escrow of tenant improvement and broker commissions up front to move forward.

5.56    In addition to the $8,562,846.74 taken by BSP on or about May 7, 2025, the following is a revised summary of funds BSP has taken from Silver Star's cash management account since May 1, 2025, along with a statement of what accounting BSP has provided, if any:

| DATE | AMOUNT | (BSP)ACCOUNTING |
|------|--------|-----------------|
| 07/16/25 | $136,658.64 | NONE |
| 07/14/25 | $457,700.55 | NONE |
| 07/07/25 | $447,706.71 | NONE |
| 06/30/25 | $114,444.82 | NONE |
| 06/20/25 | $490,910.79 | NONE |

| | | |
|---|---|---|
| 06/18/25 | $23,606.91 | NONE |
| 06/06/25 | $1,000,290.93 | NONE |
| 05/19/25 | $1,394,028.68 | NONE |
| 05/16/25 | $5,000.00 | NONE |
| | $4,070,348.03 | |

5.57    BSP has provided NO explanation or accounting for how most of these funds taken from Silver Star have been applied. The last disbursement of Silver Star Collateral operating expenses was April 9, 2025, in the amount of $886,916.30 for payment of April 2025 operating expenses. For the period from 7-17 to 7-31-2025 the Silver Star Collateral estimates tenant receipts of $135,000.  For the month of August 2025, estimated tenant receipts are $1,130,000. The utility costs listed above have been noticed for DISCONNECT on 7-28-2025.

5.58    For all of these reasons, Silver Star requests that this Court enter the appropriate Temporary Restraining Order, Temporary Injunction and Permanent Injunction so that Silver Star and its shareholders' investments are protected, rather than being destroyed by BSP's overreach and predatory lending practices.

## VI.  CAUSES OF ACTION

## A) Texas Statutory Tort – Fraud in a Real Estate Transaction:

6.1    When BSP marketed and sold the Walgreens properties, it ceased being a mere purchase money lender, and it stepped into the role of seller. In addition to BSP's representations and commitment regarding future financing, in marketing the Walgreens properties for sale, BSP provided due diligence materials that included leases, historical analyses and other documents related to the performance and value of the properties. Silver

Star will show that the materials provided by BSP indicated that the values of the Walgreens properties was greater than their values actually were. BSP made the misrepresentations for the purpose of inducing Silver Star to buy the Walgreens properties. In reliance on BSP's misrepresentations, Silver Star purchased the Walgreens properties. Silver Star suffered harm from BSP's misrepresentations, in that it purchased Walgreens properties it would not otherwise have purchased but for BSP's misrepresentations, and it now owns properties worth significantly less than the values it believed it was getting. For these reasons, BSP's actions constitute the Texas tort of statutory fraud in a real estate transaction.

6.2     The elements of statutory fraud in a real estate transaction are:

a. There was a transaction involving real estate.

b. During the transaction, the defendant:

i. made a false representation of fact;

ii. made a false promise; or

iii. benefited by not disclosing that a third party's representation or promise was false.

c. The false representation or promise was made for the purpose of inducing the plaintiff to enter into a contract.

d. The plaintiff relied on the false representation or promise by entering into the contract; and

e. The reliance caused the plaintiff injury.

Tex. Bus. & Comm. Code §27.01, *et seq*.

6.3     Silver Star Properties REIT, Inc. sues for statutory fraud in a real estate transaction and seeks actual and exemplary damages of undetermined value.

**B) <u>Texas Tort of Breach of Fiduciary Duty</u>:**

6.4     A lender is no longer at arm's length when it takes exclusive control over the borrower's business and is effectively running the borrower's business. When that occurs, the lender becomes the borrower's fiduciary and incurs the fiduciary duties of not self-dealing and complete candor, among others. *In re Bailey Tool & Manufacturing Co.*, 2021 WL 6101847, *41 (Bankr. N.D.Tex. – December 23, 2021, Sternigan, J.) ("If a lender exercises excessive control over a borrower, however, a lender can assume the role of fiduciary rather than a mere creditor. When such a change occurs… the lender is required to make decisions in the best interests of the borrower, even if contrary to the best interest of the lender.

6.5     Alternatively, even if a fiduciary relationship is not established, if a lender takes a particularly active role in the business decisions of the borrower and…intentionally interferes with…borrower's business contracts, a lender may become liable for tortious interference.").[1] The mere fact that the loan agreement contractually authorizes a remedy is not a defense to the claim of breach of fiduciary duty, and when a contract places a decision in the lender's discretion it presumes the lender will act reasonably. *State Nat. Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661, 685 (Tex.App. – El Paso 1984, *writ granted; case dismissed* 1985).

6.6     Here, on loans experiencing no monetary defaults, BSP continues to deny Silver Star the ability to pay a single operating expense – insuring imminent and substantial harm to Silver Star before it can even have its contractual defenses heard by this Court. At all times material to this case, BSP retained possession and exclusive control over Silver Star's cash reserves, and it retained the exclusive right to approve every dollar spent. Silver Star had to ask BSP for permission to spend its own money. Silver Star's requests for operational expenses were not only reasonable –

---

[1] *In re Bailey Tool* also held that Texas tort law applied, regardless of what state's law applied to contractual claims. *In re Bailey Tool*, 2021 WL 6101847, at *36

they were essential both to the fulfillment of Silver Star's duties to the properties' tenants and critical to Silver Star's survival as a company. Moreover, while a non-material breach may give rise to a cause of action, it does not excuse future performance. Perhaps most importantly, BSP was never actually insecure – it was fully collateralized and no monetary defaults had occurred.

6.7     As such, at all material times, BSP was a fiduciary of Silver Star and owed Silver Star a duty of complete candor and to avoid self-dealing. BSP breached its duty of complete candor by failing and refusing to provide Silver Star with an accounting of the Silver Star funds it converted. BSP breached its fiduciary duty by self-dealing – that is, putting its own financial interests above those of Silver Star.

6.8     A breach of fiduciary duty occurs under Texas law when:

1)  The plaintiff and defendant had a fiduciary relationship;

2)  The defendant breached its fiduciary relationship to the plaintiff; and

3)  The defendant's breach resulted in

   (a)  Injury to the plaintiff; or
   (b)  Benefit to the defendant.

In this case, BSP's actions resulted in *both* injury to Silver Star and a benefit to BSP.  In a breach of fiduciary duty case, a plaintiff is entitled to recover actual damages, including both economic and mental anguish damages, plus exemplary damages, in addition to equitable remedies such as disgorgement. Silver Star hereby sues for breach of fiduciary duty and seeks all such damages, which as of this date an undetermined value.

6.9     Alternatively, the fact that BSP's conduct constituted breach of fiduciary duty further supports Silver Star's request that this Court declare it unreasonable and enjoin it, both emergently and permanently.

**C) <u>Texas Tort of</u> <u>Conversion</u>:**

6.10    The elements of conversion in Texas are:

   a. The plaintiff owned, possessed, or had the right to immediate possession of property;

   b. The property was personal property;

   c. The defendant wrongfully exercised dominion or control over the property; and

   d. The plaintiff suffered injury.

Silver Star hereby sues for conversion.

6.11    Alternatively, the fact that BSP's conduct constituted conversion further supports Silver Star's request that this Court declare it unreasonable and enjoin it, both emergently and permanently.

**D) <u>Texas Tort of</u> <u>Duress/Economic Duress</u>:**

6.12    In a borrow/lender relationship, "duress" occurs when the lender makes a threat to engage in conduct that is wrongful or unlawful, the borrow had no reasonable alternative but to acquiesce in the lender's demands, the lender's threat actually induced the borrower's conduct or agreement, and the threat of harm was imminent.

6.13    "Economic duress" occurs when the lender threatened to cause economic injury (such as calling a loan, refusing to extend credit, or demanding immediate payment), the threatened conduct was wrongful (such conduct can be wrongful even if technically within the lender's contractual rights, if exercised in bad faith), the borrower had no reasonable alternative source of financing or means to avoid the economic harm, and the threat actually caused the borrow to act against their will. Silver Star sues for economic duress.

6.14    Alternatively, the fact that BSP's conduct constituted duress and/or economic duress further supports Silver Star's request that this Court declare it unreasonable and enjoin it, both emergently and permanently.

**E) <u>Declaratory Judgment</u>:**

6.15    Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Silver Star seeks a declaratory judgment from this Court that:

> a. Section 4.2's requirement that Silver Star furnish annual financial statements "prepared and reviewed by an independent CPA" is an impossibility, which is a contractual defense to BSP's claim of default;

> b. Section 4.2's requirement that Silver Star furnish annual financial statements "prepared and reviewed by an independent CPA" is not a material term; and/or

> c. BSP acted unreasonably in declaring default, charging default interest, awarding itself an "exit fee," seizing Silver Star's cash reserves and refusing and continuing to refuse to advance such funds as are reasonably necessary for Silver Star to run its business.

**F) <u>Exemplary/Punitive Damages</u>:**

6.16    Under Texas public policy, exemplary/punitive damages are designed to penalize a defendant for outrageous, malicious, or otherwise morally culpable conduct, and to deter such conduct in the future – by that defendant or others. Further, the actions of a business entity's principals or vice principals *are* the entity's acts, and business entities are subject to exemplary/punitive damages for the actions of their principals and vice principals committed in breach of a fiduciary duty, or with fraud, gross negligence or malice. Plaintiff's breach of fiduciary duty and fraud claims are explained above.

6.17    Under Texas law, "gross negligence" occurs when 1) the act or omission, viewed objectively from the defendant's standpoint at the time it occurred, involved an extreme risk, considering the probability and magnitude of the potential harm to others; and 2) the defendant

had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety or welfare of others.

6.18    Under Texas law, "malice" is defined as a specific intent to cause substantial injury or harm to the plaintiff.

## VII. ATTORNEY'S FEES

7.1    Silver Star has retained Walter L. Taylor of the Taylor Law Firm to represent it in this declaratory action, and has agreed to pay the firm's reasonable and necessary attorney's fees. Silver Star is entitled to recovery these fees if it prevails on its statutory fraud in a real estate claim. Tex. Bus. & Comm. Code §27.01(e). Further, an award of reasonable and necessary attorney's fees to Silver Star would be equitable and just, and therefore it is authorized by Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

## VIII.    CONDITIONS PRECEDENT

8.1    All conditions precedent to the filing of this suit, as well as the recovery of attorney's fees, have been met.

## IX.    APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUCTION AND PERMANENT INJUCTION

9.1    The Silver Star Plaintiffs would show that Defendant has engaged in unlawful acts and unlawful refusals to act – both imminently likely to occur again in the future – which have resulted in, continue to result in, and will continue to result in, immediate and irreparable injury, loss, or damage to Plaintiffs before notice can be served and a hearing had on this Application.  As established by the Affidavit of Silver Star's CFO, Lou T. Fox, III, attached hereto as Exhibit 1, Plaintiffs have suffered irreparable harm in a way that cannot be tracked or calculated.  Further, commercial leasing and vendor/service relationships are unique and built on history and trust –

they are not fungible. The loss of these relationships and Silver Star's reputation constitutes irreparable injury, for which there is no adequate remedy at law.

9.2     Moreover, allowing Defendants' tortious and unreasonable conduct to continue unrestrained will result in an undetermined and possibly immeasurable harm to Plaintiff's business relationships and the investments of its approximately 4,500 shareholders, which harm is difficult to calculate, and for which there is also no adequate remedy at law.

9.3     Plaintiff would show it also has a likelihood of success on the merits, the balance of interests (between a fully secured and protected creditor and a solvent borrower the creditor is putting out of business unnecessarily) weighs in favor of granting the TRO and Temporary Injunction, and that Texas public policy also favors granting the TRO and Temporary Injunction.

9.4     Accordingly, Plaintiffs pray that this Court enforce, extend and renew its Temporary Restraining Order currently in effect, restraining and compelling the BSP Defendants – including all of their affiliates, subsidiaries, parent companies, officers, directors, managers, principals and vice principals, and all persons and entities acting in active concert or participation with the BSP Defendants and all such persons and entities as follows:

> To the extent revenues from the Properties (as defined in the Loan Agreements) are currently in the Clearing Account, the Cash Management Account, or the Reserve Accounts (as defined in the Loan Agreements), or collected in such accounts after August 4, 2025, Temporary Restraining Order is was signed and before the expiration of the Court TRO at 4:35 p.m. on August 18, 2025, or the expiration of an extended TRO, if any, the BSP Defendants shall release to Silver Star Plaintiffs requested funding, in an amount not to exceed $1.25 million, for (1) the operating expenses of $1,074,039.69 listed in the chart on p. 2 of Plaintiff's Supplemental Application for TRO – with the exception of the tenant refund amount of $55,335.96; and (2) to the extent not duplicative of such amounts, the operating expenses listed on pp. 4-5 of Plaintiff's Supplemental Application for TRO.

Plaintiffs request the Court lower its arbitrarily high cap from $1.5 million to $1.25 million.

Plaintiffs request a trial on the merits to occur no later than November 2025.Within five (5) days of payment of such operational expenses, Plaintiffs shall provide documentation of such operational expenses in native or .pdf format with metadata intact.

Plaintiffs pray that the Court extend the TRO for an additional fourteen (14) days and lengthen its application to all rents collected prior to the conclusion of the Temporary Injunction hearing (at whatever new date the Court sets).

Plaintiffs pray that the Court authorize Plaintiffs to conduct expedited discovery, including depositions, requests for production of documents, or other appropriate discovery means, in preparation for the Temporary Injunction hearing, and that the Court set a hearing date for the Temporary Injunction.

9.5     Plaintiffs further pray that after notice, citation and writs have been issued, and after hearing evidence, that the Court further grant Plaintiffs the relief requested in this Application for Temporary Restraining Order, and such other and further relief as Plaintiffs may request between now and then as a result of further investigation or discovery, in the form of a Temporary Injunction.

9.6     Finally, Plaintiffs pray that, upon trial of the final merits of this cause, that the Court further grant Plaintiffs the relief granted in this Temporary Restraining Order, and such other and further relief as Plaintiffs may request between now and then as a result of further investigation or discovery, in the form of a Permanent Injunction and Final Judgment.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully pray that Defendant be cited to appear and answer herein, that Plaintiffs be granted a Temporary Restraining Order and Temporary Injunction ordering or restraining the foregoing emergency relief, and that, after a trial on the merits, Plaintiffs be awarded judgment against Defendants for injunctive relief, and specific performance. Plaintiffs reserve their right to amend these pleadings to conform to the facts as they may develop, or to assert claims for damages resulting from future conduct, or that

the evidence may later reveal have occurred. Plaintiffs further pray for costs, pre-judgment and post-judgment interest at the maximum rate allowed by law, whether equitable or statutory, and for such other and further relief, special or general, legal or equitable, to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
*taylorlawfirmdfw@gmail.com*
**TAYLOR LAW FIRM**
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700

**ATTORNEY FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I certify by my signature above that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on August 11, 2025, including:

**Jacob Sparks**
Email: *Jacob.Sparks@NelsonMullins.com*

**Brent T. Buyse**
Email: *Brent.Buyse@NelsonMullins.com*

**Xenna Davis**
Email: *Xenna.Davis@NelsonMullins.com*

**NELSON MULLINS RILEY &SCARBOROUGH, LLP**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Walter Taylor on behalf of Walter Taylor
Bar No. 19727030
taylorlawfirmdfw@gmail.com
Envelope ID: 104188082
Filing Code Description: Amended Filing
Filing Description: P Silver Star's Second Amended Original Petition
Status as of 8/11/2025 8:37 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacob Sparks | 24066126 | Jacob.Sparks@NelsonMullins.com | 8/11/2025 7:40:47 AM | SENT |
| Walter Taylor | 19727030 | taylorlawfirmdfw@gmail.com | 8/11/2025 7:40:47 AM | SENT |
| Business Court 8B | | BCDivision8B@txcourts.gov | 8/11/2025 7:40:47 AM | SENT |

NO. 048-366561-25

| | | |
|---|---|---|
| SILVER STAR PROPERTIES REIT, INC., SILVER STAR CRE, LLC, SILVER STAR CRE II, LLC, SILVER STAR DELRAY, LLC, Plaintiffs, | § § § § § | IN THE DISTRICT COURT |
| V. | § § § | 48th JUDICIAL DISTRICT |
| BSPRT CRE FINANCE, LLC, FBRED BDC FINANCE, LLC, and BSPRT CS LOAN, LLC, Defendants | § § § | TARRANT COUNTY, TEXAS |

### PLAINTIFF'S SUPPLEMENTAL APPLICATION FOR TEMPORARY RESTRAINING ORDER

Without waiving their rights to seek or receive other requested relief, the Silver Star Plaintiffs file this Supplemental Application for Temporary Restraining Order – incorporating their Original Petition, Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction, as well as any amendments or supplements thereto.

Specifically, between now and the August 12, 2025, Temporary Injunction hearing, the Silver Star Plaintiffs request very narrow 11-day emergency relief maintaining the status quo as Silver Star's loans with the BSP Defendants contemplated – that is, allowing Silver Star to continue operating its collateral commercial buildings and storage facility by collecting rents and expending necessary operating expenses, and restraining the BSP Defendants from using their access and exclusive control of Silver Star's cash account(s) to drive Silver Star out of business and cost Silver Star's 4,500 shareholders (many of whom are non-institutional investors and some of whom are elderly. On or about July 14, 2025, the Honorable Melody Wilkinson denied Silver Star's requested TRO to order BSP to return Silver Star's applicable reserves in excess of $8 million, among other relief. Since that time, however, new irreparable harms continue to occur and threaten to occur:

Plaintiff's Supplemental Application for TRO - *Silver Star, et al., v. BSPRT CRE Finance, LLC, et al.*, p. 1

## Past Due Balances for Which BSP Refuses to Approve Payment:

As demonstrated by Exhibit 1 – the August 1, 2025, Affidavit of Lou T. Fox, III – Silver Star REIT, Inc.'s Chief Financial Officer, the following irreparable harm is imminent:

As of July 7, 2025, the following property operating expenses (shown as "OPEX") are either past due or currently due and payable:

| OPEX Type | Current Due |
|---|---|
| Electricity | 340,924.54 |
| Elevator | 15,006.40 |
| HVAC | 145,073.27 |
| Internet | 1,012.74 |
| Janitorial | 259,502.67 |
| Landscape | 13,566.42 |
| Parking lot rental | 2,500.00 |
| Permits | 4,077.15 |
| Pest control | 7,593.56 |
| Security | 156,361.60 |
| Security access control | 6,243.18 |
| Tenant refund | 54,335.96 |
| Trash | 7,697.20 |
| Uniforms | 1,001.19 |
| Water | 59,143.81 |
| **Grand Total** | **1,074,039.69** |

In addition to the foregoing list of property operating expenses, property operating labor expenses have not been disbursed. Property operating labor expenses are $157,294 for May 2025, $157,294 for June 2025 and $148,527 for July 2025. Property management and operations personnel have been paid as of August 1, 2025, for salaries and wages earned as of July 26, 2025. There can be no assurance that Silver Star will be able to fund next payroll which is due August 15, 2025.

### Additional Funds Swept by BSP for its own Benefit

After the $8+ million swept by BSP and applied to early loan payments, fees and other costs benefiting BSP, the following is a revised total of additional funds swept by BSP since May

1, 2025, without accounting by BSP or explanation, all of which is resulting irreparable harm to Silver Star:

| DATE | AMOUNT | (BSP)ACCOUNTING |
|---|---|---|
| 07/16/25 | $136,658.64 | NONE |
| 07/14/25 | $457,700.55 | NONE |
| 07/07/25 | $447,706.71 | NONE |
| 06/30/25 | $114,444.82 | NONE |
| 06/20/25 | $490,910.79 | NONE |
| 06/18/25 | $23,606.91 | NONE |
| 06/06/25 | $1,000,290.93 | NONE |
| 05/19/25 | $1,394,028.68 | NONE |
| 05/16/25 | $5,000.00 | NONE |
| | $4,070,348.03 | |

BSP has provided NO explanation or accounting for how most of these funds taken from Silver Star have been applied. The last disbursement of Silver Star Collateral operating expenses was April 9, 2025, in the amount of $886,916.30 for payment of April 2025 operating expenses. For the period from 7-17 to 7-31-2025 the Silver Star Collateral estimates tenant receipts of $135,000. For the month of August 2025, estimated tenant receipts are $1,130,000. The utility costs listed above have been noticed for DISCONNECT on 7-28-2025.

*Additional Imminent and Irreparable Harm*

Silver Star continues to experience serious problems across the legacy portfolio that both impact and threaten its ability to provide the required, appropriate, and safe property-level service to its tenants and customers as outlined by its lease agreements with them. These include but are

not limited to fire safety, HVAC repair & maintenance, elevator repair and maintenance, housekeeping and janitorial, and funding of tenant improvements, including but not limited to:

**Three Forest Plaza** – One of the two chillers is not operational and requires a leak repair. The other chiller has a bad bearing which needs to be replaced. With one down and the other operating under need of repair, Silver Star is at significant risk of losing the ability to provide conditioned air to tenants at the peak of summer, which if failure of the operating chiller happened would force them to close their offices and work elsewhere. There is an outstanding balance of $11,287 plus tax due to the HVAC vendor at Three Forest. A non-operational garage elevator needs repair, which creates both convenience and safety issues for Silver Star's frustrated tenants. One of the high-rise elevators is non-operational, requiring assessment costing $10,242 plus tax that Silver Star cannot fund to determine the necessary work to bring it operational.

**The Preserve** – One of the two chillers is not operating and needs a new compressor costing $94,795 plus tax. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for its tenants.

**One Technology** – as discussed above the fire panel needs replacement at a cost of $87,987 plus tax and one of Silver Star's significant tenants has sent employees away until this safety issue is resolved. Silver Star has $82,995 in unpaid bills with an HVAC vendor preventing Silver Star from obtaining the proper repair and maintenance work necessary to keep these systems operational. UT Health San Antonio has abandoned the building due to ongoing problems with HVAC.

**Westheimer Central** – One of the two chillers is not operational. With a substantial past due balance, the vendor is unwilling to repair the other chiller. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for Silver Star's tenants. The pending HVAC work at this property would cost $96,277 plus tax. Silver Star has outstanding repairs necessary to the elevators, estimated at $150,000 by its Director of Asset Management, which cannot move forward without proper funding.

**601 Sawyer** – Silver Star's HVAC vendor is unwilling to provide service due to unpaid balance of $5,995 plus tax.

**Across the Legacy Portfolio**

- Chemicals for chilled water – Silver Star's vendors are unpaid and therefore not providing chemicals for treatment of the chilled water across the legacy portfolio. This puts these systems at imminent risk for further damage.

- Landscaping maintenance – Payments to landscaping service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Tejas landscaping, one of the landscape vendors, has stopped providing service with $5,485 of outstanding balance.

- Janitorial services – Payments to janitorial service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Starlight the vendor at Three Forest Plaza says they will stop service with a $63,201 balance due.

- Security – Silver Star's portfolio-wide security vendor had been threatening to remove service due to a $162,430 past due balance. On July 30, 2025, Avail Security terminated service for all office properties (Preserve, Westheimer, Sawyer, One Technology Center, and Three Forest Plaza. Silver Star was forced to reject Avail's demand for current weekly payments, because with BSP's withholding of operation expense funding, Silver Star has no means to make such payments. This removal of security puts Silver Star's tenants at substantial personal, possibly life threatening, risk, and it will likely induce them to abandon Silver Star's buildings.

Due to these issues, tenants are and have been unable to operate at the properties. They are also reluctant to engage in renewal discussions. When they do engage in renewal discussions, they and their broker representatives have required non-market concessions, such as escrow of tenant improvement and broker commissions up front to move forward.

*Grounds*

In additional to the grounds articulated in Silver Star's pleadings, and as articulated elsewhere in Silver Star's briefing, a lender is no longer at arm's length when it takes exclusive control over the borrower's business and is effectively running the borrower's business. When that occurs, the lender becomes the borrower's fiduciary and incurs the fiduciary duties of not self-dealing and complete candor, among others. *In re Bailey Tool & Manufacturing Co.*, 2021 WL 6101847, *41 (N.D.Tex.Bankruptcy – December 23, 2021, Sternigan, Bankruptcy Judge) ("If a lender exercises excessive control over a borrower, however, a lender can assume the role of fiduciary rather than a mere creditor. When such a change occurs… the lender is required to make

decisions in the best interests of the borrower, even if contrary to the best interest of the lender. Alternatively, even if a fiduciary relationship is not established, if a lender takes a particularly active role in the business decisions of the borrower and…intentionally interferes with…borrower's business contracts, a lender may become liable for tortious interference.").[1] The mere fact that the loan agreement contractually authorizes a remedy is not a defense to the claim of breach of fiduciary duty, and when a contract places a decision in the lender's discretion it presumes the lender will act reasonably. *State Nat. Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661, 685 (Tex.App. – El Paso 1984, *writ granted; case dismissed* 1985). Here, on loans experiencing no monetary defaults, BSP continues to deny Silver Star the ability to pay a single operating expense – insuring Silver Star's death before it can even have its contractual defenses heard by this Court.

Section 14.6 of BSP's loan documents expressly authorizes Silver Star to obtain injunctive relief when BSP acts unreasonably. As Silver Star's pleadings and briefing articulate elsewhere, BSP has filed no document claiming that Silver Star has unclean hands or is barred from equitable injunctive relief. Even if such a claim were made, however, the doctrine "unclean" hands – when claimed – requires a showing of unlawful, inequitable, unjust or unconscionable. *Paciwest, Inc., v. Warner Properties, LLC*, 266 S.W.3d 559, 571 (Tex.App. – Fort Worth, pet. denied); *Dunnagan v. Watson,* 204 S.W.3d 30, 41 (Tex.App.–Fort Worth 2006, pet. denied). Here, the evidence before the Court shows Silver Star has the defense of impossibility (among others) to the breach BSP has claimed. Since "impossibility" is a contract defense, it cannot be "unlawful, inequitable, unjust or unconscionable." Even when such conduct is pled and shown, however, it still cannot serve as a bar to equitable relief unless it is also shown that party asserting the doctrine has been seriously

---

[1] *In re Bailey Tool* also held that Texas tort law applied, regardless of what state's law applied to contractual claims. *In re Bailey Tool*, 2021 WL 6101847, at *36

harmed _and_ the wrong complained of cannot be corrected without the application of the doctrine. _Paciwest, Inc., v. Warner Properties, LLC_, 266 S.W.3d at 571; _Dunnagan v. Watson_, 204 S.W.3d at 41.

For all of these reasons, Silver Star requests that this Court enter the appropriate Temporary Restraining Order, Temporary Injunction and Permanent Injunction so that Silver Star and its shareholders' investments are protected, rather than being destroyed by BSP's overreach and predatory lending practices.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
_taylorlawfirmdfw@gmail.com_
**TAYLOR LAW FIRM**
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700

**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify by my signature above that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on August 1, 2025, including:

**Jacob Sparks**
Email: _Jacob.Sparks@NelsonMullins.com_

**Brent T. Buyse**
Email: _Brent.Buyse@NelsonMullins.com_

**Xenna Davis**
Email: _Xenna.Davis@NelsonMullins.com_

**NELSON MULLINS RILEY &SCARBOROUGH, LLP**

<span style="color:red">EXHIBIT 1</span>

NO. 048-366561-25

| | | |
|---|---|---|
| **SILVER STAR PROPERTIES REIT,** | § | **IN THE DISTRICT COURT** |
| **INC., SILVER STAR CRE, LLC, SILVER** | § | |
| **STAR CRE II, LLC, SILVER STAR** | § | |
| **DELRAY, LLC, Plaintiffs,** | § | |
| | § | |
| | § | **48ᵗʰ JUDICIAL DISTRICT** |
| **V.** | § | |
| | § | |
| **BSPRT CRE FINANCE, LLC, FBRED** | § | |
| **BDC FINANCE, LLC, and BSPRT CS** | § | |
| **LOAN, LLC, Defendants** | § | **TARRANT COUNTY, TEXAS** |

<u>**AFFIDAVIT OF LOUIS T. FOX, III, CHIEF FINANCIAL OFFICER**</u>
<u>**AND TREASURER, SILVER STAR PROPERTIES REIT, INC.**</u>

**STATE  OF  TEXAS**        §

**COUNTY OF TARRANT**     §

BEFORE ME, the undersigned authority, on this day personally appeared Louis T. Fox, III, Chief Financial Officer and Treasurer of Silver Star REIT, Inc., who swore on oath that the following facts are true:

"1.     My name is Louis T. Fox, III, and I have served as the Chief Financial Officer ("CFO") and Treasurer for Plaintiff Silver Star REIT, Inc. ("Silver Star" or "the Company"), since 2007. I am fully competent to make this Affidavit, and all of the facts stated herein are within my personal knowledge unless otherwise indicated.

**<u>Qualifications, Experience and Expertise:</u>**

2.     As Plaintiff's CFO, I have responsibility for financial reporting, accounting, treasury, and investor relations within Silver Star REIT, Inc., and its affiliated entities, and I have extensive education and professional experience in this field. I received a Bachelor of Arts degree in accounting from the University of Texas at San Antonio, I am a former practicing certified public accountant, and I started my career as a tax accountant with Arthur Andersen & Co.

3.     Prior to joining Silver Star Properties REIT in March, 2007, from April 2006 until January 2007 I served as Chief Financial Officer of Legacy Brands, a restaurant group, and from January 2004 until April 2006 as Chief Financial Officer of Unidynamics, Inc., a specialized EPC manufacturer of unique handling system solutions for the marine and energy industries. Prior to that, I served as Treasurer and CFO of Goodman Manufacturing, a major manufacturer of residential and commercial HVAC products for 9 years. In addition to my years of experience in the manufacturing industry, I have served in senior financial positions in the construction and debt collection service concerns.

Exhibit 1, Affidavit of Lou T. Fox, III - *Silver Star, et al., v. Benefit Street Partners ("BSP"), et al.*, p. 1

## Overview of Silver Star Properties REIT, Inc. and Basis for Lawsuit and Injunctive Relief:

4. Silver Star Properties REIT, Inc. is a self-managed real estate investment trust specializing in the acquisition and management of institutional-grade self-storage properties and other storage properties in secondary markets. In addition, Silver Star manages five legacy commercial office assets which we are evaluating for a sale or hold strategy.

5. Silver Star currently owns and operates office and self-storage assets in Houston, Dallas, McKinney and San Antonio, Texas and Delray Beach, Florida and is continuously evaluating future investments. Silver Star is currently focused on acquiring well-located self-storage facilities in markets with significant demand for storage space.

6. This plan to expand the Company's asset classes allows the Company to maintain a resilient investment approach and create a more inflation-resistant portfolio. Silver Star's business plan for the last 18 to 24 months has been to pivot away from its office REIT title to include a broader selection of asset classes. Silver Star expects this pivot to better position the Company to provide enhanced liquidity to its shareholders, by scaling its operations quickly with anticipated capital and through a listing of its securities on a national exchange.

7. I sign this Affidavit in support of Plaintiff's First Amended Original Petition and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction, and/or any Supplemental Application for Temporary Restraining Order, which have been made necessary because Silver Star's lender(s) – Benefit Street Partners and its affiliated lending entities ("BSP") – have overreached their lender rights under one or more in a series of cross-collateralized loan agreements with Silver Star and its affiliated entities. As explained more fully below, BSP's overreaching and egregious, aggressive collection measures have included abusing its exclusive control over Silver Star's entire cash reserves (in excess of $8 million), seizing all of Silver Star's available cash (in excess of $8 million) for its own benefit and increasing Silver Star's peril, charging excessive "default interest," insurance charges ($120,000), and BSP's legal fees ($50,000). Most critical to Silver Star's survival is BSP's refusal to maintain the status quo – using the buildings' rental income to fund basic monthly property operating expenses such as electricity, HVAC, janitorial, security, tenant refunds, trash, water, and other normal operational expenses – all of which has harmed and imminently threatens continuing irreparable harm to Silver Star Properties REIT, Inc. and its subsidiaries.

8. As of May 7, 2025, all Silver Star / BSP loans were fully performing, and no monetary default had occurred on any loan between the parties. Moreover, at all times material to these loans, BSP's interests were at all times fully and adequately secured by the collateral contractually chosen and agreed upon by the parties. Despite these facts, BSP declared a default on a non-monetary covenant (and in Silver Star's view, a non-material covenant impossible to perform as written) – the provision of financial statements "prepared and reviewed by an 'independent' certified public accountant."

9. Silver Star has been transparent with BSP about the futility and impossibility of performing this non-monetary covenant and has offered alternative solutions in response to BSP's declaration

of its breach. Silver Star has requested that BSP maintain the status quo – that is, that BSP continue to perform its lender obligations under the loans – approving and releasing basic operating expenses from Silver Star's cash reserves – but BSP has refused. BSP has instead seized Silver Star's operating funds and all cash reserves, and BSP has refused to extend operating expense funds necessary to operate the collateral properties and make Silver Star's payroll.

10.     In addition to its claims for damages herein, as irreparable harms continue to occur and additional irreparable harms remain imminent, Silver Star is requesting again that this Court grant immediate injunctive relief in the form of a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction ordering BSP to refrain from further conversion of Silver Star's operating funds, and compelling BSP to disburse to Silver Star's necessary operating expense funds from available unconverted funds. This emergency relief is necessary to restore the status quo – where Silver Star as landlord collects rents on the properties, and uses those funds to pay expenses necessary to operate the commercial properties, as described more fully below. This is necessary to preserve the viability of collateral and cross-collateral real estate assets in order to avoid and mitigate irreparable harm to Silver Star and its real estate tenants.

**Improper and Unauthorized Actions by Prior Executive Chairman; Bankruptcy Filing; BSP Exit Loans:**

11.     In the field of finance, "senior debt" is a type of debt that has priority over other forms of debt and equity in the event of a company's liquidation. Silver Star's senior debt – commonly referred to as the SASB loan ("SASB") – was originated in October 2018.  The SASB had a two-year term and three one-year extensions.  The final one-year extension was effective in October 2022.  The maturity date of the SASB was October 9, 2023.

12.     During the term of the SASB final extension, Silver Star undertook to sell certain real estate assets with applications of net sales proceeds to the SASB loan balance, in order to reduce the loan amount to be refinanced.

13.     In November 2022, Silver Star met with representatives of Raymond James Financial, Inc. – an investment banking and financial services company – to discuss an engagement to identify prospective lenders and manage the process of a refinance of Silver Star's SASB.  In January 2023, Silver Star engaged Raymond James, who then commenced preparation of an offering memorandum and began marketing efforts. In March 2023 Raymond James completed the offering memorandum and identified three prospective lenders.  In order to enter into negotiations with Silver Star, BSP signed a non-disclosure agreement ("NDA").

14.     In May 2023 BSP delivered an initial term sheet to Silver Star to provide up to $200 million for the refinance. In June 2023, representatives of Silver Star met with BSP in New York, and shortly thereafter Silver Star executed the term sheet/loan application. From June 2023 to August 2023 preliminary loan documents were drafted and reviewed.

15.     During these negotiations, it became necessary for Silver Star to address a pending internal issue affecting its ability to refinance the SASB. Unfortunately, Silver Star's former Executive Chair Allen Hartman had previously engaged in improper, illegal, and unauthorized actions in

order to challenge, frustrate and cloud title issues related to assets sales necessary to reduce Silver Star's SASB loan balance. As a means of swiftly addressing, and for the sole purpose of resolving, Hartman's spurious claims and actions against an affiliated entity bearing his name, Silver Star approved the filing of a Chapter 11 bankruptcy petition for Hartman SPE LLC (the named borrower and collateral owner under the SASB) on September 13, 2023.

16. Together with counsel for Hartman SPE LLC (now the Debtor), Silver Star developed a plan of reorganization. On November 28, 2023, BSP provided an updated term sheet (unsigned) for exit financing for the exit plan.

**The Silver Star Senior and Junior Exit Loans:**

17. On March 27, 2024, the reorganized Debtor entered into the BSP Senior Loan and the RMWC Junior Loan which provided $120 million and $15 million, respectively, of exit financing under the exit plan approved by the bankruptcy court, the lenders and the unsecured creditors.

18. Pursuant to the plan to which all parties had agreed, property sales were executed for the purpose of reducing the SASB loan – including many properties sold at a gain. In order to defer tax liability associated with gains, the property sales were closed using a qualified intermediary to facilitate 1031 exchanges. The net sales proceeds (cash) from the property sales were applied to reduce Silver Star's secured debt. In order to complete the 1031 exchange requirements and defer tax consequences, however, Silver Star had to identify replacement property and then acquire it within a certain time frame.

19. In order to complete the re-investment leg of the 1031 exchange, in June 2024 an arrangement was made with RMWC to provide an upsize to its Junior Loan in order to provide borrowed equity to close open 1031 exchanges. In June 2024, Silver Star acquired the McKinney storage property from an unrelated third party using upsize Junior loan proceeds for equity capital and seller financing. In July 2024, Silver Star acquired the Walgreens portfolio of 16 net lease assets from BSP using upsize Junior loan proceeds for equity capital and seller financing provided by BSP.

20. In summary, on March 27, 2024, Silver Star entered into the BSP Senior and Junior exit loans provided in connection with the conclusion of the Chapter 11 bankruptcy proceedings of Hartman SPE LLC. The Senior loan was a $120 million loan with a maturity date of April 2026. The Junior loan was initially a $15 million loan which was later upsized by the Junior lender to approximately $35 million. The primary document for these loans is the March 27, 2024, Loan Agreement between SILVER STAR CRE, LLC and SILVER STAR CRE II, LLC, as Debtors, and BSPRT CRE FINANCE LLC, as Lenders, which is attached as Exhibit 1-A to Plaintiff's Original Petition on file with the Court.

21. As of December 31, 2024, the Senior loan was paid in full, including Silver Star's payment of $14.4 million in minimum interest. The balance of the Junior loan as of April 30, 2025, was approximately $4.7 million. During the first quarter of 2025, BSP purchased the Junior loan, which to that point in time had experienced no monetary defaults and was performing well.

**The Walgreens Portfolio Loans – "BSP the Lender" Becomes "BSP the Seller:"**

22.     BSP, the senior lender for Hartman SPE LLC – the significant subsidiary of Silver Star – in connection with Hartman SPE  LLC's exit from Chapter 11 bankruptcy – requested Silver Star purchase sixteen (16) Walgreen's properties BSP had foreclosed, rather than BSP's having to sell them at auction. BSP agreed to finance the purchase, if Silver Star would buy the foreclosed properties. On July 1, 2024, acting through its affiliate lending entities BSPRT Walgreens Portfolio (Nos. 1, 2, 3, 4, 6, 7, 13, 14, 15, 16, 17, 19, 20, 21, 23 and 24) LLC ("BSPRT Walgreens"), BSP sold sixteen (16) single tenant Walgreens retail locations to Silver Star for a sales price of $60,925,000.  Acting through its affiliate BSPRT CRE FINANCE, LLC, BSP provided seller financing for the sale transaction(s) in the original loan amount of $57,750,000.  The Walgreens loan is subject to a cash management agreement during the term of the loan.  The maturity date of the Walgreens loan is August 9, 2025. The Walgreens Purchase and Sale Agreement is attached as Exhibit 1-B to Plaintiff's Original Petition on file with the Court.

23.     Silver Star's acquiescence to BSP's request that it purchase the Walgreens portfolio was an accommodation to BSP – as both seller and financing source – based on informal discussions that included BSP's representation, and therefore Silver Star's very reasonable expectation, of future financing commitment by BSP after the repayment of the exit loans provided at the conclusion of the Chapter 11 bankruptcy proceedings of Hartman SPE LLC.

24.     In addition to BSP's representations and commitment regarding future financing, in this lawsuit Silver Star alleges that in marketing the Walgreens properties for sale, BSP provided due diligence materials that included leases, historical analyses and other documents related to the performance and value of the properties. Silver Star further alleges the materials provided by BSP indicated that the values of the Walgreens properties was greater than their values actually were. BSP made the misrepresentations for the purpose of inducing Silver Star to buy the Walgreens properties. In reliance on BSP's misrepresentations, Silver Star purchased the Walgreens properties. Silver Star alleges it suffered harm from BSP's misrepresentations, in that it purchased Walgreens properties it would not otherwise have purchased but for BSP's misrepresentations, and it now owns properties worth significantly less than the values it believed it was getting.

**The Delray Loan:**

25.     On July 19, 2024, BSP and Silver Star entered into a third loan agreement for the financing of one stand-alone self-storage facility. The Delray Loan Agreement between SILVER STAR DELRAY, LLC, as Borrower, and FBRED BDC FINANCE, LLC, as Lender, which is attached as Exhibit 1-C to Plaintiff's Original Petition on file with the Court.  The Delray storage property was identified as a replacement property for 1031 exchange purposes in order to defer gain attributable to a property sold.  The net proceeds of the property sold were utilized to pay down secured debt.  The Delray acquisition was financed with proceeds of the upsized RMWC Junior Loan as equity capital and mortgage debt provided by BSP.

**BSP's Exclusive Control of Silver Star's Business Operations, and Unreasonable Self-Help Remedies:**

26. At BSP's insistence from day one, all cash collections for the legacy office properties, the Delray self-storage and the Walgreens portfolio are subject to the exclusive control of BSP and its agents, as are Silver Star's cash reserves. Since not one dollar can be spent without BSP's approval, BSP is essentially operating Silver Star's business – it determines every bill to pay or not pay, including every capital improvement, vendor or maintenance expense.

27. The situation Silver Star has endured since April as a result of BSP's actions is untenable to the point of impossibility. Specifically, Silver Star is unable to pay collateral property operating expenses, which will quickly result in irreparable harm to vendor and tenant relationships.

28. These relationships are not fungible nor easily recovered or replaced – they are built on trust and reputation, and word travels. If utilities are not paid, utilities are subject to service interruption (i.e., the power goes off). Unpaid contractual services such as security, janitorial, elevator maintenance, HVAC maintenance will result in service suspensions that will in turn disrupt property management operations and irreparably harm tenant relationships and renewal prospects.

29. The loan principle secured by Silver Star's legacy office properties is now ZERO. The funds needed for property operating expenses for these legacy properties are instead being converted to loan principal and fees of cross-collateral property (Walgreens). Since BSP is also fully secured on the Walgreens loan, BSP's exercise of power to divert Silver Star's funds is unnecessary for its own protection and instead serves principally to irreparably harm Silver Star and its affiliates, tenants and vendors.

The impossibility of the "prepared and reviewed by an independent CPA" covenant:

30. As previously stated, all three (3) loans in the Silver Star / BSP series are cross-collateralized. Both the Senior and Junior Exit Loans (March 2024) and the Delray Loan (July 2024) contained the following identical provision:

> **Section 4.12 Books and Records.**
> …
> (b) ***Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements <u>prepared and reviewed by an independent certified public accountant</u> acceptable to Lender (provided, however, that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower or the Property, <u>the same shall, upon Lender's written request, be audited by such independent certified public accountant</u>)*** in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the

financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, and operating expenses.

31. Based on my education and training in the financial world, including public accounting, the words "certified public accountant (CPA)," "review" and "independent," as they pertain to financial statements, are terms of art in the field of public accounting. A certified public accountant (CPA) is a licensed accounting professional who has met specific education, examination, and experience requirements, allowing them to provide a range of accounting services to the public. CPAs prepare and analyze financial records, prepare tax returns, conduct audits, reviews and compilations of financial statements, and provide other consulting and financial services. A "review" of financial statements by a certified public accountant generally refers to an attest or assurance engagement for the purpose of issuing a review report resulting from the conduct of work conducted in connection with the scope of work outlined in an engagement letter. "Independent" as that term is applied to certified public accountants means that the certified public accountant is independent in the performance of its professional services, which includes the representation that the reviewer did not participate in the preparation of the financial statements he/she is reviewing. Participation in the preparation of the financial statements under review spoil independence.

32. Financial statements can be prepared by a certified public accountant. Such accountant could be a third party, unrelated and unaffiliated. An independent certified public accountant could review or (not required here) audit financial statements. A certified public accountant who prepares and reviews financial statements is not independent. In my opinion as Chief Financial Officer and in Silver Star's opinion, the financial statements furnished are no different than financial statements which would have been prepared by any other competent accountant with knowledge of the individual properties, their respective leases, the administration of funds and the Loan Agreement. The determination to provide annual financial statements prepared by the Borrower was done in good faith and in the sincere belief that the literal loan agreement requirement is an impossibility. The Borrower's hands are clean. Notwithstanding the impossibility described above, the Borrower mitigated the issue by preparing and providing its annual financial statements.

33. With respect to the Walgreens properties, the periodic financial statements for the individual properties are simple. Income consists of rent. Expense consists of interest expense and bank charges. The difference between income and expense is net operating income. The accounting source information necessary for the preparation of the financial statements is under the control and administration of the Lender. The Lender, as the former owner and previous lender for the individual properties, is fully versed in the leases and the rents. Pursuant to the cash management account required and administered by the Lender, the Lender has full insight and access to the rent payment. The Lender has full insight and access to its servicer regarding the payment of debt service and bank charges.

**Silver Star exercises substantial effort to perform its non-monetary covenants capable of performance.**

34.     Silver Star takes the performance of its non-monetary covenants seriously. For example, Silver Star REIT's Guarantee requires it to furnish audited financial statements. At the time the loans were made, however, Silver Star's prospects for engaging an auditor had been, and continued to be, hamstrung by an inquiry subsequently an investigation by the SEC and the continuous assault on the Company by a rogue director and dissident shareholder – of which BSP was also aware prior to the inception of all three loans.

35.     Specifically, on or about November 29, 2023, Silver Star's previous CPA firm – Weaver and Tidwell, L.L.P. ("Weaver") – notified the Company and the Audit Committee of its Board of Directors of Weaver's decision not to stand for reelection as the Company's registered public accounting firm for the Annual Report for the 2023 fiscal year. Immediately thereafter, Silver Star – at the direction of the Audit and Executive Committees – undertook to engage a successor certified accounting firm.

36.     Silver Star and its Audit Committee engaged in countless calls, meetings and discussions with seven (7) prospective CPA firms, including a former auditor for the Company. On or about January 8, 2024, the Audit Committee signed an engagement letter with a prospective successor audit CPA firm. On or about January 15, 2024, however, this same prospective successor audit CPA firm advised the Company that, after completion of the CPA firm's client acceptance procedures, the CPA firm's client acceptance committee determined it would not approve the engagement. All of these facts predated the March 2024 Exit Loans and were fully known to BSP prior to executing the transactions.

37.     From January 2024 through November 2024, Silver Star had periodic and significant contact with the prospective firms referred to above – including substantial solicitations relating to acceptance of the full audit engagement – before Silver Star's negotiations with CBIZ CPAs (formerly Marcum LLP) finally entered a more serious phase as the Company was sent CBIZ's engagement letter for review.

38.     Throughout this period of time, several concerns were expressed by the various prospective CPA firms regarding potential engagement, including but not limited to the following:

(a) the ability of Hartman SPE to exit satisfactorily out of the bankruptcy proceedings;

(b) the SEC initiated inquiry/investigation; and

(c) the ongoing litigation with Hartman, in both Baltimore Maryland and Harris County, Texas, which involved complex analysis regarding the cessation of distributions, damages directly caused by Hartman's mismanagement, and general potential reputational harm to the Company.

39.     Of these concerns, the most challenging and a common hurdle negating client acceptance by the CPA firms was the SEC investigation. Fortunately, on December 24, 2024, Silver Star engaged CBIZ CPAs as its new independent registered public accounting firm. As of the date of this Affidavit, the CBIZ engagement team is and has continued to be fully engaged in the audit of the 2023 consolidated financial statements including communications with and documentation for the firms practice directors. Silver Star now expects it to be completed in either the late 3rd Quarter or early 4th Quarter of 2025.

40.     On or about April 16, 2025, I provided BSP by letter and E-mail the only set of financial statements Silver Star had been able to obtain up to that point in time, which Silver Star had prepared on its own behalf at my direction. I also advised BSP that having annual financial statements "prepared and reviewed by an independent CPA" was a futility. With respect to Silver Star REIT – the Guarantor – I also advised BSP that CBIZ CPAs had signed on as successor independent registered public accountants on December 24, 2024, to conduct audits of the Company's consolidated financial statements for the years ended December 31, 2023 and 2024, and that those audits were underway. I also advised BSP that, under the direction of its Audit Committee, Silver Star had put forth substantial effort to obtain audited financial statements after the resignation of our previous auditing CPAs, but those efforts had been futile until CBIZ CPA's accepted the position. I also advised BSP that, although CBIZ CPAs' efforts were underway, the estimated completion date for both audits was currently undetermined at that time.

**As a result of BSP's self-dealing, irreparable harm has occurred and will continue unless the status quo operation of the properties is restored and preserved:**

41.     Generally, the way these loans were supposed to operate was that Silver Star would market a collateralized property for sale, sell it, and a specified portion would be applied toward principal and interest related to that property. The remainder would be held in trust by BSP under a Cash Management Agreement – a side agreement in the loan packages the parties had executed. Prior to April of 2025, Silver Star made reasonable requests from its revenue collections for funding of ordinary and necessary property operating expenses (electricity, HVAC, internet, janitorial, landscape, parking lot rental, permits, pest control, security, security access control, trash, tenant refunds on sold properties, and water, among other critical monthly expenses). Prior to April of 2025, these requests were usually between $700,000 and $900,000, and BSP ultimately funded such requests, although not without other issues causing harm to Silver Star (see below). However, the last such request to fund under the loans was $886,916 on April 9, 2025.

42.     On May 7, 2025, instead of working with the Silver Star entities, BSP notified Silver Star that on April 25, 2025, it had acquired and was now the owner and holder of the Junior Loan Agreement and the Loan Documents as defined therein. At inception the Senior Loan lender is BSP. SitusAMC is/was the service for the Senior Loan and held the various loan reserves provided for under the loan agreement. The Junior Loan Lender is/was RMWC. Bellwether was the servicer for the Junior Loan. After the payoff of the Senior Loan is December 2024, SitusAMC transferred the loan reserves to Bellwether to hold and maintain. Following the BSP acquisition of the Junior Loan, loan servicing was transferred back to SitusAMC. SitusAMC is the servicer for the Delray Loan and the Walgreens Loan.

43.    BSP also immediately invoked Section 4.12(b) of the Junior Loan Agreement (discussed above as an impossibility) and declared Silver Star to be in covenant default. BSP then seized $8,562,846.74 of Silver Star's reserve funds, paid off the Junior Loan Agreement's principal ($4,733,151.80), as well as $3,511,932.80 toward the Walgreens Loan Agreement's principal. In the process, BSP also paid itself accrued regular interest on the Junior Loan Agreement ($112,928.76), then charged Silver Star an extra $5,916.44 in "default interest" on the Junior Loan Agreement, and $104,053.90 in "default interest" on the Walgreens Loan. In short, by letter dated May 7, 2025, counsel for BSP advised the taking and application of $8.6 million of Silver Star Collateral Reserves to (1) payoff $4.9 million of the Junior Exit loan balance acquired by BSP and costs, and (2) the application of $3.7 million to the principle and interest costs of the Walgreens Loan. A copy of BSP's May 7, 2025, letter is attached as Exhibit 1-D to Plaintiff's Original Petition on file with the Court.

44.    On May 9, 2025, Silver Star requested disbursement of $746,207 from its revenue collections for the month of May 2025. Silver Star was initially told the servicer for BSP was processing the request, but the request was not funded. Silver Star's Collateral funding requirement for operating expense funds was $732,694 for June 2025 and $720,225 for July 2025. However, since April 11, 2025, Silver Star has ordered ten (10) withdrawals from the cash management account for a total of $4,222,982. Without any response or explanation to these requests, not one of these requests has been funded, nor has BSP responded to requests for accounting as to where and how it applied the funds.

45.    On May 29, 2025, BSP declared Silver Star in default on the Delray loan, citing the same provision, and asserted that BSP would now charge the Delray loan's interest at the "default rate." BSP seized $549,854.35 of Silver Star's operating funds and purported to apply $387,854.35 to principal, $112,000 to an unspecified "insurance," and $50,000 to an unspecified "legal retainer." Both actions were taken despite the fact there had been no monetary default prior to BSP's aggressive collection actions. A copy of BSP's May 29, 2025, letter is attached as Exhibit 1-E to Plaintiff's Original Petition on file with the Court.

46.    By the very design of the loan packages and the agreements between the parties, Silver Star is wholly dependent on revenue from the Silver Star Collateral properties to pay the operating expenses of those properties. BSP's good faith and wise discretion and consideration of the business interests of Silver Star is therefore critical to Silver Star's survival. As of July 7, 2025, the following property operating expenses (shown as "OPEX") are either past due or currently due and payable:

| OPEX Type | Current Due |
|---|---|
| Electricity | 340,924.54 |
| Elevator | 15,006.40 |
| HVAC | 145,073.27 |
| Internet | 1,012.74 |
| Janitorial | 259,502.67 |
| Landscape | 13,566.42 |
| Parking lot rental | 2,500.00 |
| Permits | 4,077.15 |
| Pest control | 7,593.56 |
| Security | 156,361.60 |
| Security access control | 6,243.18 |
| Tenant refund | 54,335.96 |
| Trash | 7,697.20 |
| Uniforms | 1,001.19 |
| Water | 59,143.81 |
| **Grand Total** | **1,074,039.69** |

47.     In addition to the foregoing list of property operating expenses, property operating labor expenses have not been disbursed. Property operating labor expenses are $157,294 for May 2025, $157,294 for June 2025 and $148,527 for July 2025. Property management and operations personnel have been paid as of August 1, 2025, for salaries and wages earned as of July 26, 2025. There can be no assurance that Silver Star will be able to fund next payroll which is due August 15, 2025.

48.     The Silver Star Collateral Reserves included a tax reserve and insurance reserve. All 2024 tax payments were not timely or ever paid from the tax reserve and the time of conversion and application. The annual property and related insurance coverages renewal for 2025-2026 had been bound in April 2025. The insurance reserve was converted and applied elsewhere.

**Loss of CubeSmart management relationship, which BSP used to accusing Silver Star of diverting funds:**

49.     Silver Star had engaged CubeSmart to initially manage the Delray self-storage facility. From the inception of the Delray Loan, Silver Star experienced recurring monthly issue with BSP regarding the disbursement of operating expenses from operating revenues. The recurring delays in operating expense funding damaged Silver Star's relationship with CubeSmart to the point of default under the CubeSmart management agreement and ultimately the termination of the CubeSmart relationship. As a result of this change in management, rents were delayed because CubeSmart failed to deliver information to Silver Star, including credit card authorizations necessary to process payments for some of the tenants' rent payments. As a result, the related rent payments were not made. Silver Star informed BSP of the loss of this relationship on June 5, 2025, and the numerous likely delays and errors likely to result are obvious. Rather than recognizing and understanding the results of its own predatory collections practices, BSP hired its lawyers to write

an incendiary letter pointing out the discrepancy in rents collected and accusing Silver Star of misappropriating funds.

50.     Irreparable harm and damage to tenant obligations and relationships will imminently result from a combination of one or more unpaid operating expenses.  In the event of utility disconnects, the Silver Star Collateral properties affected will be closed and secured.  Tenants will not have access to the properties.  The order of the cascade failure is not readily determinable. As of the signing of this Affidavit, other than BSP's recent and unfounded accusations of wrongdoing by Silver Star, BSP has otherwise gone "dark" – no accounting, no response to reasonable requests for operating expense funds under the agreement, and no response to any proposals by Silver Star for a workout agreement that allows Silver Star to continue to operate. Despite the fact that the loans were never in monetary default and BSP was at all times fully secured, BSP has engaged in these aggressive collection tactics and charged extra, excessive and unnecessary fees for its own financial gain, to the detriment of Silver Star, its ongoing business interests, its relationships, and the value of the interests of Silver Star's roughly 4,500 shareholders (who hold approximately 185 million shares – all of whom will suffer irreparable harm in the loss of their investment(s) should Silver Star go under – which BSP's actions will very likely cause.

**BSP's Egregious Actions Have Now Caused the Evacuation of a Major Silver Star Tenant:**

51.     The GSA – Veterans Administration ("VA") is a tenant of the Silver Star office property referred to as One Technology Center ("OTC") located at 7411 John Smith Drive, San Antonio, Texas.  The VA occupies approximately 48,708 square feet, which is roughly 24.8% of the rental square footage of OTC.

52.     On July 11, 2025, the VA notified Silver Star that it is temporarily vacating all tenant space at OTC as a result of its safety concern with respect to the inability of Silver Star to install a necessary fire panel replacement for the property.

53.     This fire panel issue was identified by Silver Star in 2024 and communicated to BSP's representatives.  As a result of the fire panel function or malfunction, a fire watch status was instituted resulting in the deployment by Silver Star of full-time additional security until such as time as the fire panel replacement could be completed.

54.     On February 28, 2025, Silver Star made a formal request for disbursement of approximately $95,000 for the replacement of the fire panel.  The request was delivered to RMWC as lender and Bellwether as servicer for the then remaining Junior loan.  As of March 12, 2025, Silver Star's correspondence with Bellwether reflects that the service was ready to process the payment request subject to receipt of the fire panel invoice and payment instructions.

55.     On April 7, 2025, however, Silver Star received an email and letter from Bellwether regarding a certain financial statement covenant which was outstanding, but Bellwether communicated nothing further regarding the fire panel funding request.

56.     On or about May 7, 2025, Silver Star learned that BSP had acquired the balance of the RMWC Junior loan and that Silver Star's applicable reserves had been transferred to the service for BSP.  In a telephone conversation on May 23, 2025, in which I participated with Silver Star's counsel, BSP and its counsel stated that it had no knowledge of any reserve requests.

57.     Failure on the part of RMWC/Bellwether – and now BSP – to release operating expense funds necessary to replace this fire panel has resulted in the displacement of a substantial tenant of Silver Star's. If this Court does not grant a Temporary Restraining Order resulting in the release of operating expenses funds sufficient to replace the fire panel, the permanent departure of this substantial tenant will result in irreparable harm to Silver Star. Further, if the Court does not grant a Temporary Restraining Order resulting in the release of operating expenses corresponding to Silver Star's May 2025, June 2025, and July 2025, requests, and restrain future denials, Silver Star will suffer additional and ongoing, irreparable harm, by defaulting on its other landlord obligations and responsibilities, losing countless other valuable tenants and business relationships with managers and vendors – all critical to its very survival as a company.

**New imminent and irreparable harms continue:**

58.     I was informed promptly that, on or about July 14, 2025, the Honorable Melody Wilkinson denied Silver Star's requested TRO to order BSP to return Silver Star's applicable reserves, among other relief. Since that time, new irreparable harms continue to occur. For example, the following is a revised total of funds swept by BSP since May 1, 2025, without accounting by BSP or explanation, all of which is resulting irreparable harm to Silver Star:

| DATE | AMOUNT | (BSP)ACCOUNTING |
|---|---|---|
| 07/16/25 | $ 136,658.64 | NONE |
| 07/14/25 | $ 457,700.55 | NONE |
| 07/07/25 | $ 447,706.71 | NONE |
| 06/30/25 | $ 114,444.82 | NONE |
| 06/20/25 | $ 490,910.79 | NONE |
| 06/18/25 | $ 23,606.91 | NONE |
| 06/06/25 | $ 1,000,290.93 | NONE |
| 05/19/25 | $ 1,394,028.68 | NONE |
| 05/16/25 | $ 5,000.00 | NONE |
| | $ 4,070,348.03 | |

59.     Silver Star continues to experience serious problems across the legacy portfolio that both impact and threaten its ability to provide the required, appropriate, and safe property-level service to its tenants and customers as outlined by its lease agreements with them. These include but are not limited to fire safety, HVAC repair & maintenance, elevator repair and maintenance, housekeeping and janitorial, and funding of tenant improvements, including but not limited to:

60.     *Three Forest Plaza* – One of the two chillers is not operational and requires a leak repair. The other chiller has a bad bearing which needs to be replaced. With one down and the other operating under need of repair, Silver Star is at significant risk of losing the ability to provide conditioned air to tenants at the peak of summer, which if failure of the operating chiller happened would force them to close their offices and work elsewhere. There is an outstanding balance of $11,287 plus tax due to the HVAC vendor at Three Forest. A non-operational garage elevator needs repair, which creates both convenience and safety issues for Silver Star's frustrated tenants. One of the high-rise elevators is non-operational, requiring assessment costing $10,242 plus tax that Silver Star cannot fund to determine the necessary work to bring it operational.

61.     *The Preserve* – One of the two chillers is not operating and needs a new compressor costing $94,795 plus tax. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for its tenants.

62.     *One Technology* – as discussed above the fire panel needs replacement at a cost of $87,987 plus tax and one of Silver Star's significant tenants has sent employees away until this safety issue is resolved. Silver Star has $82,995 in unpaid bills with an HVAC vendor preventing Silver Star from obtaining the proper repair and maintenance work necessary to keep these systems operational. UT Health San Antonio has abandoned the building due to ongoing problems with HVAC.

63.     *Westheimer Central* – One of the two chillers is not operational. With a substantial past due balance, the vendor is unwilling to repair the other chiller. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for Silver Star's tenants. The pending HVAC work at this property would cost $96,277 plus tax. Silver Star has outstanding repairs necessary to the elevators, estimated at $150,000 by its Director of Asset Management, which cannot move forward without proper funding.

64.     *601 Sawyer* – Silver Star's HVAC vendor is unwilling to provide service due to unpaid balance of $5,995 plus tax.

65.     *Across the Legacy Portfolio*

- Chemicals for chilled water – Silver Star's vendors are unpaid and therefore not providing chemicals for treatment of the chilled water across the legacy portfolio. This puts these systems at imminent risk for further damage.

- Landscaping maintenance – Payments to landscaping service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Tejas landscaping, one of the landscape vendors, has stopped providing service with $5,485 of outstanding balance.

- Janitorial services – Payments to janitorial service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Starlight the vendor at Three Forest Plaza says they will stop service with a $63,201 balance due.

- Security – Silver Star's portfolio-wide security vendor had been threatening to remove service due to a $162,430 past due balance. On July 30, 2025, Avail Security terminated service for all office properties (Preserve, Westheimer, Sawyer, One Technology Center, and Three Forest Plaza. Silver Star was forced to reject Avail's demand for current weekly payments, because with BSP's withholding of operation expense funding, Silver Star has no means to make such payments. This removal of security puts Silver Star's tenants at substantial personal, possibly life threatening, risk, and it will likely induce them to abandon Silver Star's buildings.

Due to these issues, tenants are and have been unable to operate at the properties. They are also reluctant to engage in renewal discussions. When they do engage in renewal discussions, they and their broker representatives have required non-market concessions, such as escrow of tenant improvement and broker commissions up front to move forward.

66.    In addition to the $8,562,846.74 taken by BSP on or about May 7, 2025, the following is a revised summary of funds BSP has taken from Silver Star's cash management account since May 1, 2025, along with a statement of what accounting BSP has provided, if any:

| DATE | AMOUNT | (BSP)ACCOUNTING |
|---|---|---|
| 07/16/25 | $136,658.64 | NONE |
| 07/14/25 | $457,700.55 | NONE |
| 07/07/25 | $447,706.71 | NONE |
| 06/30/25 | $114,444.82 | NONE |
| 06/20/25 | $490,910.79 | NONE |
| 06/18/25 | $23,606.91 | NONE |
| 06/06/25 | $1,000,290.93 | NONE |

|         |                  |      |
|---------|------------------|------|
| 05/19/25 | $ 1,394,028.68  | NONE |
| 05/16/25 | $ 5,000.00      | NONE |
|          | $ 4,070,348.03  |      |

67.     BSP has provided NO explanation or accounting for how most of these funds taken from Silver Star have been applied. The last disbursement of Silver Star Collateral operating expenses was April 9, 2025, in the amount of $886,916.30 for payment of April 2025 operating expenses. For the period from 7-17 to 7-31-2025 the Silver Star Collateral estimates tenant receipts of $135,000. For the month of August 2025, estimated tenant receipts are $1,130,000. The utility costs listed above have been noticed for DISCONNECT on 7-28-2025.

68.     For all of these reasons, Silver Star requests that this Court enter the appropriate Temporary Restraining Order, Temporary Injunction and Permanent Injunction so that Silver Star and its shareholders' investments are protected, rather than being destroyed by BSP's overreach and predatory lending practices."

**FURTHER AFFIANT SAYETH NOT.**

**SIGNED** on August 1, 2025.

**LOUIS T. FOX, III
CHIEF FINANCIAL OFFICER AND
TREASURER, SILVER STAR PROPERTIES
REIT, INC., AFFIANT**

**STATE OF TEXAS**          §

**COUNTY OF TARRANT**      §

Subscribed and sworn to before me by Louis T. Fox, III, in his capacity as Chief Financial Officer and Treasurer of Silver Star Properties REIT, Inc., on this 1st day of August, 2025.

Notary Public, State of Texas

Renee Traghella
My Commission Expires
10/31/2026
Notary ID 124330269

EXHIBIT 2

OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS AGREEMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

**Section 14.5 Waiver of Notice**. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 14.6 Remedies of Borrower**. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Security Instrument, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

**Section 14.7 Marshalling and Other Matters**. Borrower hereby waives, to the extent permitted by applicable Legal Requirements, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale under the Security Instrument of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of the Security Instrument and on behalf of all persons to the extent permitted by applicable Legal Requirements.

**Section 14.8 Waiver of Statute of Limitations**. To the extent permitted by applicable Legal Requirements, Borrower hereby expressly waives and releases to the fullest extent permitted by applicable Legal Requirements, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its obligations hereunder, under the Note, Security Instrument or other Loan Documents.

**Section 14.9 Waiver of Counterclaim**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

**Section 14.10 Sole Discretion of Lender**. Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Walter Taylor on behalf of Walter Taylor
Bar No. 19727030
taylorlawfirmdfw@gmail.com
Envelope ID: 103863046
Filing Code Description: No Fee Documents
Filing Description: P's Supplemental Application for Temporary Restraining Order
Status as of 8/1/2025 11:14 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Walter Taylor | 19727030 | taylorlawfirmdfw@gmail.com | 8/1/2025 10:24:20 AM | SENT |
| Jacob Sparks | | jacob.sparks@nelsonmullins.com | 8/1/2025 10:24:20 AM | SENT |
| Brent T.Buyse | | brent.buyse@nelsonmullins.com | 8/1/2025 10:24:20 AM | SENT |
| Xenna K.Davis | | Xenna.Davis@nelsonmullins.com | 8/1/2025 10:24:20 AM | SENT |
| Jessica Cannon | | Jessica.cannon@nelsonmullins.com | 8/1/2025 10:24:20 AM | SENT |
| Mary Versfelt | | mary.versfelt@nelsonmullins.com | 8/1/2025 10:24:20 AM | SENT |

FILED
TARRANT COUNTY
8/4/2025 4:42 PM
THOMAS A. WILDER
DISTRICT CLERK

NO. 048-366561-25

| | | |
|---|---|---|
| **SILVER STAR PROPERTIES REIT, INC., SILVER STAR CRE, LLC, SILVER STAR CRE II, LLC, SILVER STAR DELRAY, LLC, Plaintiffs,** | § § § § § | **IN THE DISTRICT COURT** |
| **V.** | § § § | **48th JUDICIAL DISTRICT** |
| **BSPRT CRE FINANCE, LLC, FBRED BDC FINANCE, LLC, and BSPRT CS LOAN, LLC, Defendants** | § § § | **TARRANT COUNTY, TEXAS** |

## ORDER GRANTING IN PART AND DENYING IN PART SILVER STAR PLAINTIFFS' SUPPLEMENTAL APPLICATION FOR TEMPORARY RESTRAINING ORDER

On this day the Court heard the Silver Star Plaintiffs' Supplemental Application for Temporary Restraining Order. The Court, after examining the Supplemental Application, and all other matters properly before it, grants the Supplemental Application in part and denies it in part as follows.

The BSP Defendants – including all of their affiliates, subsidiaries, parent companies, officers, directors, managers, principals and vice principals, and all persons and entities acting in active concert or participation with the BSP Defendants, are hereby **ORDERED**, and all such persons and entities shall:

a. To the extent revenues from the Properties (as defined in the Loan Agreements) are currently in the Clearing Account, the Cash Management Account, or the Reserve Accounts (as defined in the Loan Agreements), or collected in such accounts after this Order is signed and before the hearing on Plaintiff's Application for Temporary Injunction set for August 12, 2025, at 10:00, a.m., the BSP Defendants shall release to Silver Star Plaintiffs requested funding, in an amount not to exceed $1.5 million, for (1) the operating expenses of $1,074,039.69 listed in the chart on p. 2 of Plaintiff's Supplemental Application for TRO – with the exception of the tenant refund amount of $55,335.96; and (2) to the extent not duplicative of such amounts, the operating expenses listed on pp. 4-5 of Plaintiff's Supplemental Application for TRO;

Within five (5) days of payment of such operational expenses, Plaintiffs shall provide documentation of such operational expenses in native or .pdf format with metadata intact.

*TRO - Silver Star, et al., v. Benefit Street Partners ("BSP"), et al.*, p. 1

The hearing on Plaintiff's Application for Temporary Injunction is set for August 12, 2025, at 10:00, a.m.

The Court sets bond at $100,000.00.

This Order expires at **4:35** p.m., on August 18, 2025.

**SIGNED** at 4:35 p.m., on August 4, 2025.

_____
**HONORABLE DISTRICT JUDGE**
**CHRISTOPHER TAYLOR**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 103956987
Filing Code Description: No Fee Documents
Filing Description: ***TRO
Status as of 8/4/2025 4:45 PM CST

Associated Case Party: THESILVER STAR PROPERTIES REIT INC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Walter Taylor | 19727030 | taylorlawfirmdfw@gmail.com | 8/4/2025 4:42:59 PM | SENT |

Associated Case Party: THEBSPRT CRE FINANCE LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacob Sparks | | jacob.sparks@nelsonmullins.com | 8/4/2025 4:42:59 PM | SENT |
| Brent T.Buyse | | brent.buyse@nelsonmullins.com | 8/4/2025 4:42:59 PM | SENT |
| Xenna K.Davis | | Xenna.Davis@nelsonmullins.com | 8/4/2025 4:42:59 PM | SENT |
| Jessica Cannon | | Jessica.cannon@nelsonmullins.com | 8/4/2025 4:42:59 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mary Versfelt | | mary.versfelt@nelsonmullins.com | 8/4/2025 4:42:59 PM | SENT |

NO. 25-BC08B-0016

| | | |
|---|---|---|
| SILVER STAR PROPERTIES REIT, INC., SILVER STAR CRE, LLC, SILVER STAR CRE II, LLC, SILVER STAR DELRAY, LLC, Plaintiffs, | § § § § § | IN THE |
| | § | TEXAS BUSINESS COURT |
| V. | § § | |
| BSPRT CRE FINANCE, LLC, FBRED BDC FINANCE, LLC, and BSPRT CS LOAN, LLC, Defendants | § § § | EIGHTH DIVISION FORT WORTH, TEXAS |

## ORDER EXTENDING AUGUST 4, 2025, TEMPORARY RESTRAINING ORDER

On August 4, 2025, the 48th Judicial District Court of Tarrant County, Texas, entered a Temporary Restraining Order, which expires by its own terms at 4:35 p.m. on August 18, 2025, and scheduled the parties for a Temporary Injunction hearing at 10:00 a.m., August 12, 2025. The BSP Defendants removed the case to this Court on Friday, August 8, 2025, and this Court has reset the Temporary Injunction hearing for August 20, 2025, at 1:30 p.m.

The Court hereby extends the 48th Judicial District Court's August 4, 2025, Temporary Restraining Order as follows:

The BSP Defendants – including all of their affiliates, subsidiaries, parent companies, officers, directors, managers, principals and vice principals, and all persons and entities acting in active concert or participation with the BSP Defendants, are hereby **ORDERED**, and all such persons and entities shall:

    a. To the extent revenues from the Properties (as defined in the Loan Agreements) are currently in the Clearing Account, the Cash Management Account, or the Reserve Accounts (as defined in the Loan Agreements), or collected in such accounts after the August 4, 2025, Temporary Restraining Order was signed and before the hearing on Plaintiff's Application for Temporary Injunction set for August 20, 2025, at 1:30, p.m., the BSP Defendants shall release to Silver Star Plaintiffs requested funding, in an amount not to exceed $1.5 million, for (1) the operating expenses of $1,074,039.69 listed in the chart on p. 2 of Plaintiff's Supplemental Application for TRO – with the exception of the

*TRO - Silver Star, et al., v. Benefit Street Partners ("BSP"), et al.*, p. 1
4900-0588-4510 v.1

tenant refund amount of $55,335.96; and (2) to the extent not duplicative of such amounts, the operating expenses listed on pp. 4-5 of Plaintiff's Supplemental Application for TRO;

Within five (5) days of payment of such operational expenses, Plaintiffs shall provide documentation of such operational expenses in native or .pdf format with metadata intact.

The hearing on Plaintiff's Application for Temporary Injunction is set for August 20, 2025, at 1:30, p.m.

The Court continues bond at the $100,000.00 amount Plaintiffs previously posted with the Tarrant County District Clerk.

This Order expires at 5:00 p.m., on August 26, 2025.

**SIGNED** at 4:25 p.m., on August 12, 2025.

**HONORABLE BRIAN STAGNER,**
**TEXAS BUSINESS COURT,**
**EIGHTH DIVISION**

E-filed in the Office of the Clerk
for the Business Court of Texas
8/12/2025 1:08 PM
Accepted by: Alexis Jennings
Case Number: 25-BC08B-0016

NO. 25-BC08B-0016

| | | |
|---|---|---|
| SILVER STAR PROPERTIES REIT, INC., SILVER STAR CRE, LLC, SILVER STAR CRE II, LLC, SILVER STAR DELRAY, LLC, Plaintiffs, | § § § § § | IN THE |
| | § | TEXAS BUSINESS COURT |
| V. | § § | |
| BSPRT CRE FINANCE, LLC, FBRED BDC FINANCE, LLC, and BSPRT CS LOAN, LLC, Defendants | § § § | EIGHTH DIVISION FORT WORTH, TEXAS |

## AGREED ORDER EXTENDING AUGUST 4, 2025, TEMPORARY RESTRAINING ORDER

On August 4, 2025, the 48th Judicial District Court of Tarrant County, Texas, entered a Temporary Restraining Order, which expires by its own terms at 4:35 p.m. on August 18, 2025, and scheduled the parties for a Temporary Injunction hearing at 10:00 a.m., August 12, 2025. The BSP Defendants removed the case to this Court on Friday, August 8, 2025, and this Court has reset the Temporary Injunction hearing for August 20, 2025, at 1:30 p.m.

The Court hereby extends the 48th Judicial District Court's August 4, 2025, Temporary Restraining Order as follows:

The BSP Defendants – including all of their affiliates, subsidiaries, parent companies, officers, directors, managers, principals and vice principals, and all persons and entities acting in active concert or participation with the BSP Defendants, are hereby **ORDERED**, and all such persons and entities shall:

    a.  To the extent revenues from the Properties (as defined in the Loan Agreements) are currently in the Clearing Account, the Cash Management Account, or the Reserve Accounts (as defined in the Loan Agreements), or collected in such accounts after the August 4, 2025, Temporary Restraining Order was signed and before the hearing on Plaintiff's Application for Temporary Injunction set for August 20, 2025, at 1:30, p.m., the BSP Defendants shall release to Silver Star Plaintiffs requested funding, in an amount not to exceed $1.5 million, for (1) the operating expenses of $1,074,039.69 listed in the chart on p. 2 of Plaintiff's Supplemental Application for TRO – with the exception of the

TRO - *Silver Star, et al., v. Benefit Street Partners ("BSP"), et al.*, p. 1
4900-0588-4510 v.1

tenant refund amount of $55,335.96; and (2) to the extent not duplicative of such amounts, the operating expenses listed on pp. 4-5 of Plaintiff's Supplemental Application for TRO;

Within five (5) days of payment of such operational expenses, Plaintiffs shall provide documentation of such operational expenses in native or .pdf format with metadata intact.

The hearing on Plaintiff's Application for Temporary Injunction is set for August 20, 2025, at 1:30, p.m.

The Court continues bond at the $100,000.00 amount Plaintiffs previously posted with the Tarrant County District Clerk.

This Order expires at _____; ____.m., on August __, 2025.

**SIGNED** at _____; ____.m., on August __, 2025.

 

 

_____

**HONORABLE BRIAN STAGNER,**
**TEXAS BUSINESS COURT,**
**EIGHTH DIVISION**

**APPROVED AS TO FORM AND SUBSTANCE**
**(WITHOUT WAIVER OF RIGHTS AS TO JURISDICTION):**

Walter L. Taylor
State Bar No. 19727030
***taylorlawfirmdfw@gmail.com***
**TAYLOR LAW FIRM**
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700
*Attorney for Plaintiffs*

**APPROVED AS TO FORM ONLY:**

By: */s/ Jacob Sparks*
**Jacob Sparks**
Texas Bar No. 24066126
Email: Jacob.Sparks@NelsonMullins.com
**Brent T. Buyse**
Texas Bar No. 24105567
Email: Brent.Buyse@NelsonMullins.com
**Xenna K. Davis**
Texas Bar No. 24132037
Email: Xenna.Davis@NelsonMullins.com
**NELSON MULLINS RILEY &SCARBOROUGH, LLP**
5830 Granite Parkway, Suite 1000
Plano, Texas 75024
Tel: (469) 484-4758
Fax: (469) 828-7217
*Attorneys for Defendants*

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Walter Taylor on behalf of Walter Taylor
Bar No. 19727030
taylorlawfirmdfw@gmail.com
Envelope ID: 104269774
Filing Code Description: Proposed Order
Filing Description: Agreed Order Extending August 4, 2025, Temporary Restraining Order
Status as of 8/12/2025 1:48 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacob Sparks | 24066126 | Jacob.Sparks@NelsonMullins.com | 8/12/2025 1:08:34 PM | SENT |
| Walter Taylor | 19727030 | taylorlawfirmdfw@gmail.com | 8/12/2025 1:08:34 PM | SENT |
| Xenna K.Davis | | Xenna.Davis@nelsonmullins.com | 8/12/2025 1:08:34 PM | SENT |
| Business Court 8B | | BCDivision8B@txcourts.gov | 8/12/2025 1:08:34 PM | SENT |
| Jessica Cannon | | jessica.cannon@nelsonmullins.com | 8/12/2025 1:08:34 PM | SENT |
| Lee Hart | | lee.hart@nelsonmullins.com | 8/12/2025 1:08:34 PM | SENT |
| Ilene Maccioli | | ilene.maccioli@nelsonmullins.com | 8/12/2025 1:08:34 PM | SENT |

E-filed in the Office of the Clerk
for the Business Court of Texas
8/11/2025 6:56 PM
Accepted by: Alexis Jennings
Case Number: 25-BC08B-0016

NO. 25-BC08B-0016

| | | |
|---|---|---|
| SILVER STAR PROPERTIES REIT, INC., SILVER STAR CRE, LLC, SILVER STAR CRE II, LLC, SILVER STAR DELRAY, LLC, Plaintiffs, | § § § § § | IN THE |
| | § | TEXAS BUSINESS COURT |
| V. | § § | |
| BSPRT CRE FINANCE, LLC, FBRED BDC FINANCE, LLC, and BSPRT CS LOAN, LLC, Defendants | § § § § | EIGHTH DIVISION FORT WORTH, TEXAS |

## PLAINTIFF'S NOTICE OF HEARING ON PLAINTIFF'S SECOND AMENDED APPLICATION FOR TEMPORARY INJUNCTION

Please take notice that a hearing on the Silver Star Plaintiffs' Second Amended Application for Temporary Injunction has been scheduled for Thursday, August 20, 2025, at 1:30 p.m. in the Texas Business Court, Eighth Division, located at 1515 Commerce Street, Ste. 170, Fort Worth, TX 76102.

Respectfully submitted without waiver
of any jurisdictional argument,

Walter L. Taylor
State Bar No. 19727030
*taylorlawfirmdfw@gmail.com*
TAYLOR LAW FIRM
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700
**ATTORNEY FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify by my signature above that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on August 11, 2025, including:

**Jacob Sparks**
Email: *Jacob.Sparks@NelsonMullins.com*

**Brent T. Buyse**
Email: *Brent.Buyse@NelsonMullins.com*

**Xenna Davis**
Email: *Xenna.Davis@NelsonMullins.com*

**NELSON MULLINS RILEY &SCARBOROUGH, LLP**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Walter Taylor on behalf of Walter Taylor
Bar No. 19727030
taylorlawfirmdfw@gmail.com
Envelope ID: 104239776
Filing Code Description: Notice
Filing Description: Notice of Hearing on Silver Star Plaintiffs' Second Amended Application for Temporary Injunction
Status as of 8/12/2025 8:33 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacob Sparks | 24066126 | Jacob.Sparks@NelsonMullins.com | 8/11/2025 6:56:41 PM | SENT |
| Walter Taylor | 19727030 | taylorlawfirmdfw@gmail.com | 8/11/2025 6:56:41 PM | SENT |
| Xenna K.Davis | | Xenna.Davis@nelsonmullins.com | 8/11/2025 6:56:41 PM | SENT |
| Business Court 8B | | BCDivision8B@txcourts.gov | 8/11/2025 6:56:41 PM | SENT |
| Jessica Cannon | | jessica.cannon@nelsonmullins.com | 8/11/2025 6:56:41 PM | SENT |
| Lee Hart | | lee.hart@nelsonmullins.com | 8/11/2025 6:56:41 PM | SENT |
| Ilene Maccioli | | ilene.maccioli@nelsonmullins.com | 8/11/2025 6:56:41 PM | SENT |

FILED
TARRANT COUNTY
8/1/2025 2:23 PM
THOMAS A. WILDER
DISTRICT CLERK

**NO. 048-366561-25**

| | | |
|---|---|---|
| **SILVER STAR PROPERTIES REIT, INC., SILVER STAR CRE, LLC, SILVER STAR CRE II, LLC, SILVER STAR DELRAY, LLC, Plaintiffs,** | § § § § § | **IN THE DISTRICT COURT** |
| **V.** | § § § | **48th JUDICIAL DISTRICT** |
| **BSPRT CRE FINANCE, LLC, FBRED BDC FINANCE, LLC, and BSPRT CS LOAN, LLC, Defendants** | § § § | **TARRANT COUNTY, TEXAS** |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMAMENT INJUNCTION

The Silver Star Plaintiffs (hereinafter "Plaintiff" or "Silver Star") file this First Amended Original Petition, etc.

### I.  OVERVIEW OF CLAIMS AND EMERGENCY RELIEF

1.1 Silver Star is an investment boutique firm focused on commercial office building ownership and leasing, whose two principal offices are in Texas – one in Fort Worth. A New York lender – Benefit Street Partners ("BSP") – and Silver Star entered into a debt refinancing relationship, in which they expressly contemplated BSP's future financing of Silver Star's planned pivot into self-storage facilities. After the refinancing, when Silver Star sought to expand its portfolio, BSP conditioned its willingness on a fraudulent devil's bargain: "buy sixteen (16) of our foreclosed properties at what we say they're worth or forget about the future financing you were counting on."

1.2 Emergency injunctive relief is necessary because, without warning, and despite the fact that no monetary default had occurred, BSP abused its exclusive control and possession of Silver Star's cash reserves to self-deal and refused to advance critical operating funds – all of which put a stranglehold on Silver Star that threatens its very survival, unless this Court grants a TRO. Instead of allowing Silver

Star to operate its business, BSP converted more than $8 million to its own use – paying off loans early and charging extra interest and fees.

## II. DISCOVERY CONTROL PLAN AND CLAIM FOR RELIEF

2.1    Pursuant to Tex. R. Civ. P. 190.4, Plaintiff intends to conduct discovery under a Level 3 Order of the Court, in addition to expedited discovery as authorized by the Court in a Temporary Restraining Order. Plaintiff hereby requests expedited discovery in pursuit of a Temporary Injunction, and that the Court enter a discovery control order under Rule 190.4 at the appropriate time.

2.2    Purely for case administrative purposes, Texas Rule of Civil Procedure 47 requires an original petition to select among specified ranges of potential relief. This original petition selects the range in Texas Rule of Civil Procedure 47(c)(4). This range may change over time. Plaintiff is free to suggest, and the jury and judge are free to find, more or less at trial based on the evidence.

## III. PARTIES

3.1    Plaintiff **SILVER STAR PROPERTIES REIT, INC.**, is a Maryland corporation with its principal place of business in Texas. Plaintiffs **SILVER STAR CRE, LLC**, **SILVER STAR CRE II, LLC**, and **SILVER STAR DELRAY, LLC,** are Delaware limited liability companies with their principal places of business in Texas.

3.2    Defendants **BSPRT CRE FINANCE, LLC**, **FBRED BDC FINANCE, LLC,** and **BSPRT CS LOAN, LLC** are Delaware limited liability companies, which have appeared. No service is requested at this time.

## IV. JURISDICTION AND VENUE

4.1    Jurisdiction and venue of this action are proper in this Court, in that Plaintiff's damages exceed the minimum jurisdictional limits of this Court, its causes of action accrued in Tarrant County, Texas, as well as tortious acts by Defendant in Tarrant County that caused harm in Tarrant

County. Jurisdiction further rests with this Court because Plaintiff seeks the equitable relief in the form of a temporary restraining order, temporary injunction, and permanent injunction.

## V. FACTUAL ALLEGATIONS

**Introduction**

5.1    Silver Star Properties REIT, Inc. is a self-managed real estate investment trust specializing in the acquisition and management of institutional-grade self-storage properties and other storage properties in secondary markets. In addition, Silver Star manages five legacy commercial office assets which it is evaluating for a sale or hold strategy.

5.2    Silver Star currently owns and operates office and self-storage assets in Houston, Dallas, McKinney and San Antonio, Texas and Delray Beach, Florida and is continuously evaluating future investments. Silver Star is currently focused on acquiring well-located self-storage facilities in markets with significant demand for storage space.

5.3    This plan to expand the Company's asset classes allows the Company to maintain a resilient investment approach and create a more inflation-resistant portfolio. Silver Star's business plan for the last 18 to 24 months has been to pivot away from its office REIT title to include a broader selection of asset classes. Silver Star expects this pivot to better position the Company to provide enhanced liquidity to its shareholders, by scaling its operations quickly with anticipated capital and through a listing of its securities on a national exchange.

5.4    Plaintiff's First Amended Original Petition and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction, and/or any Supplemental Application for Temporary Restraining Order, have been made necessary because Silver Star's lender(s) – Benefit Street Partners and its affiliated lending entities ("BSP") – have overreached their lender rights under one or more in a series of cross-collateralized loan agreements with Silver Star and its affiliated entities. As explained more fully below, BSP's overreaching and egregious, aggressive

collection measures have included abusing its exclusive control over Silver Star's entire cash reserves (in excess of $8 million), seizing all of Silver Star's available cash (in excess of $8 million) for its own benefit and increasing Silver Star's peril, charging excessive "default interest," insurance charges ($120,000), and BSP's legal fees ($50,000). Most critical to Silver Star's survival is BSP's refusal to maintain the status quo – using the buildings' rental income to fund basic monthly property operating expenses such as electricity, HVAC, janitorial, security, tenant refunds, trash, water, and other normal operational expenses – all of which has harmed and imminently threatens continuing irreparable harm to Silver Star Properties REIT, Inc. and its subsidiaries.

5.5     As of May 7, 2025, all Silver Star / BSP loans were fully performing, and no monetary default had occurred on any loan between the parties. Moreover, at all times material to these loans, BSP's interests were at all times fully and adequately secured by the collateral contractually chosen and agreed upon by the parties. Despite these facts, BSP declared a default on a non-monetary covenant (and in Silver Star's view, a non-material covenant impossible to perform as written) – the provision of financial statements "prepared and reviewed by an 'independent' certified public accountant."

5.6     Silver Star has been transparent with BSP about the futility and impossibility of performing this non-monetary covenant and has offered alternative solutions in response to BSP's declaration of its breach. Silver Star has requested that BSP maintain the status quo – that is, that BSP continue to perform its lender obligations under the loans – approving and releasing basic operating expenses from Silver Star's cash reserves – but BSP has refused. BSP has instead seized Silver Star's operating funds and all cash reserves, and BSP has refused to extend operating expense funds necessary to operate the collateral properties and make Silver Star's payroll.

5.7    In addition to its claims for damages herein, as irreparable harms continue to occur and additional irreparable harms remain imminent, Silver Star is requesting again that this Court grant immediate injunctive relief in the form of a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction ordering BSP to refrain from further conversion of Silver Star's operating funds, and compelling BSP to disburse to Silver Star's necessary operating expense funds from available unconverted funds. This emergency relief is necessary to restore the status quo – where Silver Star as landlord collects rents on the properties, and uses those funds to pay expenses necessary to operate the commercial properties, as described more fully below. This is necessary to preserve the viability of collateral and cross-collateral real estate assets in order to avoid and mitigate irreparable harm to Silver Star and its real estate tenants.

**Improper and Unauthorized Actions by Prior Executive Chairman; Bankruptcy Filing; BSP Exit Loans**

5.8    In the field of finance, "senior debt" is a type of debt that has priority over other forms of debt and equity in the event of a company's liquidation. Silver Star's senior debt – commonly referred to as the SASB loan ("SASB") – was originated in October 2018.  The SASB had a two-year term and three one-year extensions.  The final one-year extension was effective in October 2022.  The maturity date of the SASB was October 9, 2023.

5.9    During the term of the SASB final extension, Silver Star undertook to sell certain real estate assets with applications of net sales proceeds to the SASB loan balance, in order to reduce the loan amount to be refinanced.

5.10    In November 2022, Silver Star met with representatives of Raymond James Financial, Inc. – an investment banking and financial services company – to discuss an engagement to identify prospective lenders and manage the process of a refinance of Silver Star's SASB.  In January 2023, Silver Star engaged Raymond James, who then commenced preparation of an offering

memorandum and began marketing efforts. In March 2023 Raymond James completed the offering memorandum and identified three prospective lenders. In order to enter into negotiations with Silver Star, BSP signed a non-disclosure agreement ("NDA").

5.11    In May 2023 BSP delivered an initial term sheet to Silver Star to provide up to $200 million for the refinance. In June 2023, representatives of Silver Star met with BSP in New York, and shortly thereafter Silver Star executed the term sheet/loan application. From June 2023 to August 2023 preliminary loan documents were drafted and reviewed.

5.12    During these negotiations, it became necessary for Silver Star to address a pending internal issue affecting its ability to refinance the SASB. Unfortunately, Silver Star's former Executive Chair Allen Hartman had previously engaged in improper, illegal, and unauthorized actions in order to challenge, frustrate and cloud title issues related to assets sales necessary to reduce Silver Star's SASB loan balance. As a means of swiftly addressing, and for the sole purpose of resolving, Hartman's spurious claims and actions against an affiliated entity bearing his name, Silver Star approved the filing of a Chapter 11 bankruptcy petition for Hartman SPE LLC (the named borrower and collateral owner under the SASB) on September 13, 2023.

5.13    Together with counsel for Hartman SPE LLC (now the Debtor), Silver Star developed a plan of reorganization. On November 28, 2023, BSP provided an updated term sheet (unsigned) for exit financing for the exit plan.

**The Silver Star Senior and Junior Exit Loans**

5.14    On March 27, 2024, the reorganized Debtor entered into the BSP Senior Loan and the RMWC Junior Loan which provided $120 million and $15 million, respectively, of exit financing under the exit plan approved by the bankruptcy court, the lenders and the unsecured creditors.

5.15    Pursuant to the plan to which all parties had agreed, property sales were executed for the purpose of reducing the SASB loan – including many properties sold at a gain.  In order to defer tax liability associated with gains, the property sales were closed using a qualified intermediary to facilitate 1031 exchanges.  The net sales proceeds (cash) from the property sales were applied to reduce Silver Star's secured debt.  In order to complete the 1031 exchange requirements and defer tax consequences, however, Silver Star had to identify replacement property and then acquire it within a certain time frame.

5.16    In order to complete the re-investment leg of the 1031 exchange, in June 2024 an arrangement was made with RMWC to provide an upsize to its Junior Loan in order to provide borrowed equity to close open 1031 exchanges. In June 2024, Silver Star acquired the McKinney storage property from an unrelated third party using upsize Junior loan proceeds for equity capital and seller financing. In July 2024, Silver Star acquired the Walgreens portfolio of 16 net lease assets from BSP using upsize Junior loan proceeds for equity capital and seller financing provided by BSP.

5.17    In summary, on March 27, 2024, Silver Star entered into the BSP Senior and Junior exit loans provided in connection with the conclusion of the Chapter 11 bankruptcy proceedings of Hartman SPE LLC.  The Senior loan was a $120 million loan with a maturity date of April 2026. The Junior loan was initially a $15 million loan which was later upsized by the Junior lender to approximately $35 million. The primary document for these loans is the March 27, 2024, Loan Agreement between SILVER STAR CRE, LLC and SILVER STAR CRE II, LLC, as Debtors, and BSPRT CRE FINANCE LLC, as Lenders, which is attached as Exhibit 1-A to Plaintiff's Original Petition on file with the Court.

5.18    As of December 31, 2024, the Senior loan was paid in full, including Silver Star's payment of $14.4 million in minimum interest. The balance of the Junior loan as of April 30, 2025, was approximately $4.7 million. During the first quarter of 2025, BSP purchased the Junior loan, which to that point in time had experienced no monetary defaults and was performing well.

**The Walgreens Portfolio Loans – "BSP the Lender" Becomes "BSP the Seller"**

5.19    BSP, the senior lender for Hartman SPE LLC – the significant subsidiary of Silver Star – in connection with Hartman SPE  LLC's exit from Chapter 11 bankruptcy – requested Silver Star purchase sixteen (16) Walgreen's properties BSP had foreclosed, rather than BSP's having to sell them at auction. BSP agreed to finance the purchase, if Silver Star would buy the foreclosed properties. On July 1, 2024, acting through its affiliate lending entities BSPRT Walgreens Portfolio (Nos. 1, 2, 3, 4, 6, 7, 13, 14, 15, 16, 17, 19, 20, 21, 23 and 24) LLC ("BSPRT Walgreens"), BSP sold sixteen (16) single tenant Walgreens retail locations to Silver Star for a sales price of $60,925,000.  Acting through its affiliate BSPRT CRE FINANCE, LLC, BSP provided seller financing for the sale transaction(s) in the original loan amount of $57,750,000.  The Walgreens loan is subject to a cash management agreement during the term of the loan.  The maturity date of the Walgreens loan is August 9, 2025. The Walgreens Purchase and Sale Agreement is attached as Exhibit 1-B to Plaintiff's Original Petition on file with the Court.

5.20    Silver Star's acquiescence to BSP's request that it purchase the Walgreens portfolio was an accommodation to BSP – as both seller and financing source – based on informal discussions that included BSP's representation, and therefore Silver Star's very reasonable expectation, of future financing commitment by BSP after the repayment of the exit loans provided at the conclusion of the Chapter 11 bankruptcy proceedings of Hartman SPE LLC.

5.21    In addition to BSP's representations and commitment regarding future financing, in marketing the Walgreens properties for sale, BSP provided due diligence materials that included

leases, historical analyses and other documents related to the performance and value of the properties. Silver Star will show that the materials provided by BSP indicated that the values of the Walgreens properties was greater than their values actually were. BSP made the misrepresentations for the purpose of inducing Silver Star to buy the Walgreens properties. In reliance on BSP's misrepresentations, Silver Star purchased the Walgreens properties. Silver Star suffered harm from BSP's misrepresentations, in that it purchased Walgreens properties it would not otherwise have purchased but for BSP's misrepresentations, and it now owns properties worth significantly less than the values it believed it was getting.

**The Delray Loan**

5.22    On July 19, 2024, BSP and Silver Star entered into a third loan agreement for the financing of one stand-alone self-storage facility. The Delray Loan Agreement between SILVER STAR DELRAY, LLC, as Borrower, and FBRED BDC FINANCE, LLC, as Lender, which is attached as Exhibit 1-C to Plaintiff's Original Petition on file with the Court.  The Delray storage property was identified as a replacement property for 1031 exchange purposes in order to defer gain attributable to a property sold.  The net proceeds of the property sold were utilized to pay down secured debt.  The Delray acquisition was financed with proceeds of the upsized RMWC Junior Loan as equity capital and mortgage debt provided by BSP.

**BSP's Exclusive Control of Silver Star's Business Operations, and Unreasonable Self-Help Remedies**

5.23    At BSP's insistence from day one, all cash collections for the legacy office properties, the Delray self-storage and the Walgreens portfolio are subject to the exclusive control of BSP and its agents, as are Silver Star's cash reserves. Since not one dollar can be spent without BSP's approval, BSP is essentially operating Silver Star's business – it determines every bill to pay or not pay, including every capital improvement, vendor or maintenance expense.

5.24	The situation Silver Star has endured since April as a result of BSP's actions is untenable to the point of impossibility. Specifically, Silver Star is unable to pay collateral property operating expenses, which will quickly result in irreparable harm to vendor and tenant relationships.

5.25	These relationships are not fungible nor easily recovered or replaced – they are built on trust and reputation, and word travels. If utilities are not paid, utilities are subject to service interruption (i.e., the power goes off). Unpaid contractual services such as security, janitorial, elevator maintenance, HVAC maintenance will result in service suspensions that will in turn disrupt property management operations and irreparably harm tenant relationships and renewal prospects.

5.26	The loan principle secured by Silver Star's legacy office properties is now ZERO. The funds needed for property operating expenses for these legacy properties are instead being converted to loan principal and fees of cross-collateral property (Walgreens). Since BSP is also fully secured on the Walgreens loan, BSP's exercise of power to divert Silver Star's funds is unnecessary for its own protection and instead serves principally to irreparably harm Silver Star and its affiliates, tenants and vendors.

**The impossibility of the "prepared and reviewed by an independent CPA" covenant**

5.27	As previously stated, all three (3) loans in the Silver Star / BSP series are cross-collateralized. Both the Senior and Junior Exit Loans (March 2024) and the Delray Loan (July 2024) contained the following identical provision:

> **Section 4.12 Books and Records.**
> …
> (b) ***Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements <u>prepared and reviewed by an independent certified public accountant</u> acceptable to Lender (provided, however, that at any time an Event***

***of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower or the Property, <u>the same shall, upon Lender's written request, be audited by such independent certified public accountant</u>)*** in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, and operating expenses.

5.28     As established by the Affidavit of Lou T. Fox, III and his education and training in the financial world, including public accounting, the words "certified public accountant (CPA)," "review" and "independent," as they pertain to financial statements, are terms of art in the field of public accounting. A certified public accountant (CPA) is a licensed accounting professional who has met specific education, examination, and experience requirements, allowing them to provide a range of accounting services to the public.  CPAs prepare and analyze financial records, prepare tax returns, conduct audits, reviews and compilations of financial statements, and provide other consulting and financial services. A "review" of financial statements by a certified public accountant generally refers to an attest or assurance engagement for the purpose of issuing a review report resulting from the conduct of work conducted in connection with the scope of work outlined in an engagement letter.  "Independent" as that term is applied to certified public accountants means that the certified public accountant is independent in the performance of its professional services, which includes the representation that the reviewer did not participate in the preparation of the financial statements he/she is reviewing. Participation in the preparation of the financial statements under review spoil independence.

5.29     Financial statements can be prepared by a certified public accountant.  Such accountant could be a third party, unrelated and unaffiliated.  An independent certified public accountant could review or (not required here) audit financial statements.  A certified public accountant who

prepares and reviews financial statements is not independent. In Fox's opinion as Chief Financial Officer and in Silver Star's opinion, the financial statements furnished are no different than financial statements which would have been prepared by any other competent accountant with knowledge of the individual properties, their respective leases, the administration of funds and the Loan Agreement. The determination to provide annual financial statements prepared by the Borrower was done in good faith and in the sincere belief that the literal loan agreement requirement is an impossibility. The Borrower's hands are clean. Notwithstanding the impossibility described above, the Borrower mitigated the issue by preparing and providing its annual financial statements.

5.30    With respect to the Walgreens properties, the periodic financial statements for the individual properties are simple. Income consists of rent. Expense consists of interest expense and bank charges. The difference between income and expense is net operating income. The accounting source information necessary for the preparation of the financial statements is under the control and administration of the Lender. The Lender, as the former owner and previous lender for the individual properties, is fully versed in the leases and the rents. Pursuant to the cash management account required and administered by the Lender, the Lender has full insight and access to the rent payment. The Lender has full insight and access to its servicer regarding the payment of debt service and bank charges.

**Silver Star exercises substantial effort to perform its non-monetary covenants capable of performance.**

5.31    Silver Star takes the performance of its non-monetary covenants seriously. For example, Silver Star REIT's Guarantee requires it to furnish audited financial statements. At the time the loans were made, however, Silver Star's prospects for engaging an auditor had been, and continued to be, hamstrung by an inquiry subsequently an investigation by the SEC and the continuous

assault on the Company by a rogue director and dissident shareholder – of which BSP was also aware prior to the inception of all three loans.

5.32    Specifically, on or about November 29, 2023, Silver Star's previous CPA firm – Weaver and Tidwell, L.L.P. ("Weaver") – notified the Company and the Audit Committee of its Board of Directors of Weaver's decision not to stand for reelection as the Company's registered public accounting firm for the Annual Report for the 2023 fiscal year. Immediately thereafter, Silver Star – at the direction of the Audit and Executive Committees – undertook to engage a successor certified accounting firm.

5.33    Silver Star and its Audit Committee engaged in countless calls, meetings and discussions with seven (7) prospective CPA firms, including a former auditor for the Company. On or about January 8, 2024, the Audit Committee signed an engagement letter with a prospective successor audit CPA firm. On or about January 15, 2024, however, this same prospective successor audit CPA firm advised the Company that, after completion of the CPA firm's client acceptance procedures, the CPA firm's client acceptance committee determined it would not approve the engagement. All of these facts predated the March 2024 Exit Loans and were fully known to BSP prior to executing the transactions.

5.34    From January 2024 through November 2024, Silver Star had periodic and significant contact with the prospective firms referred to above – including substantial solicitations relating to acceptance of the full audit engagement – before Silver Star's negotiations with CBIZ CPAs (formerly Marcum LLP) finally entered a more serious phase as the Company was sent CBIZ's engagement letter for review.

5.35    Throughout this period of time, several concerns were expressed by the various prospective CPA firms regarding potential engagement, including but not limited to the following:

(a) the ability of Hartman SPE to exit satisfactorily out of the bankruptcy proceedings;

(b) the SEC initiated inquiry/investigation; and

(c) the ongoing litigation with Hartman, in both Baltimore Maryland and Harris County, Texas, which involved complex analysis regarding the cessation of distributions, damages directly caused by Hartman's mismanagement, and general potential reputational harm to the Company.

5.36     Of these concerns, the most challenging and a common hurdle negating client acceptance by the CPA firms was the SEC investigation. Fortunately, on December 24, 2024, Silver Star engaged CBIZ CPAs as its new independent registered public accounting firm. As of the date of this Affidavit, the CBIZ engagement team is and has continued to be fully engaged in the audit of the 2023 consolidated financial statements including communications with and documentation for the firms practice directors. Silver Star now expects it to be completed in either the late 3rd Quarter or early 4th Quarter of 2025.

5.37     On or about April 16, 2025, Silver Star's CFO – Lou T. Fox, III – provided BSP by letter and E-mail the only set of financial statements Silver Star had been able to obtain up to that point in time, which Silver Star had prepared on its own behalf at Fox's direction. Fox also advised BSP that having annual financial statements "prepared and reviewed by an independent CPA" was a futility. With respect to Silver Star REIT – the Guarantor – Fox also advised BSP that CBIZ CPAs had signed on as successor independent registered public accountants on December 24, 2024, to conduct audits of the Company's consolidated financial statements for the years ended December 31, 2023, and December 31, 2024, and that those audits were underway. Fox also advised BSP that, under the direction of its Audit Committee, Silver Star had put forth substantial effort to obtain audited financial statements after the resignation of its previous auditing CPAs, but those efforts had been futile until CBIZ CPA's accepted the position. Fox also advised BSP that,

although CBIZ CPAs' efforts were underway, the estimated completion date for both audits was currently undetermined at that time.

**As a result of BSP's self-dealing, irreparable harm has occurred and will continue unless the status quo operation of the properties is restored and preserved**

5.38    Generally, the way these loans were supposed to operate was that Silver Star would market a collateralized property for sale, sell it, and a specified portion would be applied toward principal and interest related to that property. The remainder would be held in trust by BSP under a Cash Management Agreement – a side agreement in the loan packages the parties had executed. Prior to April of 2025, Silver Star made reasonable requests from its revenue collections for funding of ordinary and necessary property operating expenses (electricity, HVAC, internet, janitorial, landscape, parking lot rental, permits, pest control, security, security access control, trash, tenant refunds on sold properties, and water, among other critical monthly expenses). Prior to April of 2025, these requests were usually between $700,000 and $900,000, and BSP ultimately funded such requests, although not without other issues causing harm to Silver Star (see below). However, the last such request to fund under the loans was $886,916 on April 9, 2025.

5.39    On May 7, 2025, instead of working with the Silver Star entities, BSP notified Silver Star that on April 25, 2025, it had acquired and was now the owner and holder of the Junior Loan Agreement and the Loan Documents as defined therein. At inception the Senior Loan lender is BSP. SitusAMC is/was the service for the Senior Loan and held the various loan reserves provided for under the loan agreement. The Junior Loan Lender is/was RMWC. Bellwether was the servicer for the Junior Loan. After the payoff of the Senior Loan is December 2024, SitusAMC transferred the loan reserves to Bellwether to hold and maintain. Following the BSP acquisition of the Junior Loan, loan servicing was transferred back to SitusAMC. SitusAMC is the servicer for the Delray Loan and the Walgreens Loan.

5.40    BSP also immediately invoked Section 4.12(b) of the Junior Loan Agreement (discussed above as an impossibility) and declared Silver Star to be in covenant default. BSP then seized $8,562,846.74 of Silver Star's reserve funds, paid off the Junior Loan Agreement's principal ($4,733,151.80), as well as $3,511,932.80 toward the Walgreens Loan Agreement's principal. In the process, BSP also paid itself accrued regular interest on the Junior Loan Agreement ($112,928.76), then charged Silver Star an extra $5,916.44 in "default interest" on the Junior Loan Agreement, and $104,053.90 in "default interest" on the Walgreens Loan. In short, by letter dated May 7, 2025, counsel for BSP advised the taking and application of $8.6 million of Silver Star Collateral Reserves to (1) payoff $4.9 million of the Junior Exit loan balance acquired by BSP and costs, and (2) the application of $3.7 million to the principle and interest costs of the Walgreens Loan. A copy of BSP's May 7, 2025, letter is attached as Exhibit 1-D to Plaintiff's Original Petition on file with the Court.

5.41    On May 9, 2025, Silver Star requested disbursement of $746,207 from its revenue collections for the month of May 2025. Silver Star was initially told the servicer for BSP was processing the request, but the request was not funded. Silver Star's Collateral funding requirement for operating expense funds was $732,694 for June 2025 and $720,225 for July 2025. However, since April 11, 2025, Silver Star has ordered ten (10) withdrawals from the cash management account for a total of $4,222,982. Without any response or explanation to these requests, not one of these requests has been funded, nor has BSP responded to requests for accounting as to where and how it applied the funds.

5.42    On May 29, 2025, BSP declared Silver Star in default on the Delray loan, citing the same provision, and asserted that BSP would now charge the Delray loan's interest at the "default rate."

BSP seized $549,854.35 of Silver Star's operating funds and purported to apply $387,854.35 to principal, $112,000 to an unspecified "insurance," and $50,000 to an unspecified "legal retainer." Both actions were taken despite the fact there had been no monetary default prior to BSP's aggressive collection actions. A copy of BSP's May 29, 2025, letter is attached as Exhibit 1-E to Plaintiff's Original Petition on file with the Court.

5.43    By the very design of the loan packages and the agreements between the parties, Silver Star is wholly dependent on revenue from the Silver Star Collateral properties to pay the operating expenses of those properties. BSP's good faith and wise discretion and consideration of the business interests of Silver Star is therefore critical to Silver Star's survival. As of July 7, 2025, the following property operating expenses (shown as "OPEX") are either past due or currently due and payable:

| OPEX Type | Current Due |
|---|---|
| Electricity | 340,924.54 |
| Elevator | 15,006.40 |
| HVAC | 145,073.27 |
| Internet | 1,012.74 |
| Janitorial | 259,502.67 |
| Landscape | 13,566.42 |
| Parking lot rental | 2,500.00 |
| Permits | 4,077.15 |
| Pest control | 7,593.56 |
| Security | 156,361.60 |
| Security access control | 6,243.18 |
| Tenant refund | 54,335.96 |
| Trash | 7,697.20 |
| Uniforms | 1,001.19 |
| Water | 59,143.81 |
| **Grand Total** | **1,074,039.69** |

5.44    In addition to the foregoing list of property operating expenses, property operating labor expenses have not been disbursed.  Property operating labor expenses are $157,294 for May 2025,

$157,294 for June 2025 and $148,527 for July 2025. Property management and operations personnel have been paid as of August 1, 2025, for salaries and wages earned as of July 26, 2025. There can be no assurance that Silver Star will be able to fund next payroll which is due August 15, 2025.

5.45 The Silver Star Collateral Reserves included a tax reserve and insurance reserve. All 2024 tax payments were not timely or ever paid from the tax reserve and the time of conversion and application. The annual property and related insurance coverages renewal for 2025-2026 had been bound in April 2025. The insurance reserve was converted and applied elsewhere.

**Loss of CubeSmart management relationship, which BSP used to accusing Silver Star of diverting funds**

5.46 Silver Star had engaged CubeSmart to initially manage the Delray self-storage facility. From the inception of the Delray Loan, Silver Star experienced recurring monthly issue with BSP regarding the disbursement of operating expenses from operating revenues. The recurring delays in operating expense funding damaged Silver Star's relationship with CubeSmart to the point of default under the CubeSmart management agreement and ultimately the termination of the CubeSmart relationship. As a result of this change in management, rents were delayed because CubeSmart failed to deliver information to Silver Star, including credit card authorizations necessary to process payments for some of the tenants' rent payments. As a result, the related rent payments were not made. Silver Star informed BSP of the loss of this relationship on June 5, 2025, and the numerous likely delays and errors likely to result are obvious. Rather than recognizing and understanding the results of its own predatory collections practices, BSP hired its lawyers to write an incendiary letter pointing out the discrepancy in rents collected and accusing Silver Star of misappropriating funds.

5.47    Irreparable harm and damage to tenant obligations and relationships will imminently result from a combination of one or more unpaid operating expenses. In the event of utility disconnects, the Silver Star Collateral properties affected will be closed and secured. Tenants will not have access to the properties. The order of the cascade failure is not readily determinable. As of the signing of this Affidavit, other than BSP's recent and unfounded accusations of wrongdoing by Silver Star, BSP has otherwise gone "dark" – no accounting, no response to reasonable requests for operating expense funds under the agreement, and no response to any proposals by Silver Star for a workout agreement that allows Silver Star to continue to operate. Despite the fact that the loans were never in monetary default and BSP was at all times fully secured, BSP has engaged in these aggressive collection tactics and charged extra, excessive and unnecessary fees for its own financial gain, to the detriment of Silver Star, its ongoing business interests, its relationships, and the value of the interests of Silver Star's roughly 4,500 shareholders (who hold approximately 185 million shares – all of whom will suffer irreparable harm in the loss of their investment(s) should Silver Star go under – which BSP's actions will very likely cause.

**BSP's Egregious Actions Have Now Caused the Evacuation of a Major Silver Star Tenant**

5.48    The GSA – Veterans Administration ("VA") is a tenant of the Silver Star office property referred to as One Technology Center ("OTC") located at 7411 John Smith Drive, San Antonio, Texas. The VA occupies approximately 48,708 square feet, which is roughly 24.8% of the rental square footage of OTC. On July 11, 2025, the VA notified Silver Star that it is temporarily vacating all tenant space at OTC as a result of its safety concern with respect to the inability of Silver Star to install a necessary fire panel replacement for the property.

5.49    This fire panel issue was identified by Silver Star in 2024 and communicated to BSP's representatives. As a result of the fire panel function or malfunction, a fire watch status was

instituted resulting in the deployment by Silver Star of full-time additional security until such as time as the fire panel replacement could be completed.

5.50 On February 28, 2025, Silver Star made a formal request for disbursement of approximately $95,000 for the replacement of the fire panel. The request was delivered to RMWC as lender and Bellwether as servicer for the then remaining Junior loan. As of March 12, 2025, Silver Star's correspondence with Bellwether reflects that the service was ready to process the payment request subject to receipt of the fire panel invoice and payment instructions.

5.51 On April 7, 2025, however, Silver Star received an email and letter from Bellwether regarding a certain financial statement covenant which was outstanding, but Bellwether communicated nothing further regarding the fire panel funding request. On or about May 7, 2025, Silver Star learned that BSP had acquired the balance of the RMWC Junior loan and that Silver Star's applicable reserves had been transferred to the service for BSP. In a telephone conversation on May 23, 2025, in which Fox participated with Silver Star's counsel, BSP and its counsel stated that it had no knowledge of any reserve requests.

5.52 Failure on the part of RMWC/Bellwether – and now BSP – to release operating expense funds necessary to replace this fire panel has resulted in the displacement of a substantial tenant of Silver Star's. If this Court does not grant a Temporary Restraining Order resulting in the release of operating expenses funds sufficient to replace the fire panel, the permanent departure of this substantial tenant will result in irreparable harm to Silver Star. Further, if the Court does not grant a Temporary Restraining Order resulting in the release of operating expenses corresponding to Silver Star's May 2025, June 2025, and July 2025, requests, and restrain future denials, Silver Star will suffer additional and ongoing, irreparable harm, by defaulting on its other landlord obligations

and responsibilities, losing countless other valuable tenants and business relationships with managers and vendors – all critical to its very survival as a company.

**New imminent and irreparable harms continue**

5.53    On or about July 14, 2025, the Honorable Melody Wilkinson denied Silver Star's initial request for a TRO to order BSP to return Silver Star's applicable reserves, among other relief. Since that time, new irreparable harms continue to occur. For example, the following is a revised total of funds swept by BSP since May 1, 2025, without accounting by BSP or explanation, all of which is resulting irreparable harm to Silver Star:

| DATE | AMOUNT | (BSP)ACCOUNTING |
|------|--------|-----------------|
| 07/16/25 | $136,658.64 | NONE |
| 07/14/25 | $457,700.55 | NONE |
| 07/07/25 | $447,706.71 | NONE |
| 06/30/25 | $114,444.82 | NONE |
| 06/20/25 | $490,910.79 | NONE |
| 06/18/25 | $23,606.91 | NONE |
| 06/06/25 | $1,000,290.93 | NONE |
| 05/19/25 | $1,394,028.68 | NONE |
| 05/16/25 | $5,000.00 | NONE |
| | $4,070,348.03 | |

5.54    Silver Star continues to experience serious problems across the legacy portfolio that both impact and threaten its ability to provide the required, appropriate, and safe property-level service to its tenants and customers as outlined by its lease agreements with them.  These include but are

not limited to fire safety, HVAC repair & maintenance, elevator repair and maintenance, housekeeping and janitorial, and funding of tenant improvements, including but not limited to:

*Three Forest Plaza* – One of the two chillers is not operational and requires a leak repair. The other chiller has a bad bearing which needs to be replaced. With one down and the other operating under need of repair, Silver Star is at significant risk of losing the ability to provide conditioned air to tenants at the peak of summer, which if failure of the operating chiller happened would force them to close their offices and work elsewhere. There is an outstanding balance of $11,287 plus tax due to the HVAC vendor at Three Forest. A non-operational garage elevator needs repair, which creates both convenience and safety issues for Silver Star's frustrated tenants. One of the high-rise elevators is non-operational, requiring assessment costing $10,242 plus tax that Silver Star cannot fund to determine the necessary work to bring it operational.

*The Preserve* – One of the two chillers is not operating and needs a new compressor costing $94,795 plus tax. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for its tenants.

*One Technology* – as discussed above the fire panel needs replacement at a cost of $87,987 plus tax and one of Silver Star's significant tenants has sent employees away until this safety issue is resolved. Silver Star has $82,995 in unpaid bills with an HVAC vendor preventing Silver Star from obtaining the proper repair and maintenance work necessary to keep these systems operational. UT Health San Antonio has abandoned the building due to ongoing problems with HVAC.

*Westheimer Central* – One of the two chillers is not operational. With a substantial past due balance, the vendor is unwilling to repair the other chiller. With only one chiller operational, Silver Star is at significant risk during the peak summer heat of being unable to provide air conditioning for Silver Star's tenants. The pending HVAC work at this property would cost $96,277 plus tax. Silver Star has outstanding repairs necessary to the elevators, estimated at $150,000 by its Director of Asset Management, which cannot move forward without proper funding.

*601 Sawyer* – Silver Star's HVAC vendor is unwilling to provide service due to unpaid balance of $5,995 plus tax.

*Across the Legacy Portfolio*

- Chemicals for chilled water – Silver Star's vendors are unpaid and therefore not providing chemicals for treatment of the chilled water across the legacy portfolio. This puts these systems at imminent risk for further damage.

- Landscaping maintenance – Payments to landscaping service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Tejas landscaping, one of the landscape vendors, has stopped providing service with $5,485 of outstanding balance.

- Janitorial services – Payments to janitorial service vendors are significantly behind and these vendors have abandoned or are at imminent risk to abandon Silver Star properties. Starlight the vendor at Three Forest Plaza says they will stop service with a $63,201 balance due.

- Security – Silver Star's portfolio-wide security vendor had been threatening to remove service due to a $162,430 past due balance. On July 30, 2025, Avail Security terminated service for all office properties (Preserve, Westheimer, Sawyer, One Technology Center, and Three Forest Plaza. Silver Star was forced to reject Avail's demand for current weekly payments, because with BSP's withholding of operation expense funding, Silver Star has no means to make such payments. This removal of security puts Silver Star's tenants at substantial personal, possibly life threatening, risk, and it will likely induce them to abandon Silver Star's buildings.

5.55    Due to these issues, tenants are and have been unable to operate at the properties. They are also reluctant to engage in renewal discussions. When they do engage in renewal discussions, they and their broker representatives have required non-market concessions, such as escrow of tenant improvement and broker commissions up front to move forward.

5.56    In addition to the $8,562,846.74 taken by BSP on or about May 7, 2025, the following is a revised summary of funds BSP has taken from Silver Star's cash management account since May 1, 2025, along with a statement of what accounting BSP has provided, if any:

| DATE | AMOUNT | (BSP)ACCOUNTING |
| --- | --- | --- |
| 07/16/25 | $136,658.64 | NONE |
| 07/14/25 | $457,700.55 | NONE |
| 07/07/25 | $447,706.71 | NONE |
| 06/30/25 | $114,444.82 | NONE |
| 06/20/25 | $490,910.79 | NONE |

| | | |
|---|---|---|
| 06/18/25 | $23,606.91 | NONE |
| 06/06/25 | $1,000,290.93 | NONE |
| 05/19/25 | $1,394,028.68 | NONE |
| 05/16/25 | $5,000.00 | NONE |
| | $4,070,348.03 | |

5.57 BSP has provided NO explanation or accounting for how most of these funds taken from Silver Star have been applied. The last disbursement of Silver Star Collateral operating expenses was April 9, 2025, in the amount of $886,916.30 for payment of April 2025 operating expenses. For the period from 7-17 to 7-31-2025 the Silver Star Collateral estimates tenant receipts of $135,000. For the month of August 2025, estimated tenant receipts are $1,130,000. The utility costs listed above have been noticed for DISCONNECT on 7-28-2025.

5.58 For all of these reasons, Silver Star requests that this Court enter the appropriate Temporary Restraining Order, Temporary Injunction and Permanent Injunction so that Silver Star and its shareholders' investments are protected, rather than being destroyed by BSP's overreach and predatory lending practices.

## VI. CAUSES OF ACTION

### A) Texas Statutory Tort – Fraud in a Real Estate Transaction:

6.1 When BSP marketed and sold the Walgreens properties, it ceased being a mere purchase money lender, and it stepped into the role of seller. In addition to BSP's representations and commitment regarding future financing, in marketing the Walgreens properties for sale, BSP provided due diligence materials that included leases, historical analyses and other documents related to the performance and value of the properties. Silver

Star will show that the materials provided by BSP indicated that the values of the Walgreens properties was greater than their values actually were. BSP made the misrepresentations for the purpose of inducing Silver Star to buy the Walgreens properties. In reliance on BSP's misrepresentations, Silver Star purchased the Walgreens properties. Silver Star suffered harm from BSP's misrepresentations, in that it purchased Walgreens properties it would not otherwise have purchased but for BSP's misrepresentations, and it now owns properties worth significantly less than the values it believed it was getting. For these reasons, BSP's actions constitute the Texas tort of statutory fraud in a real estate transaction.

6.2     The elements of statutory fraud in a real estate transaction are:

a. There was a transaction involving real estate.

b. During the transaction, the defendant:

i. made a false representation of fact;

ii. made a false promise; or

iii. benefited by not disclosing that a third party's representation or promise was false.

c. The false representation or promise was made for the purpose of inducing the plaintiff to enter into a contract.

d. The plaintiff relied on the false representation or promise by entering into the contract; and

e. The reliance caused the plaintiff injury.

Tex. Bus. & Comm. Code §27.01, *et seq*.

6.3     Silver Star Properties REIT, Inc. seeks actual and exemplary damages for statutory fraud in a real estate transaction.

**B) <u>Texas Tort of</u> <u>Breach of Fiduciary Duty</u>:**

6.4     A lender is no longer at arm's length when it takes exclusive control over the borrower's business and is effectively running the borrower's business. When that occurs, the lender becomes the borrower's fiduciary and incurs the fiduciary duties of not self-dealing and complete candor, among others. *In re Bailey Tool & Manufacturing Co.*, 2021 WL 6101847, *41 (Bankr. N.D.Tex. – December 23, 2021, Sternigan, J.) ("If a lender exercises excessive control over a borrower, however, a lender can assume the role of fiduciary rather than a mere creditor. When such a change occurs… the lender is required to make decisions in the best interests of the borrower, even if contrary to the best interest of the lender.

6.5     Alternatively, even if a fiduciary relationship is not established, if a lender takes a particularly active role in the business decisions of the borrower and…intentionally interferes with…borrower's business contracts, a lender may become liable for tortious interference.").[1] The mere fact that the loan agreement contractually authorizes a remedy is not a defense to the claim of breach of fiduciary duty, and when a contract places a decision in the lender's discretion it presumes the lender will act reasonably. *State Nat. Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661, 685 (Tex.App. – El Paso 1984, *writ granted; case dismissed* 1985).

6.6     Here, on loans experiencing no monetary defaults, BSP continues to deny Silver Star the ability to pay a single operating expense – insuring Silver Star's death before it can even have its contractual defenses heard by this Court. At all times material to this case, BSP retained possession and exclusive control over Silver Star's cash reserves, and it retained the exclusive right to approve every dollar spent. Silver Star had to ask BSP for permission to spend its own money. Silver Star's requests for operational expenses were not only reasonable – they were essential both to the

---

[1] *In re Bailey Tool* also held that Texas tort law applied, regardless of what state's law applied to contractual claims. *In re Bailey Tool*, 2021 WL 6101847, at *36

fulfillment of Silver Star's duties to the properties' tenants and critical to Silver Star's survival as a company. Moreover, while a non-material breach may give rise to a cause of action, it does not excuse future performance. Perhaps most importantly, BSP was never actually insecure – it was fully collateralized and no monetary defaults had occurred.

6.7    As such, at all material times, BSP was a fiduciary of Silver Star and owed Silver Star a duty of complete candor and to avoid self-dealing. BSP breached its duty of complete candor by failing and refusing to provide Silver Star with an accounting of the Silver Star funds it converted. BSP breached its fiduciary duty by self-dealing – that is, putting its own financial interests above those of Silver Star.

6.8    A breach of fiduciary duty occurs under Texas law when:

1) The plaintiff and defendant had a fiduciary relationship;

2) The defendant breached its fiduciary relationship to the plaintiff; and

3) The defendant's breach resulted in

   (a) Injury to the plaintiff; or
   (b) Benefit to the defendant.

In this case, BSP's actions resulted in _both_ injury to Silver Star and a benefit to BSP. In a breach of fiduciary duty case, a plaintiff is entitled to recover actual damages, including both economic and mental anguish damages, plus exemplary damages, in addition to equitable remedies such as disgorgement. Silver Star hereby sues for breach of fiduciary duty and seeks all such damages.

6.9    Alternatively, the fact that BSP's conduct constituted breach of fiduciary duty further supports Silver Star's request that this Court declare it unreasonable and enjoin it, both emergently and permanently.

**C) <u>Texas Tort of</u> <u>Conversion</u>:**

6.10    The elements of conversion in Texas are:

a. The plaintiff owned, possessed, or had the right to immediate possession of property;

b. The property was personal property;

c. The defendant wrongfully exercised dominion or control over the property; and

d. The plaintiff suffered injury.

Silver Star hereby sues for conversion.

6.11    Alternatively, the fact that BSP's conduct constituted conversion further supports Silver Star's request that this Court declare it unreasonable and enjoin it, both emergently and permanently.

**D) <u>Texas Tort of</u> <u>Duress/Economic Duress</u>:**

6.12    In a borrow/lender relationship, "duress" occurs when the lender makes a threat to engage in conduct that is wrongful or unlawful, the borrow had no reasonable alternative but to acquiesce in the lender's demands, the lender's threat actually induced the borrower's conduct or agreement, and the threat of harm was imminent.

6.13    "Economic duress" occurs when the lender threatened to cause economic injury (such as calling a loan, refusing to extend credit, or demanding immediate payment), the threatened conduct was wrongful (such conduct can be wrongful even if technically within the lender's contractual rights, if exercised in bad faith), the borrower had no reasonable alternative source of financing or means to avoid the economic harm, and the threat actually caused the borrow to act against their will. Silver Star sues for economic duress.

6.14    Alternatively, the fact that BSP's conduct constituted duress and/or economic duress further supports Silver Star's request that this Court declare it unreasonable and enjoin it, both emergently and permanently.

**E) <u>Declaratory Judgment</u>:**

6.15    Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Silver Star seeks a declaratory judgment from this Court that:

>    a. Section 4.2's requirement that Silver Star furnish annual financial statements "prepared and reviewed by an independent CPA" is an impossibility, which is a contractual defense to BSP's claim of default;

>    b. Section 4.2's requirement that Silver Star furnish annual financial statements "prepared and reviewed by an independent CPA" is not a material term; and/or

>    c. BSP acted unreasonably in declaring default, charging default interest, awarding itself an "exit fee," seizing Silver Star's cash reserves and refusing and continuing to refuse to advance such funds as are reasonably necessary for Silver Star to run its business.

**F) <u>Exemplary/Punitive Damages</u>:**

6.16    Under Texas public policy, exemplary/punitive damages are designed to penalize a defendant for outrageous, malicious, or otherwise morally culpable conduct, and to deter such conduct in the future – by that defendant or others. Further, the actions of a business entity's principals or vice principals _are_ the entity's acts, and business entities are subject to exemplary/punitive damages for the actions of their principals and vice principals committed in breach of a fiduciary duty, or with fraud, gross negligence or malice. Plaintiff's breach of fiduciary duty and fraud claims are explained above.

6.17    Under Texas law, "gross negligence" occurs when 1) the act or omission, viewed objectively from the defendant's standpoint at the time it occurred, involved an extreme risk, considering the probability and magnitude of the potential harm to others; and 2) the defendant

had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety or welfare of others.

6.18    Under Texas law, "malice" is defined as a specific intent to cause substantial injury or harm to the plaintiff, which includes financial ruin.

6.19    Texas' Exemplary Damages Act expressly authorizes a plaintiff to recover up to two (2) times its economic damages. Should Silver Star recover economic damages in excess of $100 million, Texas law would authorize an exemplary/punitive damages award up to twice that amount, or in excess of $200 million.

## VII. ATTORNEY'S FEES

7.1    Silver Star has retained Walter L. Taylor of the Taylor Law Firm to represent it in this declaratory action, and has agreed to pay the firm's reasonable and necessary attorney's fees. Silver Star is entitled to recovery these fees if it prevails on its statutory fraud in a real estate claim. Tex. Bus. & Comm. Code §27.01(e). Further, an award of reasonable and necessary attorney's fees to Silver Star would be equitable and just, and therefore it is authorized by Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

## VIII. CONDITIONS PRECEDENT

8.1    All conditions precedent to the filing of this suit, as well as the recovery of attorney's fees, have been met.

## IX. APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUCTION AND PERMANENT INJUNCTION

9.1    The Silver Star Plaintiffs would show that Defendant has engaged in unlawful acts and unlawful refusals to act – both imminently likely to occur again in the future – which have resulted in, continue to result in, and will continue to result in, immediate and irreparable injury, loss, or

damage to Plaintiffs before notice can be served and a hearing had on this Application. As established by the Affidavit of Silver Star's CFO, Lou T. Fox, III, attached hereto as Exhibit 1, Plaintiffs have suffered irreparable harm in a way that cannot be tracked or calculated. Further, commercial leasing and vendor/service relationships are unique and built on history and trust – they are not fungible. The loss of these relationships and Silver Star's reputation constitutes irreparable injury, for which there is no adequate remedy at law.

9.2     Moreover, allowing Defendants' tortious and unreasonable conduct to continue unrestrained will result in immeasurable damage to Plaintiffs' very livelihood and viability as a company, its business relationships, and the investments of its approximately 4,500 shareholders, for which there is also no adequate remedy at law.

9.3     Plaintiff would show it also has a likelihood of success on the merits, the balance of interests (between a fully secured and protected creditor and a solvent borrower the creditor is putting out of business unnecessarily) weighs in favor of granting the TRO and Temporary Injunction, and that Texas public policy also favors granting the TRO and Temporary Injunction.

9.4     Accordingly, Plaintiffs pray that this Court grant Plaintiffs, *ex parte* and without notice, a Temporary Restraining Order against Defendants, including the following relief:

   a. That Defendants, and any and all of their representatives, agents and employees be ordered to release Plaintiffs' May operating expense funds in the amount of $746,207;

   b. That Defendants, and any and all of their representatives, agents and employees be ordered to release Plaintiffs' June operating expense funds in the amount of $732,694;

   c. That Defendants, and any and all of their representatives, agents and employees be ordered to release Plaintiffs' July operating expense funds in the amount of $720,225;

d. That Defendants, and any and all of their representatives, agents and employees be ordered to release the funds listed in sub-paragraphs (a) through (c) above, in the aggregate sum of $2,199,126, within twenty-four (24) hours of the signing of this Court's Temporary Restraining Order;

e. That Defendants, and any and all of their representatives, agents and employees be ordered to release Plaintiffs' requested funding for the replacement of the One Technology Center ("OTC") fire panel in the in the amount of $95,000, within twenty-four (24) hours of the signing of this Court's Temporary Restraining Order;

f. That Defendants, and any and all of their representatives, agents and employees, be ordered to reverse the sweeps of Plaintiffs' cash management accounts in the amounts of $8,562,846.74 (as described in BSP's May 7, 2025, letter) and $549,854.35 (as described in BSP's May 29, 2025, letter), within twenty-four (24) hours of the signing of this Court's Temporary Restraining Order;

g. That Defendants, and any and all of its representatives, agents and employees, be ordered to refrain from withholding future requests to release operating expense funding, unless and until this Court shall approve such refusals;

h. That the Court authorize Plaintiffs to conduct expedited discovery, including depositions, requests for production of documents, or other appropriate discovery means, in preparation for the Temporary Injunction hearing;

i. That the Court's restraint of the acts described above be effective immediately; and

j. That the Court set a hearing date for the Temporary Injunction.

9.5     Plaintiffs further pray that after notice, citation and writs have been issued, and after hearing evidence, that the Court further grant Plaintiffs the relief requested in this Application for Temporary Restraining Order, and such other and further relief as Plaintiffs may request between now and then as a result of further investigation or discovery, in the form of a Temporary Injunction.

9.6     Finally, Plaintiffs pray that, upon trial of the final merits of this cause, that the Court further grant Plaintiffs the relief granted in this Temporary Restraining Order, and such other and further relief, including money damages, as Plaintiffs may request between now and then as a result of

further investigation or discovery, in the form of a Permanent Injunction and Final Judgment.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully pray that Defendant be cited to appear and answer herein, that Plaintiffs be granted a Temporary Restraining Order and Temporary Injunction ordering or restraining the foregoing emergency relief, and that, after a trial on the merits, Plaintiffs be awarded judgment against Defendants for injunctive relief, specific performance, and Plaintiffs' actual damages resulting from Defendants' tortious conduct. Plaintiffs reserve their right to amend these pleadings to conform to the facts as they may develop. Plaintiffs further pray for costs, pre-judgment and post-judgment interest at the maximum rate allowed by law, whether equitable or statutory, and for such other and further relief, special or general, legal or equitable, to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
*taylorlawfirmdfw@gmail.com*
**TAYLOR LAW FIRM**
6630 Colleyville Blvd, Suite 200
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify by my signature above that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on August 1, 2025, including:

**Jacob Sparks**
Email: *Jacob.Sparks@NelsonMullins.com*

**Brent T. Buyse**
Email: *Brent.Buyse@NelsonMullins.com*

**Xenna Davis**
Email: *Xenna.Davis@NelsonMullins.com*

**NELSON MULLINS RILEY &SCARBOROUGH, LLP**

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Walter Taylor on behalf of Walter Taylor
Bar No. 19727030
taylorlawfirmdfw@gmail.com
Envelope ID: 103882288
Filing Code Description: Amended Filing
Filing Description: P's First Amended Original Petition, Application for
TRO, Temporary Injunction and Permanent Injunction
Status as of 8/1/2025 2:43 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Walter Taylor | 19727030 | taylorlawfirmdfw@gmail.com | 8/1/2025 2:23:23 PM | SENT |
| Jacob Sparks | | jacob.sparks@nelsonmullins.com | 8/1/2025 2:23:23 PM | SENT |
| Brent T.Buyse | | brent.buyse@nelsonmullins.com | 8/1/2025 2:23:23 PM | SENT |
| Xenna K.Davis | | Xenna.Davis@nelsonmullins.com | 8/1/2025 2:23:23 PM | SENT |
| Jessica Cannon | | Jessica.cannon@nelsonmullins.com | 8/1/2025 2:23:23 PM | SENT |
| Mary Versfelt | | mary.versfelt@nelsonmullins.com | 8/1/2025 2:23:23 PM | SENT |

FILED
TARRANT COUNTY
8/8/2025 1:38 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 048-366561-25

| | | |
|---|---|---|
| SILVERSTAR PROPERTIES REIT, INC.; SILVER STAR CRE, LLC; SILVER STAR CRE II, LLC; and SILVER STAR DELRAY, LLC, | § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § § | |
| v. | § § § | 48TH JUDICIAL DISTRICT |
| BSPRT CRE FINANCE, LLC; FBRED BDC FINANCE, LLC; and BSPRT CS LOAN, LLC, | § § § § § | |
| *Defendants.* | § § | TARRANT COUNTY, TEXAS |

---

## DEFENDANTS' NOTICE OF REMOVAL TO THE BUSINESS COURT OF TEXAS

---

Defendants BSPRT CRE Finance, LLC ("***BSPRT Finance***"), FBRED BDC Finance, LLC ("***BDC Finance***"), and BSPRT CS Loan, LLC ("***BSPRT Loan***") (collectively, "***Defendants***") file this Notice of Removal.

### I.   INTRODUCTION

**1.** The above-captioned cause was initially filed in the District Court of Tarrant County, Texas, and assigned to the 48th Judicial District Court, Cause Number 048-633561-25.

**2.** Defendants submit this Notice of Removal pursuant to sections 25A.004 and 25A.006 of the Texas Government Code[1] and Rule 355 of the Texas Rules of Civil Procedure.[2]

**3.** Prior to filing this Notice of Removal, Defendants' counsel conferred with Plaintiffs' counsel, and Plaintiffs do not agree to remove this action from the District Court of Tarrant County to the Business Court of Texas.

---

[1] TEX. GOV'T CODE §§ 25A.004, 25A.006.

[2] TEX. R. CIV. P. 355.

## II.    VENUE AND JURISDICTION

**4.**     The Business Court of Texas has jurisdiction pursuant to sections 25A.004(d)(1) and (3) of the Texas Government Code.[3]

**5.**     Venue is proper in the Eighth Business Court Division because the Eighth Business Court Division has jurisdiction over Tarrant County.[4]

**6.**     Removal is timely under section 25A.006(f) of the Texas Government Code[5]

## III.    GROUNDS FOR REMOVAL

**7.**     BSPRT Finance and BSPRT Loan are each an "entity that is majority owned or controlled by" Franklin BSP Realty Trust, Inc., a publicly traded company (NYSE: FBRT).

**8.**     Plaintiffs assert claims against Defendants arising out of a qualified transaction greater than $10 million.[6]  Defendants are lenders on three (3) separate loans to Plaintiffs, totaling over $228 million of original principal advanced.[7] As of August 1, 2025, $66,985,686.47 remained outstanding.  Accordingly, the Business Court of Texas has jurisdiction under section 25A.004(d)(1) of the Texas Government Code.

**9.**     Additionally, Silver Star asserts a claim in excess of $10 million[8] for statutory fraud in a real estate transaction under section 27.01 of the Texas Business Organizations Code,[9] and

---

[3] TEX. GOV'T CODE § 25A.004(d)(1) and (3).

[4] TEX. R. CIV. P. 355(b)(2)(B); TEX. GOV'T CODE § 25A.003(j); TEX. GOV'T CODE § 74.042(i).

[5] TEX. GOV'T CODE Ann. § 25A.006(f).

[6] TEX. GOV'T CODE § 25A.004(d)(1).

[7] *See* Pls' Am. Pet. ¶¶ 5.14-.22 (allegations regarding loans); TEX. GOV'T CODE § 25A.001(14) (definition of "Qualified Transaction").

[8] *See, e.g.,* Pls' Am. Pet. ¶ 6.19.

[9] TEX. BUS. & COM. CODE § 27.01

Defendants are not banks, credit unions, or savings and loan associations.[10] Therefore, the Business Court of Texas has jurisdiction under section 25A.004(d)(3) of the Texas Government Code.

10.     Accordingly, this cause is removable to the Business Court of Texas pursuant to section 25A.006(d) of the Texas Government Code[11] and Rule 355(a) of the Texas Rules of Civil Procedure.[12]

11.     The Business Court will have supplemental jurisdiction over all other claims related to the controversy that form part of the same case or controversy.[13]

## IV.     ATTACHMENTS

12.     Accompanying the Notice of Removal filed in the Business Court of Texas was an index that "contain[s] a copy of the district court's … docket sheet and all process, pleadings, and orders in the action,"[14] including:

    a.     A copy of the docket sheet from the 48th Judicial District Court of Tarrant County;

    b.     *Plaintiffs' First Amended Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* dated August 1, 2025;

    c.     *Temporary Restraining Order* entered August 4, 2025;

    d.     *Defendants' Response to Plaintiffs' Amended Application for Temporary Injunction* dated August 7, 2025; and

    e.     A copy of the Notice of Removal submitted to the Clerk of the 48th Judicial District Court of Tarrant County.

---

[10] TEX. GOV'T CODE § 25A.004(d)(3).

[11] TEX. GOV'T CODE Ann. § 25A.006(d).

[12] TEX. R. CIV. P. 355(a).

[13] TEX. GOV'T CODE Ann. § 25A.004(f).

[14] TEX. R. CIV. P. 355(b)(3).

These exhibits are not attached to this Notice of Removal being filed in the 48th Judicial District Court of Tarrant County, as they are already part of the record.

**13.**     Citations were never issued. The docket sheet reflects that citations were paid for on July 14, 2025, but according to the Clerk of Court, citations were never issued.

**V.     CONCLUSION**

**14.**     Defendants have tendered the filing fee of $2,500.00 to the Clerk of the Eight Business Court Division along with the Notice of Removal.

**15.**     This Notice of Removal is also being filed in the 48th Judicial District Court of Tarrant County, Texas, and all counsel of record are being provided complete copies.

**16.**     Accordingly, Defendants hereby remove the above-captioned action to the Business Court of Texas.

Respectfully submitted,

By: /s/ *Jacob Sparks*
**Jacob Sparks**
Texas Bar No. 24066126
Email: Jacob.Sparks@NelsonMullins.com

**Brent T. Buyse**
Texas Bar No. 24105567
Email: Brent.Buyse@NelsonMullins.com

**Xenna K. Davis**
Texas Bar No. 24132037
Email: Xenna.Davis@NelsonMullins.com

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
5830 Granite Parkway, Suite 1000
Plano, Texas 75024
Tel: (469) 484-4758
Fax: (469) 828-7217

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 8, 2025, a true and correct copy of the foregoing

document was served in accordance with Texas Rule of Civil Procedure 21a on Plaintiffs' counsel:

Walter L. Taylor
Taylor Law Firm
6630 Colleyville Blvd., Ste. 200
Colleyville, Texas 76034
P: (817) 770-4343
F: (512) 474-6700
Email: taylorlawfirmdfw@gmail.com

By: /s/ *Jacob Sparks*
**JACOB SPARKS**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Docketing DFW on behalf of Jacob Sparks
Bar No. 24066126
docketing.dfw@nelsonmullins.com
Envelope ID: 104150827
Filing Code Description: No Fee Documents
Filing Description: Notice of Removal to Business Court
Status as of 8/8/2025 1:41 PM CST

Associated Case Party: THESILVER STAR PROPERTIES REIT INC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Walter Taylor | 19727030 | taylorlawfirmdfw@gmail.com | 8/8/2025 1:38:15 PM | SENT |

Associated Case Party: THEBSPRT CRE FINANCE LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacob Sparks | | jacob.sparks@nelsonmullins.com | 8/8/2025 1:38:15 PM | SENT |
| Brent T.Buyse | | brent.buyse@nelsonmullins.com | 8/8/2025 1:38:15 PM | SENT |
| Xenna K.Davis | | Xenna.Davis@nelsonmullins.com | 8/8/2025 1:38:15 PM | SENT |
| Jessica Cannon | | Jessica.cannon@nelsonmullins.com | 8/8/2025 1:38:15 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mary Versfelt | | mary.versfelt@nelsonmullins.com | 8/8/2025 1:38:15 PM | SENT |

048-366561-25

E-filed in the Office of the Clerk
for the Business Court of Texas
Accepted by: Alexis Jennings
Case No. 28-BC08B-0016

FILED
TARRANT COUNTY
8/8/2025 4:54 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 048-366561-25

| | | |
|---|---|---|
| SILVERSTAR PROPERTIES REIT, INC.; SILVER STAR CRE, LLC; SILVER STAR CRE II, LLC; and SILVER STAR DELRAY, LLC, | § § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | 48TH JUDICIAL DISTRICT |
| v. | § § | |
| BSPRT CRE FINANCE, LLC; FBRED BDC FINANCE, LLC; and BSPRT CS LOAN, LLC, | § § § § § | |
| *Defendants.* | § § | TARRANT COUNTY, TEXAS |

## DEFENDANTS' RESPONSE TO
## PLAINTIFFS' AMENDED APPLICATION FOR TEMPORARY INJUNCTION

Defendants BSPRT CRE Finance, LLC ("***BSPRT Finance***"), FBRED BDC Finance, LLC ("***BDC Finance***"), and BSPRT CS Loan, LLC ("***BSPRT Loan***") (collectively, "***Defendants***") respond to Plaintiffs' Amended Application for Temporary Injunction filed by Plaintiffs Silver Star Properties REIT, Inc. ("***SS REIT***"), Silver Star CRE, LLC ("***SS CRE***"), Silver Star CRE II, LLC ("***SS CRE II***"), and Silver Star Delray, LLC ("***SS Delray***") (collectively, "***Plaintiffs***").

## I.     INTRODUCTION AND RESPONSE SUMMARY

1.     On August 1, 2025, Plaintiffs filed *Plaintiffs' First Amended Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* (the "***Amended Application***"), alleging causes of action for Fraud in a Real Estate Transaction, Breach of Fiduciary Duty, Conversion, Duress/Economic Duress, and Declaratory Judgment. Plaintiffs are not entitled to a temporary injunction because they cannot show a probable, imminent and irreparable injury or a probable right to recovery on any of their flawed claims, all of which fail as a matter of law. The Amended Application should be denied.

**2.** Despite all the ink spilled by Plaintiffs alleging bad acts of Defendants (which are, as discussed below, largely untrue and out of context), at its core, this dispute is solely one in which borrowers—Plaintiffs—defaulted under their Loan Agreements; and, after they were given notice and failed to cure the defaults, their lenders—Defendants—exercised the remedies contractually provided for under the Loan Documents (as defined below) and Article 9 of the Uniform Commercial Code, as codified in the Texas Business and Commerce Code §§ 9.101, *et seq.* ("***Article 9***"). Indeed, Plaintiffs complain about economic harms allegedly flowing from remedies that Defendants took in strict compliance with the Loan Documents and Article 9 after Plaintiffs defaulted. Not only are Plaintiffs not entitled to injunctive relief, but their claims fail in their entirety based on the plain language of the parties' written agreements and applicable statutes, as Defendants cannot be held liable for exercising the very remedies that the law provides and to which Plaintiffs agreed in their contracts.

**3.** In order to circumvent this reality, Plaintiffs assert claims for Fraud in a Real Estate Transaction, Breach of Fiduciary Duty, Conversion, Duress/Economic Duress, and Declaratory Judgment. **Plaintiffs' omission of any claim for breach of contract speaks volumes and constitutes an admission that at all times Defendants acted in accordance with the parties' binding agreements**. In any event, for the reasons set forth below, Plaintiffs' claims are meritless.

**4.** Plaintiffs are a family of entities owned by a publicly traded real estate investment trust (a "***REIT***") that publicly files documents with the Securities and Exchange Commission (the "***SEC***") under ticker SLVS. For years, Plaintiffs have been mired in operational and governance turmoil, including: (**a**) an SEC investigation;[1] (**b**) a September 13, 2023, Chapter 11 filing by subsidiary Hartman SPE, LLC ("***Hartman SPE***");[2] (**c**) ongoing corporate governance litigation;[3] (**d**) frequent management turnover, including SS REIT's president and general counsel;[4] (**e**) resignation of and

---

[1] Am. Pet. ¶¶ 5.35–5.36.

[2] *In re Hartman SPE LLC*, No. 1:23-BK-11452 (Bankr. D. Del.).

[3] *Hartman v. Silver Star Properties REIT, Inc.*, Case No. 24-c-23-003722 (Balt. Cir. Ct.).

[4] Ex. 13, Forms 8-K, Nov. 2, 2023 & May 23, 2025.

failure to replace its auditor **for two years**;[5] and (**f**) persistent inability to produce reliable financial statements consistent with SEC filings.

5.       However, based solely on the strength of their real estate, and in exchange for the covenants and protections promised to Defendants under their Loan Documents—which were intended to mitigate Plaintiffs' operational challenges and chaotic circumstances—Defendants agreed to loan Plaintiffs and their affiliates a total of $193,280,000.00 over the course of three (3) separate loans: (**a**) the Exit Facility, (**b**) the Walgreens Loan, and (**c**) the Delray Loan (each defined below). As of August 1, 2025, $66,985,686.47 remains outstanding: $50,801,887.39 under the Walgreens Loan and $16,183,799.08 under the Delray Loan.

6.       **By the time the Amended Application is heard, the Walgreens Loan will have matured—the stated maturity date occurring on August 9, 2025—meaning the entire amount is indisputably due and owing**. Absent from the Amended Application is any allegation regarding how any of Defendants' actions—all of which were proper—hindered Plaintiffs' ability to repay Defendants upon maturity. Indeed, Plaintiffs' request for a temporary injunction will be largely mooted by this maturity default.

7.       Plaintiffs have steadfastly refused to deliver to Defendants annual financial statements prepared and reviewed by an independent certified public accountant ("*CPA*"), as explicitly required by no less than three (3) Loan Agreements—agreements that were heavily negotiated by Plaintiffs and Defendants over months, with all parties represented by independent and sophisticated legal counsel. Instead, upon request, Plaintiffs simply provided self-generated financial statements lacking any external validation, which appear inconsistent with financial information provided to Plaintiffs' shareholders amid an ongoing corporate governance fight. Plaintiffs have outright refused to offer even a projected timeline for delivering the required independent CPA-prepared and reviewed statements.

---

[5] Am. Pet. ¶¶ 5.31–5.36.

**8.**     Moreover, Plaintiffs have demonstrated no viable strategy for repaying Defendants upon the maturity date of the loans. Rather, they have resorted to publicly harassing and threatening Defendants' executives while making proposals for extensions and modifications that are clearly commercially unreasonable. Defendants, however, have no legal or contractual obligation to amend the parties' Loan Agreements.

**9.**     In response to Plaintiffs' breaches, Defendants declared Events of Default under the Loan Agreements and the other written agreements governing the Loans (collectively, the "***Loan Documents***") and exercised certain remedies available under the Loan Documents, which specifically include the right to offset amounts held by Defendants in cash reserves against the unpaid balance of Plaintiffs' loans. Defendants at all times acted strictly in accordance with the letter of the Loan Documents that Plaintiffs signed.

**10.**     Although Plaintiffs resort to exaggeration, omission, and mischaracterization to manufacture claims, this case fundamentally concerns loans in default owed by borrowers who have failed to implement their own business plan and have descended into such operational and governance disarray that they now seek to shift blame onto their lender for merely exercising contractual remedies that Plaintiffs expressly agreed to in writing.

**11.**     Plaintiffs have failed to show a probable, imminent, and irreparable injury. To demonstrate irreparable injury, Plaintiffs must show an injury that cannot be compensated for by money damages or that the damages cannot be measured by any certain pecuniary standard. Plaintiffs' alleged injuries **can** be ascertained with certainty and compensated for with damages. Moreover, the occurrence of the maturity date on the Walgreens Loan means that any damages alleged by Plaintiffs are moot, because all amounts thereunder will be due and owing to Lender by the time the Amended Application is heard, with no apparent path to payoff.

**12.**     In addition, Plaintiffs cannot show a probable right to recover on any of their claims. With respect to their statutory fraud claim, Plaintiffs have failed to show a probable right to recover because the merger clause and clear and unequivocal disclaimer-of-reliance language contained in

the Walgreens PSA conclusively negates Plaintiffs' allegations that they relied on alleged misrepresentations regarding the Walgreens transaction. Further, as a factual matter, Plaintiffs and Defendants negotiated the Walgreens PSA at length, both in terms of properties included and pricing, and both represented by sophisticated external and internal counsel. Regretting in hindsight is not legal grounds to unwind heavily negotiated, thoroughly documented, legally binding transactions. Plaintiffs entered into the Walgreens PSA and Walgreens Loan voluntarily, after conducting their own due diligence, and with "eyes-wide-open."

13. Further, Plaintiffs cannot show a probable right to recover on their breach of fiduciary duty claim because Defendants owed them no fiduciary duty (and therefore no such duty was breached). Texas law is clear that the relationship between a lender and a borrower is neither a fiduciary relationship nor a special relationship creating a fiduciary duty. Furthermore, Plaintiffs alleged no facts supporting the contention that the parties had a special relationship existing prior to, and apart from, the Loan Documents. All of the rights and remedies exercised by Defendants about which Plaintiffs complain are specifically permitted under (**a**) the Loan Documents that Plaintiffs voluntarily executed and (**b**) Article 9.

14. Moreover, Plaintiffs cannot show a probable right to recover on their conversion and duress/economic duress claims because, pursuant to the terms of the Loan Agreements and Article 9, Defendants had a right to possess the reserve funds. Exercising that right is not wrongful or unlawful conduct. As discussed below, holding the funds in question in reserve, and applying them to the debt during the pendency of Events of Default, are rights and remedies provided under the Loan Documents to which Plaintiffs specifically agreed. Also, Plaintiffs attempt to allege a claim for duress and economic duress; however, these concepts are affirmative defenses under Texas law, not causes of action. Finally, Plaintiffs cannot show a probable right to recover on their declaratory judgment claim because neither the evidence nor Texas law supports their claim.

## II. EXHIBITS

15.  In support of this Response, Defendants rely upon and direct the Court's attention to the following documents attached hereto:

**Exhibit 1** – *Loan Agreement*, dated March 27, 2024 (the "***Exit Loan Agreement***");

**Exhibit 2** – *Junior Loan Agreement*, dated March 27, 2024 (the "***Junior Exit Loan Agreement***," and together with the Exit Loan Agreement, the "***Exit Facility Documents***");

**Exhibit 3** – *Purchase and Sale Agreement*, dated May 25, 2024, and First Amendment to Purchase and Sale Agreement dated July 1, 2024 (the "***Walgreens PSA***");

**Exhibit 4** – *Loan Agreement*, dated July 1, 2024 (the "***Walgreens Loan Agreement***");

**Exhibit 5** – *Loan Agreement*, dated July 19, 2024 (the "***Delray Loan Agreement***");

**Exhibit 6** – *Notices*, dated April 3, April 7, May 7, and May 29, 2025;

**Exhibit 7** – *Response to April 3 and April 7 Notices*, dated April 16, 2025;

**Exhibit 8** – *[Deleted]*;

**Exhibit 9** – *Declaration of David Wheeler in Support of Chapter 11 Petition and First Day Pleadings*, dated September 13, 2023 (the "***Wheeler Declaration***");

**Exhibit 10** – *Second Amended Combined Disclosure Statement and Chapter 11 Plan of Reorganization of Hartman SPE, LLC*, dated April 16, 2025 (the "***Chapter 11 Plan***");

**Exhibit 11** – *Findings of Fact, Conclusions of Law, and Order Approving on a Final Basis and Confirming the Second Amended Combined Disclosure Statement and Chapter 11 Plan of Reorganization of Hartman SPE, LLC*, dated April 16, 2025 (the "***Confirmation Order***");

**Exhibit 12** – *Schedule 14a*, filed April 16, April 25, July 17, July 25, and August 4, 2025;

**Exhibit 13** – *Form 8-K*, filed November 2, 2023 and May 23, 2025;

**Exhibit 14** – *Letter from Defendants' Counsel to Plaintiffs' Counsel*, dated June 10, 2025; and

**Exhibit 15** – *Letter from SEC regarding Plaintiffs' Financial Statements*, dated June 23, 2025.

The Exit Facility Documents, Walgreens Loan Agreement, and Delray Loan Agreement are herein referred to as the "***Loan Agreements***." Capitalized terms not otherwise defined in this Response have the respective meanings assigned thereto in the Loan Agreements.

## III. RELEVANT FACTS

### A. Bankruptcy Filed in September 2023.

16. On September 13, 2023, a subsidiary of SS REIT—Hartman SPE, LLC ("***Hartman SPE***"), filed a petition under Chapter 11 of the Title 11 of the United States Code (the "***Bankruptcy Code***") in the U.S. Bankruptcy Court for the District of Delaware in an effort to address mounting problems, including a protracted legal battle between management and one of Plaintiffs' minority shareholders and the maturity default by Hartman SPE on its approximately $259 million mortgage loan secured by thirty-nine properties in Texas (the "***Pre-Bankruptcy Loan***").[6] This would unfortunately not be the last time that Plaintiffs' mortgage loan matured without a plan to repay the loan at its maturity.

17. In addition, prior to the bankruptcy filing, on March 24, 2022, a Final Judgment against Hartman SPE was entered in the District Court of Harris County, 295th Judicial District, awarding approximately $7 million to Summer Energy, LLC.[7]

18. On March 20, 2023, Hartman SPE's namesake, Allen R. Hartman ("***Hartman***"), and a minority member of Hartman SPE, filed suit against Hartman SPE, SS REIT, and other Silver Star defendants in the Harris County District Court, commencing Cause No. 2023-17944.[8]

19. In addition to the lawsuit, Hartman filed papers, including lis pendens, in the real estate records clouding title to Hartman SPE's various properties, hindering Hartman SPE's ability to sell properties.[9]

---

[6] Ex. 9, ¶ 20; Ex. 10, Art. IV, § A, ¶ 3.
[7] Ex. 9, ¶ 25.
[8] Ex. 9, ¶ 27; Ex. 10, Art. IV, § A, ¶ 3.
[9] Ex. 9, ¶ 27–29; *see also id.* Ex. E.

20.    In addition to all the foregoing, Hartman filed a lawsuit in Maryland styled *Hartman v. Silver Star Properties REIT, Inc.*, Circuit Court for Baltimore City, Case No. 24-c-23-003722, pursuant to which Hartman challenged whether Plaintiffs' current management properly took control of Plaintiffs.

21.    Moreover, by September 2023, approximately 147 mechanic's liens had been filed against various Hartman SPE properties.[10]

22.    The confluence of the above-referenced lawsuits, liens, lis pendens, corporate governance fight, and loan maturity precipitated Hartman SPE's bankruptcy filing. On September 13, 2023, Hartman SPE filed a Chapter 11 bankruptcy proceeding in the U.S. Bankruptcy Court for the District of Delaware. *In re: Hartman SPE LLC*, No. 1:23-BK-11452 (Bankr. D. Del.). On the bankruptcy filing date, Hartman SPE scheduled the following debts:[11]

| Class | Estimated Allowed Claims[6] | Treatment | Summary of Treatment |
|---|---|---|---|
| Class 1 – Allowed Prepetition Lender Secured Claim arising under Prepetition Loan Documents | $217,276.867.59[7] | Unimpaired, deemed to accept. | 100% |
| Class 2 – Allowed Other Secured Claims | $3,233,997.70 | Unimpaired, deemed to accept | 100% |
| Class 3 – Allowed Other Priority Claims | $0 | Unimpaired, deemed to accept | 100% |
| Class 4 – Allowed General Unsecured Claims, including Intercompany Claims and Deficiency Claims | $20,292,162[8] | Unimpaired, deemed to accept | 100% |
| Class 5 – Interests | n/a | Unimpaired, deemed to accept | Reinstated |

23.    The corporate governance and control fight has continued since the bankruptcy concluded, with Hartman waging a public war to take control over Plaintiffs via a shareholder's vote, accusing

---

[10] Ex. 9, ¶ 24; Ex. 10, Ex. C.
[11] Ex. 10, Art. VI, § A.

current management with loss of $278 million of equity, refusal to provide financial information and failure to comply with proxy statement requirements.[12]

**B. Upon The Strength Of The Real Estate, Defendants Rescued Hartman SPE And Its Real Estate By Providing Exit Financing For Its Chapter 11 Plan.**

24.     Hartman SPE's ability to confirm its Chapter 11 Plan and exit bankruptcy was entirely dependent on the credit facility (the "***Exit Facility***")—as reflected in the Exit Facility Documents—provided by BSPRT Finance to Plaintiffs SS CRE and SS CRE II and various of their affiliates (collectively, "***Exit Borrowers***").[13] The Exit Facility consisted of $120 million in senior secured financing from BSPRT Finance, loaned for the purposes of facilitating Plaintiffs' plan to pivot their businesses from owners of office properties to self-storage properties.[14] Plaintiffs and Defendants were represented by independent and sophisticated legal counsel who negotiated the Exit Facility for months.[15]

**C. Plaintiffs and Defendants Expanded Their Lending Relationship Upon the Strength of Plaintiffs' Real Estate To Provide Tax Benefits To Plaintiffs**

25.     On May 25, 2024, SS REIT entered into the Walgreens PSA with Defendants' affiliated entities, BSPRT Walgreen Portfolio (Nos. 1, 2, 3, 4, 6, 7, 13, 14, 15, 16, 17, 19, 20, 21, 23, and 24), for the purchase of sixteen Walgreens retail locations for the total sale price of $60,925,000.00.[16] To finance this purchase, on July 1, 2024, Plaintiffs' affiliates (the "***Walgreens Borrowers***") entered into the Walgreens Loan Agreement with BSPRT Finance in the principal amount of $57,750,000.00 (the "***Walgreens Loan***").[17] The Maturity Date of the Walgreens Loan

---

[12] *See* Ex. 12; *see also* Ex. 15 ("Our initial review of your definitive proxy statement indicates that it fails to comply with the requirements of the Securities Exchange Act of 1934, the rules and regulations thereunder and the requirements of the form. More specifically, you have not included the financial statements required by Exchange Act Rule 14a-3(b). We suggest that you consider filing and disseminating a supplement to your proxy statement correcting the deficiencies.").
[13] Ex. 10, Art. IV, § G; Ex. 11, ¶ 34 (feasibility depended on the Exit Facility).
[14] *See* Ex. 10, Art. IV, § A, ¶ 1.
[15] Ex. 1, § 15.15; Ex. 2, § 15.15.
[16] *See* Ex. 3.
[17] *See* Ex. 4.

is August 9, 2025 (the "***Walgreens Maturity Date***").[18] BSPRT Loan is the current holder of the Walgreens Loan. The Walgreens Maturity Date will have occurred before the Amended Application is heard. Notably, Plaintiffs elected not to join the Walgreens Borrowers to this lawsuit, even though the entities that acquired the Walgreens properties in dispute would be the entities suffering the alleged harm (and Defendants reserve the right to join the Walgreens Borrowers as necessary or appropriate).

26.     Plaintiffs and Defendants negotiated the Walgreens PSA at length over the span of weeks.[19] Plaintiffs had ample opportunity to conduct due diligence on the Walgreens properties acquired, which Plaintiffs took, resulting in the negotiation of the PSA, negotiation of the purchase price for the properties, and removal of certain properties over the course of negotiation. The acquisition of the Walgreens portfolio by Walgreens Borrowers was intended by Plaintiffs to capture tax benefits through Section 1031 transactions on future sales of office buildings.[20] To facilitate this tax benefit, Defendants sold and financed the Walgreens properties to Walgreens Borrowers under a so-called "reverse 1031 exchange" transaction, which is reflected in the Walgreens Loan Agreement.[21] Absent this transaction, Plaintiffs would have incurred additional tax liability upon the sale of their office building properties. Indeed, far from being coerced into the Walgreens PSA and Walgreens Loan as Plaintiffs wrongly allege, these transactions were extremely beneficial for Plaintiffs to realize upon the tax savings that they underwrote as part of their plans to sell their office building properties.

27.     On July 19, 2024, SS Delray entered into the Delray Loan Agreement with BDC Finance[22] for the financing of one self-storage facility in the amount of $15,530,000.00 (the "***Delray***

---

[18] *Id.* § 1.1; Am. Pet. ¶ 5.19 ("The maturity date of the Walgreens loan is August 9, 2025.").
[19] *See* Ex. 3 (showing Walgreens PSA was negotiated, as evidenced by first amendment thereto).
[20] *See* Am. Pet. ¶¶ 5.15–5.16.
[21] *See* Ex. 4, § 6.2.
[22] BDC Finance is not the current holder of the loan. Defendants reserve the right to seek appropriate remedy for Plaintiffs' failure to join the appropriate party, including, without limitation, the right to move for dismissal based upon failure to join indispensable parties.

*Loan*").[23] BDC Finance (and its successors together with BSPRT Loan and its successors, including BSPRT Loan, collectively, the "*Lenders*") is the current holder of the Delray Loan.

28.     While negotiating all three (3) Loan Agreements, Plaintiffs and Defendants were represented by independent and sophisticated legal counsel; indeed, each Loan Agreement states, "The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement, the Note, the Security Instrument and the other Loan Documents . . . ."[24]

### D. Plaintiffs Failed and Refused to Comply With The Financial Reporting Covenants Contained in Each Of The Loan Agreements They Signed.

29.     Each Loan Agreement required Plaintiffs to deliver annual financial statements prepared and reviewed by an independent CPA:[25]

> (b)     Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements prepared and reviewed by an independent certified public accountant acceptable to Lender (provided, however, that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower or the Property, the same shall, upon Lender's written request, be audited by such independent certified public accountant) in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, and operating expenses.

30.     Due to the constant turmoil surrounding Plaintiffs and their affiliates, the financial transparency required under the foregoing financial reporting covenants was a crucial part of Defendants' underwriting and agreement to lend almost $200 million to Plaintiffs and their affiliates in the course of the three (3) loans. Plaintiffs, who were at all times represented by

---

[23] Ex. 5.
[24] Ex. 1, § 15.15; Ex. 2, § 15.15; Ex. 4, § 15.15; Ex. 5, § 15.15.
[25] Ex. 1, § 4.12(b); Ex. 2, § 4.12(b); Ex. 4, § 4.12(b); Ex. 5, § 4.12(b).

sophisticated legal counsel, not once commented on this language, told Defendants they could not comply, or even asked for any relief from it.

31.     Plaintiffs and their affiliates failed to deliver the required financial reporting within ninety (90) days following the end of 2024 as required under Section 4.12(b) of each of the Loan Agreements.

32.     On April 3, April 7, and May 7, 2025, Defendants, through their loan servicers, gave notice to Walgreens Borrowers, Plaintiffs, and SS Delray (collectively, "***Borrowers***") that they failed to provide financial statements as required under Section 4.12(b) of the Loan Agreements.[26] On April 16, 2025, Borrowers responded, confirming that they did not provide financial statements in accordance with the Loan Agreements.[27] Instead, without even asking Defendants for approval to depart from the agreed-upon terms of the Loan Documents, Borrowers simply provided self-generated financial statements lacking any external validation. Not only do the financial statements delivered fail to comply with the requirements of they Loan Documents, but they also appear inconsistent with financial information dated March 2025 disseminated to Borrowers' shareholders as part of its ongoing governance fight. Borrowers also refused to provide a timeline for when such independently prepared and reviewed financial statements would be available.[28]

33.     Despite the unambiguous requirements of Section 4.12(b), which Borrowers never negotiated despite having three (3) opportunities to do so, after delivery of required notice by Lenders, Borrowers failed to cure their breach within the time provided under Section 10.1(n) of the Walgreens Loan Agreement and Section 10.1(k) of the other Loan Agreements.

34.     Under Section 10.1(n) of the Walgreens Loan Agreement and Section 10.1(k) of the other Loan Agreements, any failure to deliver financial reporting as required under Section 4.12(b) of

---

[26] Ex. 6.
[27] Ex. 7.
[28] *Id.*

the Loan Agreements becomes an automatic Event of Default if such failure continues for ten (10) business days after notice thereof:[29] Section 10.1(k)[30] of the other Loan Agreements provide:

**Section 10.1  Event of Default.**

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

. . .

(k)     if Borrower shall fail to deliver to Lender any financial reporting item required by this Agreement (including without limitation any of the items required by Section 4.12 hereof), on the date the same is due, and such failure continues for ten (10) Business Days after written notice thereof from Lender;

35.     Not only did Borrowers fail to provide the required financial reporting after Defendants provided the contractually obligated notice, but on April 16, 2025 Borrowers wrote a letter to Plaintiffs stating "[f]inancial statements prepared and reviewed by an independent certified public accountant . . . is futility [sic]", and stating that, while they were **still seeking** a replacement auditor, the estimated completion deadline for any *audits* was undetermined.[31] Plaintiffs' failure and refusal to provide the required financial reporting became an Event of Default under the Loan Agreements.[32]

36.     Upon the occurrence and during the continuance of an Event of Default, Section 7.8(c) of the Walgreens Loan Agreement, Exit Loan Agreement, and Delray Loan Agreement allows Defendants to apply funds held in reserve to the indebtedness thereunder:[33]

---

[29] Ex. 1, § 10.1(k); Ex. 2, § 10.1(k); Ex. 4, § 10.1(n); Ex. 5, § 10.1(k).
[30] Section 10.1(n) in the Walgreens Loan Agreement is identical to Sections 10.1(k) in the other Loan Agreements.
[31] *See* Ex. 7. Plaintiffs appear to misunderstand even their own obligations under the Loan Agreements, focusing on providing audits rather than independent CPA-prepared and reviewed financial statements. Regardless, Plaintiffs failed to timely provide the financial statements compliant with the Loan Agreements. *Id.*; *see also* Ex. 6.
[32] Ex. 1, § 10.1(k); Ex. 2, § 10.1(k); Ex. 4, § 10.1(n); Ex. 5, § 10.1(k); *see also* Ex. 6.
[33] Ex. 1, § 7.8(c); Ex. 4, § 7.8(c); Ex. 5, § 7.8(c).  This language appears in the Junior Loan Agreement in Section 7.2(c).  Ex. 2, § 7.2(c).

(c)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, (1) Lender shall have no obligation to disburse funds from any Reserve Account within the sixty (60) day period prior to the Maturity Date and (2) upon the occurrence and during the continuance of an Event of Default, without notice from Lender or Servicer (i) Borrower shall have no rights in respect of the Accounts, (ii) Lender may liquidate and transfer any amounts then invested in Permitted Investments pursuant to the applicable terms hereof to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (iii) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instrument, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

37.     Pursuant to Section 7.8(c) of the applicable Loan Agreements, Lenders exercised their right to apply reserve funds to Debt under the Loan Agreements.[34]

38.     Shortly after applying the funds on reserve, Defendants gave notice of such setoff, and an accounting of the application of the funds, to Borrowers.[35]

39.     In an effort to negotiate a resolution, Defendants offered to schedule a telephone conference with Plaintiffs and their counsel to discuss Borrowers' non-compliant financial statements after receiving Borrowers' April 16 letter. On May 24, 2025, the parties and their counsel attended the telephone conference, but Borrowers were entirely unprepared, bringing no plan or proposal to address their failures. Borrowers, instead, used this conference to discuss a request to fund a release of funds from reserve for a tenant improvement on a particular building, even though an Event of Default existed and such reserves had already been offset against the Debt. Defendants requested that Borrowers and their counsel provide a proposal.[36]

---

[34] Ex. 1, § 7.8(c); Ex. 4, § 7.8(c); Ex. 5, § 7.8(c); *see also* Ex. 6.
[35] Ex. 6.
[36] *Id.*

**40.**     During this time, Plaintiffs' behavior became more irrational and inappropriate. Gerald Haddock of SS REIT ("**Haddock**") verbally attacked Michael Comparato, Head of Real Estate of Benefit Street Partners ("**BSP**") and president of Defendants, on a phone call on February 11, 2025 in front of another lender and third parties.[37] On June 10, 2025, Defendants' counsel sent Plaintiffs' counsel a letter detailing Plaintiffs' inappropriate and unacceptable behavior and affording Borrowers another opportunity to resolve the Events of Default outstanding under the Loan Agreements (the "**June 10 Letter**").[38] Since the June 10 Letter, Borrowers have delivered three proposals; none of those proposals are acceptable, and Lenders are not obligated to accept any of them.

**41.**     Plaintiffs' failure to comply with SEC requirements is also telling here. On June 23, 2025, the SEC sent a letter to Plaintiffs stating that their May 29, 2025 Definitive Proxy Statement omitted required financial statements, thereby violating Securities Exchange Act Rule 14a-3(b).[39] *Plaintiffs could not even produce appropriate financial statements to their shareholders.*

**42.**     On the date the Amended Application will be heard, the Walgreens Loan will be in maturity default. The Delray Loan remains in default due to Plaintiffs' ongoing failure and refusal to provide compliant financial reporting. Plaintiffs remain in turmoil—with an ongoing corporate governance fight, no apparent path to repaying the Loans, and no realistic timeline for transparent financial reporting. Plaintiffs, by their own pleadings, admit that they are facing a shareholder meeting on August 29, 2025, at which time the current board of directors may be removed and replaced.

**43.**     Defendants have no obligation or appetite to permit the $66,985,686.47 still outstanding under the Walgreens Loan and Delray Loan to remain at risk, and certainly not to increase their loan balance by providing more money to a borrower in maturity default under a loan with over $50 million outstanding. The Court should not force Defendants to do so. All the actions taken by

---

[37] *See* Ex. 14.
[38] Ex. 14.
[39] Ex. 15.

Defendants have been strictly in accordance with the terms of the parties' negotiated Loan Agreements. The relief requested in the Amended Application should be denied.

## IV.    LEGAL STANDARD

**44.**    Texas law generally does not permit pre-judgment enforcement of a party's claims for relief, such as the injunctive relief sought by Plaintiffs in their Amended Application, except in restricted circumstances. *Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024).

**45.**    To obtain a temporary injunction, Plaintiffs must show: (1) a cause of action against the party to be enjoined; (2) a probable right to recover on that claim after a trial on the merits; and (3) a probable, imminent, and irreparable injury absent the temporary injunction. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). As discussed below, they cannot.

## V.    RESPONSE

### A.    Plaintiffs have failed to show a probable, imminent, and irreparable injury.

**46.**    To establish irreparable injury, Plaintiffs must show harm that cannot be compensated by money damages or measured with reasonable certainty. *Id.* The Walgreens Loan matures on August 9, 2025, at which point all amounts become immediately due.[40] Plaintiffs neither allege nor provide evidence that they can repay the Walgreens Loan at maturity. Because the Walgreens Loan represents the bulk of the debt and collateral, Plaintiffs cannot show any "probable, imminent, and irreparable injury" warranting injunctive relief.

**47.**    On the Walgreens Maturity Date, all the amounts outstanding under the Walgreens Loan will become immediately due and payable to Defendants. Nowhere in the Amended Application do Plaintiffs argue or advance any evidence suggesting that they are able to repay the Walgreens Loan by the Walgreens Maturity Date.

**48.**    With respect to the Walgreens Loan, which is composed of the vast majority of the funds and property in dispute, Plaintiffs have failed to show a "probable, imminent, and irreparable injury

---

[40] Ex. 4, § 1.1.

absent the temporary injunction," since the Walgreens Loan will have matured, and Plaintiffs will be entitled to commence foreclosure proceedings, in exactly the same manner as they would have prior to the date of the hearing on the Amended Application. *See id.* In any event, there is, with respect to the Walgreens Loan, effectively no harm or injury to Plaintiffs due to their failure to repay the Walgreens Loan on its maturity date.

49.     In addition, speculative fears of future harm are insufficient. *Morris v. Collins*, 881 S.W.2d 138, 140 (Tex. App.—Houston [1st Dist.] 1994, writ denied); *Mother & Unborn Baby Care of N. Tex., Inc. v. Doe*, 689 S.W.2d 336, 338 (Tex. App.—Fort Worth 1985, writ dism'd). Plaintiffs claim that unpaid operating expenses may harm tenant relationships and shareholder value,[41] but such alleged injuries are financial and readily compensable with money damages. *See Butnaru*, 84 S.W.3d at 204. Indeed, Plaintiffs' own filings confirm the monetary nature of the alleged harm. They request release of specific sums for operating expenses, and the amounts are clearly ascertainable.[42]

50.     Plaintiffs further speculate that unpaid operating expenses might lead to lease breaches, reputational losses, and harm to shareholder value but cite no specific lease terms, offer no affidavits from tenants or property managers indicating actual loss of goodwill or lease termination, and present no evidence substantiating any decrease in shareholder value.[43] Defendants' refusal to disburse funds from the reserve after Plaintiffs' default, to pay for foreseeable, routine, and non-emergent financial obligations like rent, utilities, and maintenance, does not constitute irreparable harm. Defendants have in no way blocked, precluded, or prohibited Plaintiffs from paying their vendors; Defendants have simply declined to allow Plaintiffs to use Defendants' collateral and loan proceeds under the defaulted Loans to do so. Plaintiffs, as owners of the properties, can—and presumably should—use their own funds to pay the operating expenses

---

[41] Am. Pet. ¶¶ 5.24–5.25, 5.43–5.45.
[42] *Id.* ¶¶ 9.4(a)–(g) (seeking the release of specific monetary amounts); *see also id.* ¶¶ 5.43 (listing specific amounts of property operating expenses).
[43] *Id.* ¶¶ 5.24–5.25, 5.43–5.45; *see also* Supp. App., Ex. 1, ¶ 46 at 10.

of their own properties, but in this case have chosen not to. The Court should not order Defendants to advance additional funds, including cash collateral (i.e., the funds in the accounts), to Plaintiffs. Absent evidence of probable, imminent, and irreparable injury, injunctive relief is unwarranted. *Id.*; *Doe*, 689 S.W.3d at 338. The Amended Application should be denied.

### B. Plaintiffs have failed to show a probable right to recovery on any of their claims.

51.    To establish a probable right to relief, the applicant must allege a cause of action and present evidence tending to sustain it. *Savering v. City of Mansfield*, 505 S.W.3d 33, 39 (Tex. App.—Fort Worth, 2016, no pet.). The evidence must be sufficient to raise "a bona fide issue as to the applicant's right to ultimate relief," meaning that the evidence needs to reasonably support the applicant's complaints under applicable law. *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (cleaned up). Plaintiffs fail to meet this standard because the evidence does not support their claims, and in many cases, their claims fail as a matter of law on their face.

52.    Putting aside the infirmities with each cause of action, which themselves are grounds for denial of a temporary injunction, each claim fails because Plaintiffs and Defendants are sophisticated commercial parties to negotiated commercial contracts, and Defendants at all times acted in accordance with their rights and obligations under those contracts. Defendants cannot and should not be held liable for exercising their remedies under the parties' agreements. The Amended Application should be denied.

### a. Fraud in a Real Estate Transaction.

53.    Plaintiffs allege statutory fraud under Texas Business and Commerce Code § 27.01, claiming that materials provided for the Walgreens transaction overstated property values.[44] What Defendants provided is wholly irrelevant.

54.    According to the Walgreens PSA:[45]

---

[44] Am. Pet. ¶ 6.1.
[45] Ex. 3, § 9.1 (emphasis added).

**EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND IN SELLER'S CLOSING DOCUMENTS, SELLERS MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY SELLERS TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. PURCHASER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED BY SELLERS TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY PURCHASER SHALL BE AT THE SOLE RISK OF PURCHASER, EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN.**

The clear and unequivocal disclaimer of reliance in this case conclusively negates Plaintiffs' allegations that they relied on materials provided by Defendants. ***Roxo Energy Co., LLC v. Baxsto, LLC*, 713 S.W.3d 404, 407–410 (Tex. 2025) ("[R]eliance upon an oral representation that is directly contradicted by the express unambiguous terms of a written agreement between the parties is not justified as a matter of law.")**; *Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228–29, 232–33 (Tex. 2019) (holding that provisions stating that, in entering into contract, party "is not relying upon any representation made by or on behalf of IBM that is not specified in the Agreement" and that parties are not "relying upon any representation that is not specified" in contract, clearly and unequivocally stated that parties were not relying upon representations other than those stated in contract).

55.     Plaintiffs' further suggestion that the Walgreens transaction was a condition for future financing is unsupported and refuted by the record. The acquisition was undertaken for Plaintiffs' own Section 1031 tax benefits—not to secure future lending.[46]

56.     Plaintiffs' statutory fraud claim fails for two other independent reasons.

> a. **No actionable misrepresentation.** Plaintiffs identify only vague "materials" provided by Defendants without identifying a single document that they actually believe was incorrect. Regardless, as stated above, Plaintiffs performed their own

---

[46] Am. Pet. ¶¶ 5.15–5.16; Ex. 4, § 6.2.

analysis and contractually disclaimed any reliance upon Defendants. Any calculation as to the properties' value would have been determined by Plaintiffs.

    b. **Merger clause and parol-evidence bar.** The Walgreens PSA states it is the parties' entire agreement and supersedes prior understandings.[47] Under Texas law, a valid integrated agreement precludes reliance on prior or contemporaneous representations. *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). As a result, "extrinsic evidence cannot alter the meaning of an unambiguous contract." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 170 (Tex. 2009).

57.    Lastly, the Walgreens PSA was negotiated at length over the span of weeks. Plaintiffs had, and took advantage of, ample opportunity to conduct due diligence on the Walgreens properties acquired. The parties engaged in extensive negotiations over the purchase price for the Walgreens properties, and Plaintiffs conducted substantial due diligence. At the outset, Defendants proposed to sell twenty-one (21) Walgreens properties, but after negotiations, SS REIT and Walgreens Borrowers agreed to purchase just sixteen (16) of them.  Moreover, the parties negotiated the price and related financing, with the price, loan terms and amount of equity required changing as Walgreens Borrowers conducted their diligence. When Walgreens announced its plans to close certain stores, Defendants and Walgreens Borrowers convened a phone call to discuss this announcement, which concluded with the First Amendment to Purchase and Sale Agreement dated July 1, 2024.[48] Under this amendment, SS REIT and Walgreens Borrowers required, and Defendants agreed to provide, a representation and warranty that Defendants had not received any communication from Walgreens regarding the closure of the stores to be sold, a fact that Walgreens Borrowers and SS REIT observed to Defendants may actually have enhanced the value of the Walgreens properties they intended to acquire. Plaintiffs and their affiliated Walgreens Borrowers

---

[47] Ex. 3, § 11.7.
[48] *See* Ex. 3.

conducted substantial due diligence on the stores, engaged in robust negotiations with Defendants over the acquisition and Walgreens Loan that resulted in changing of the terms and enhancement of the transaction for them, and were represented by sophisticated legal counsel. If Plaintiffs or their counsel made mistakes during due diligence or contract negotiations, they alone bear responsibility. Buyer's remorse is not grounds to enjoin a lender's exercise of remedies.

58.     Because Plaintiffs cannot show a legally or factually supportable statutory fraud claim, they have no probable right to recovery, and the Amended Application should be denied.

### b. Breach of Fiduciary Duty.

59.     Contrary to well-established Texas law, Plaintiffs allege that Defendants were their fiduciary at all material times because Defendants "retained possession and exclusive control" over Plaintiffs' cash reserves and "retained the exclusive right to approve every dollar spent."[49] Under Texas law, however, "[i]t is well settled that the relationship between a borrower and its lender is neither a fiduciary relationship, nor a special relationship." *Mfrs.' Hanover Tr. Co. v. Kingston Invs. Corp.*, 819 S.W.2d 607, 610 (Tex. App—Houston [1st Dist.] 1991, no writ); *see also 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Cap.*, 192 S.W.3d 20, 36 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("Generally, the relationship between a borrower and a lender is an arm's length business relationship in which both parties are looking out for their own interests.").

60.     A fiduciary relationship can arise only from a pre-existing relationship of trust and confidence, "prior to, and apart from, the agreement made the basis of the suit." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). Plaintiffs allege no such prior relationship.

61.     Plaintiffs' argument that Defendants were their fiduciary because they "retained possession and exclusive control" over cash reserves and "retained the exclusive right to approve every dollar spent," is an argument that lenders who, under Article 9 of the Uniform Commercial Code, perfect a security interest in accounts by control[50] are automatically fiduciaries. *See* Tex. Bus. & Com.

---

[49] Am. Pet. ¶ 6.6.

[50] Under Article 9, a lender's security interest in an account must perfected by control. Tex. Bus. & Com.

Code §§ 9.104, 9.313, 9.314 (rules governing perfection by control). Since security interests in various types of collateral must be perfected by control (*see id.*), the effect of such a rule would convert lenders into fiduciaries every time they perfect a security interest by control. That is not the law. *See Mfrs.' Hanover Tr. Co.*, 819 S.W.2d at 610 ("It is well settled that the relationship between a borrower and its lender is neither a fiduciary relationship, nor a special relationship."); *see also Lovell v. W. Nat. Life Ins. Co.*, 754 S.W.2d 298, 303 (Tex. App.—Amarillo 1988, writ denied) (holding that there is no fiduciary or special relationship between a mortgagor and mortgagee).

62.     Moreover, as would seem to be agreed to by Plaintiffs in their pleadings, Defendants did not determine "every bill to pay or not pay. . . ."[51] The Loan Agreements require Borrowers to deposit amounts into the Operating Expense Account pursuant to an Approved Annual Budget (each such term as defined in the Loan Agreements). Absent any Event of Default, those amounts are then disbursed to the Borrowers to pay expenses.[52] However, in the event the Borrower defaults, the Loan Agreements still do not preclude Plaintiffs from paying of expenses with funds that are not Defendants' collateral or otherwise proceeds of the Loans, nor have Plaintiffs alleged Defendants actually precluded any such payment (because they did not). Quite the contrary, Plaintiffs—who are the owners of the collateral properties—are obligated during the pendency of an Event of Default to pay the operating expenses of their own buildings with their own funds, and not with lender collateral or loan proceeds. Defendants were not and are not in control of Plaintiffs' business; they are simply exercising their remedies under their Loan Documents due to pending Events of Default. Plaintiffs are at all times entitled to call capital or pay funds out of pocket and spend it to repair their properties. Defendants have never obstructed that, nor do Plaintiffs even allege it. But Plaintiffs have chosen not to, instead preferring to charge Defendants for the upkeep of Plaintiffs' properties despite being in default under the Loans.

---

Code §§ 9.104, 9.313, 9.314 (rules governing perfection by control).
[51] Am. Pet. ¶ 5.23.
[52] *See* Ex. 1, § 7.5; Ex. 4, § 7.5; Ex. 5, § 7.5.

**63.** Lastly, Plaintiffs allege no facts and can present no evidence showing the parties had a special relationship existing prior to, and apart from, the Loan Agreements. All Plaintiffs allege is that they defaulted by failing to provide financial reporting required by three (3) separate Loan Agreements, so Defendants exercised remedies provided by Texas law and the parties' Loan Agreements. Without a pre-existing fiduciary relationship, Plaintiffs cannot establish a probable right to recover for breach of fiduciary duty.

### c. Conversion.

**64.** Plaintiffs cannot show a probable right to recovery on their conversion claim. To prevail, a plaintiff must show: (**1**) ownership or right to possession; (**2**) unlawful and unauthorized control by the defendant; (**3**) demand for return; and (**4**) refusal to return. *Apple Imps., Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, writ denied). Because the evidence does not reasonably support elements 1–2 for the reasons stated below, Plaintiffs cannot meet their burden here.

**65.** The evidence shows that Lenders had a contractual right to possess the reserve funds pursuant to Section 7.8(c) of the Walgreens Loan Agreement, Exit Loan Agreement, and Delray Loan Agreement.[53] These Loan Agreements specifically afford Lenders the rights to apply funds on reserve to the indebtedness after an Event of Default.[54] Further, the indebtedness under the Loan Agreements included interest,[55] default rate interest,[56] an exit fee,[57] and attorneys' fees.[58]

**66.** Article 9 likewise permits a secured party, after default, to apply deposit account balances to the secured obligations. *See* Tex. Bus. & Com. Code § 9.607(a)(1) ("If so agreed, and in any event after default, a secured party . . . may apply the balance of the deposit account to the

---

[53] Ex. 1, § 7.8(c); Ex. 4, § 7.8(c); Ex. 5, § 7.8(c).
[54] Ex. 1, § 7.8(c); Ex. 4, § 7.8(c); Ex. 5, § 7.8(c).
[55] *See* Ex. 1, § 2.5; Ex. 2, § 2.5; Ex. 4, § 2.5; Ex. 5, § 2.5.
[56] *See* Ex. 1, § 2.5(e); Ex. 2, § 2.5(e); Ex. 4, § 2.5(e); Ex. 5, § 2.5(e).
[57] *See* Ex. 1, § 2.10; Ex. 2, § 2.10.
[58] *See* Ex. 1, §§ 10.2(g), 15.9; Ex. 2, §§ 10.2(g), 15.9; Ex. 4, §§ 10.2(g), 15.9; Ex. 5, §§ 10.2(g), 15.9.

obligation secured by the deposit account . . . ."). Lenders' exercise of these agreed-upon remedies cannot constitute conversion because it was both contractually and statutorily authorized.

### d. Duress/Economic Duress.

68. Plaintiffs' theory of duress also fails. Duress and economic duress are affirmative defenses, not causes of action. *See Leibovitz v. Sequoia Real Est. Holdings, L.P.*, 465 S.W.3d 331, 349 (Tex. App.—Dallas 2015, no pet.) ("Economic duress is a defense to enforcement of a contract.") (citation omitted); Tex. R. Civ. P. 94 (listing duress as an affirmative defense).

68. Even if treated as a claim (which it is not), Plaintiffs offer no evidence of wrongful or unlawful conduct. Lenders merely exercised their express contractual rights under Section 7.8(c)[59] and statutory rights under Article 9[60] to apply reserve funds to Plaintiffs' debt upon an Event of Default. Such lawful conduct cannot constitute duress or economic duress.

### e. Declaratory Judgment.

69. Plaintiffs seek a declaration that **(a)** Section 4.12(b)'s [61] requirement that Borrowers furnish annual financial statements "prepared and reviewed by an independent CPA" is an impossibility; **(b)** Section 4.12(b)'s requirement that Borrower furnish annual financial statements "prepared and reviewed by an independent CPA" is not a material term; and **(c)** Defendants acted unreasonably in declaring default, charging amounts allowed by the loan documents, and exercising remedies allowed by the loan documents and Article 9.[62] Plaintiffs cannot establish a probable right to recovery because neither the evidence nor Texas law supports the claim. Notably, Defendants observe that, if Plaintiffs knew that providing independent CPA-prepared and reviewed financial statements was impossible at the time they executed the Loan Agreements, then Plaintiffs and their

---

[59] Ex. 1, § 7.8(c); Ex. 4, § 7.8(c); Ex. 5, § 7.8(c).

[60] Tex. Bus. & Com. Code § 9.607(a)(1)

[61] Plaintiffs' incorrectly state "Section 4.2," even though the "Books and Records" covenant is found at Section 4.12(b) of the Loan Agreements.

[62] *See* Am. Pet. ¶ 6.15.

principals have defrauded Defendants, claims which Defendants reserve the rights to assert as appropriate.

70. **Financial reporting under Section 4.12(b) is a required covenant, the failure of which gives rise to an Event of Default under the Loan Documents**. The parties entered into three separate, arm's-length Loan Agreements—each represented by independent counsel—requiring Borrowers to deliver CPA-prepared and reviewed financial statements.[63] Plaintiffs signed all three agreements after their CPA resigned, yet Plaintiffs never disclosed any inability to perform or conditioned their obligations on hiring a replacement CPA. Plaintiffs' failure to negotiate this term does not excuse them for performance of it. *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) ("[T]he law presumes that the party knows and accepts the contract terms.").

71. In a hearing before the Court on August 4, 2025, Plaintiffs argue that the financial reporting requirements in Section 4.12(b) are immaterial terms and, thus, Defendants should be precluded from calling an Event of Default due to their violation. But Plaintiffs fail to cite a single shred of authority for this proposition. Plaintiffs never negotiated—over the three (3) sets of Loans—any reasonableness or materiality thresholds applicable to these facts in Section 4.12(b). Moreover, Sections 10.1(k) and (n) of the applicable Loan Agreements make clear that Defendants may call an Event of Default after providing the contractually required notice, which Defendants provided. While Section 14.6 of the Loan Agreements states that Plaintiffs may seek injunctive relief for unreasonable lender actions, such a right is predicated on Defendants having an affirmative obligation under the documents or applicable law to act reasonably in the first place:

> **Section 14.6 Remedies of Borrower**. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Security Instrument, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

---

[63] Ex. 1, § 4.12(b); Ex. 2, § 4.12(b); Ex. 4, § 4.12(b); Ex. 5, § 4.12(b); Am. Pet. ¶¶ 5.11–5.13, 5.51.

But the Loan Agreements impose no reasonableness threshold upon Defendants' right to call an event of default in this scenario, and Plaintiffs cite no law that a lender's rights to enforce remedies must be reasonable. Indeed, such a requirement would substitute upon the lending industry a court's discretion in place of the lender's own discretion, which is simply not the law. The Loan Documents are absolute: if an event of default occurs for the failure to provide financial reporting after notice, Defendants can exercise remedies.

72.     Moreover, even putting aside Defendants' absolute rights to call an event of default, they have at all times acted reasonably. A component of Defendants' standard lending program is the requirement of financial disclosure. They only loaned to these Plaintiffs, which have been subject to a government investigation, bankruptcy, a corporate control fight, and a recent maturity default to a prior lender, among other things—upon the covenants negotiated and contained within the Loan Documents, which have been signed by Plaintiffs **three times**. Further, Plaintiffs' refusal to provide validated and transparent financial reporting, together with the apparent conflict between the reporting delivered to Defendants and the reporting disseminated to Plaintiffs' shareholders, raises additional specter of concerns. Plaintiffs owe approximately $67 million of debt to Defendants, and refusing to allow Defendants to exercise remedies in the face of the imminent maturity default under the Walgreens Loan and Plaintiffs' ongoing turmoil would deprive Defendants of the benefit of their bargain. Defendants have at all times acted reasonably, and the defaults caused by Plaintiffs' failure to deliver independent CPA-reviewed and prepared financial statements are material.

73.     **Plaintiffs undisputedly defaulted on Section 4.12(b).** Plaintiffs failed to provide the required CPA-prepared statements, **admitted** the noncompliance, and submitted only self-generated statements inconsistent with shareholder disclosures.[64] They refused to provide any timeline for compliance, and their default triggered automatic Events of Default under Section 10.1(n) of the Walgreens Loan Agreement and Section 10.1(k) of the other Loan Agreements.

---

[64] Am. Pet. ¶¶ 5.5, 5.37; Exs. 12, 13.

Under Section 7.8(c) of the Walgreens Loan Agreement, Exit Loan Agreement, and Delray Loan Agreement, Defendants were entitled to offset reserve funds against the loan balances.[65] Plaintiffs make numerous allegations that Defendants acted unreasonably. Courts, however, enforce contracts as written and will not rewrite them to add "reasonableness" where none exists. *In re Davenport*, 522 S.W.3d 452, 457–58 (Tex. 2017); *Est. of MacDonald v. Reeder Rd. Saf-T-Loc, LLC*, No. 05-16-00960-CV, 2017 WL 1427693, at *5 (Tex. App.—Dallas Apr. 19, 2017, no pet.).

74.    **The "impossibility" claim fails under Texas law.** Impossibility excuses performance only where it is caused by death/incapacity, destruction of the subject matter, or government regulation. *Tractebel Energy Mktg., Inc. v. E.I. Du Pont de Nemours & Co.*, 118 S.W.3d 60, 65 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). It does not apply to foreseeable or self-created difficulties. *United Sales Co. v. Curtis Peanut Co.*, 302 S.W.2d 763, 766 (Tex. App.—Dallas 1957, writ ref'd n.r.e.); *Stafford v. S. Vanity Mag., Inc.*, 231 S.W.3d 530 (Tex. App.—Dallas 2007, pet. denied). Plaintiffs knew their CPA had resigned before signing all three Loan Agreements, chose not to retain a replacement, and unconditionally assumed the risk of nonperformance. Self-created impossibility cannot excuse default. *Ellwood v. Nutex Oil Co.*, 148 S.W.2d 862, 864 (Tex. App.—El Paso 1941, writ ref'd); *United Sales Co. v. Curtis Peanut Co.*, 302 S.W.2d 763, 766 (Tex. App.—Dallas 1957, writ ref'd n.r.e.) ("[I]mpossibility of performance arising after the contract is made is not an excuse for nonperformance where it might reasonably have been anticipated or foreseen and guarded against in the contract.").

75.    **Declaratory relief is procedurally improper.** Plaintiffs' requests merely mirror potential defenses to contract enforcement and seek advisory opinions rather than resolution of a justiciable controversy. The Declaratory Judgments Act cannot be used to obtain premature rulings on defenses or to adjudicate contract claims piecemeal. *Transcontinental Realty Investors, Inc. v. Orix Capital Mkts., LLC*, 353 S.W.3d 241, 244–46 (Tex. App.—Dallas 2011, pet. denied).

---

[65] Ex. 1, §§ 4.12(b), 7.8(c), 10.1(k); Ex. 2, §§ 4.12(b), 10.1(k); Ex. 4, §§ 4.12(b), 7.8(c), 10.1(n); Ex. 5, §§ 4.12(b), 7.8(c), 10.1(k).

**76.** In summary, Plaintiffs knowingly assumed the obligations in Section 4.12(b), failed to perform, and triggered Events of Default. Their declaratory judgment claims are both meritless and procedurally improper.

## VI.   BOND

**77.** Texas Rule of Civil Procedure 684 requires that in an order granting a temporary restraining order, the Court must fix the amount of security to be given by the applicant. Tex. R. Civ. P. 684. The purpose of the bond is "to protect the defendant from the harm he may sustain as a result of temporary relief granted upon the reduced showing required of the injunction plaintiff, pending full consideration of all issues." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990). Accordingly, if the Court is inclined to grant any of Plaintiffs' requested relief (which it should not), Defendants respectfully request that the Court require Plaintiffs to post an $8 million bond in accordance with Texas Rule of Civil Procedure 684.

## VII.   CONCLUSION AND PRAYER

**78.** Plaintiffs are not entitled to a temporary injunction because they have failed to show a probable right to recover on any of their claims and have failed to show a probable, imminent, and irreparable injury. Defendants respectfully request that the Court deny the Amended Application and award Defendants such other and further relief, at law and in equity, to which it may show itself justly entitled.

Respectfully submitted,

By: /s/ Jacob Sparks

**Jacob Sparks**
Texas Bar No. 24066126
Email: Jacob.Sparks@NelsonMullins.com

**Brent T. Buyse**
Texas Bar No. 24105567
Email: Brent.Buyse@NelsonMullins.com

**Xenna K. Davis**
Texas Bar No. 24132037
Email: Xenna.Davis@NelsonMullins.com

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
5830 Granite Parkway, Suite 1000
Plano, Texas 75024
Tel: (469) 484-4758
Fax: (469) 828-7217

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 7, 2025, a true and correct copy of the foregoing document was served in accordance with Texas Rule of Civil Procedure 21a via electronic filing.

By: */s/ Jacob Sparks*
**JACOB SPARKS**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Walter Taylor on behalf of Walter Taylor
Bar No. 19727030
taylorlawfirmdfw@gmail.com
Envelope ID: 104384235
Filing Code Description: Original Proceeding Petition
Filing Description: 2025.08.14 Petition for Writ of Mandamus
Status as of 8/14/2025 1:56 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brian Stagner | | BCDivision8B@txcourts.gov | 8/14/2025 1:41:19 PM | SENT |
| Xenna Davis | | Xenna.Davis@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Xenna Davis | | Xenna.Davis@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Xenna Davis | | Xenna.Davis@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Brent Buyse | | Brent.Buyse@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Brent Buyse | | Brent.Buyse@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Brent Buyse | | Brent.Buyse@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Jacob Sparks | | Jacob.Sparks@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Jacob Sparks | | Jacob.Sparks@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Jacob Sparks | | Jacob.Sparks@NelsonMullins.com | 8/14/2025 1:41:19 PM | SENT |
| Walter Taylor | | taylorlawfirmdfw@gmail.com | 8/14/2025 1:41:19 PM | SENT |
| Walter Taylor | | taylorlawfirmdfw@gmail.com | 8/14/2025 1:41:19 PM | SENT |
| Walter Taylor | | taylorlawfirmdfw@gmail.com | 8/14/2025 1:41:19 PM | SENT |
| Walter Taylor | | taylorlawfirmdfw@gmail.com | 8/14/2025 1:41:19 PM | SENT |